# APPENDIX 3B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

       v.                                  CRIMINAL ACTION
                                              92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

----------------------------------------
                    VOLUME XIX

                February 9, 1993
                Richmond, Virginia
                   10:07 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                   JEFFREY B. KULL
               OFFICIAL COURT REPORTER

                P-R-O-C-E-E-D-I-N-G-S
        (In Chambers.)
            MR. VICK:  I just wanted a minute with you

on scheduling again.  Assuming that we are through with David's presentation of evidence Thursday around 3 o'clock, I am ready, the government will be ready to go ahead with its closing if the Court wants.  I wanted to strongly suggest, and I think we are fairly united on this, that if we do closings Friday morning or Friday, instruct the jury, and keep them going. We had heard that there is some thought about letting the jury go and coming back Monday morning.  And I'm very strongly of the opinion and would suggest that we keep going, and I think that's a fairly united front.

MR. BAUGH:  I don't want to argue Thursday evening.  Friday morning is one thing.  But I do not want to come right out of my case and go straight into argument on the death penalty.

THE COURT:  All right.  What else do you need?

MR. BAUGH:  You might want to admonish the jury not to pick it up.  There is a lot of interviews and a lot of stuff not in evidence, referring to the Style Magazine Weekly, February 9th, 1993.

3414

MR. GEARY:  I have two motions to make on behalf of the defendant Tipton.  The first deals with the article that appeared on the front page of the Times Dispatch on Saturday, January 23rd which the Court voir dired the jury about January 26th.  Two jurors said they remembered it.  One was excused for cause.  The article dealt with Detectives Leonard and Woody being shot at on January 2nd as they went to get a protected witness on the East End.  Mr. Seward testified he had overhead a jail conversation, a telephone call from Mr. Tipton to someone about killing Detective Woody.  Mr. McGarvey informed me that while that testimony was going on, he observed Mr. Edward Cooke's reaction.  At this point, Mr. Edward Cooke has now put the newspaper article together with Seward's testimony that Tipton, in effect, could have ordered or had something to do with the shooting of Detective Woody.  He is the only one of the 12 as far as we know that has that connective information.  On behalf of defendant Tipton, since we have three alternates, I would move to dismiss him for cause at this point.

MR. BAUGH:  We join.

MR. COOLEY:  Also.

THE COURT:  Motion denied.

3415

MR. GEARY:  You indicated in the trial a seating situation before we started.  This is, in effect, defendant Tipton's day, and I would ask the Court since there hasn't been any problem that I am aware of with the defendants during the courtroom

proceedings, that defendant Tipton be able to take Mr. White's chair at the table.

THE COURT: You can ask the Marshals. If they say no, it will be no. I'll bring them in and ask them and let you know. As far as the scheduling point, I don't have any problem with it. We will try to get finished with all of the arguments and instructions on Friday, and I'll keep them if that's what you want.

MR. WHITE: For your edification, as far as the schedule today, my opening remarks are intended to be fairly brief. I'm going to be following with two witnesses that I hope we can do this morning. I have three that we would like to do this afternoon.

THE COURT: It is your day. Any way you want to do it.

MR. VICK: Unless he spits at me in opening, I'm going to sit on my hands.

MR. GEARY: I offer this as an appellate exhibit. 123. This is the newspaper article.

3416

(Recess taken at 10:10 a.m.)

(Ed Newman entered chambers.)

THE COURT: Ed, these folks have requested that on the day that they make their mitigation presentations, each defendant be allowed to sit up at the table. That is, today Tipton would take the place where Eric White is sitting. Is that all right?

THE MARSHAL: That's fine. No problem.

THE COURT: All right.

THE MARSHAL: Anything else about sequestering?

THE COURT: The way it looks now, we will get into arguments and instructions on Friday, and we are going to keep them.

THE MARSHAL: From Friday on?

THE COURT: From Friday on. So I'll tell them probably tomorrow to bring stuff to get them through three or four days, I guess. So we will keep them. I guess if I keep them on Friday, I'm going to let them deliberate on Saturday. That means we are going to have some presence here in the Court.

THE MARSHAL: I'll start making arrangements.

THE CLERK: Deliberate on Sunday as well?

3417

THE COURT: No, I'll give them -- we will take Sunday off. But they will have decided by Sunday.

THE CLERK: They still be in the hotel Sunday, though?

THE COURT: Yes, until we return the verdict, which would be Monday. Okay? All right.

Tell Bob Geary and Eric White that they can have Tipton move up to White's seat. Just one per day. The rest of them sit back there where we can watch them.

(Recess taken from 10:13 a.m. to 10:15 a.m.)

(In Open Court.)

(Style Weekly article accepted as an exhibit, Tipton Exhibit 491.

THE CLERK: Case Number 92CV68: United States of America versus Richard Tipton, Cory Johnson, and James H. Roane, Jr., the nineteenth day of trial. Are counsel ready to proceed?

MR. VICK: Government is ready.

MR. GEARY: Ready.

MR. COOLEY: Ready, Your Honor.

MR. BAUGH: Defendant Roane is ready, Your Honor.

THE COURT: All right. Bring in the jury.

(The jury entered the courtroom.)

THE COURT: Good morning to you again, ladies and gentlemen. Before we get started today, as I've explained to you, we are going to have mitigation from one of the defendants. Mr. Tipton's counsel will be putting on mitigation information today. But I wanted to say this before we get started. The February 9th issue of Style Weekly just hit the newsstands, and there is some extensive coverage about this particular trial. I just want to urge you all, don't pick it up, don't read it, don't even think about looking at that particular issue. Just do that for me, please.

All right. Mr. White?

MR. WHITE: Thank you, Your Honor. Good morning, ladies and gentlemen. Richard Tipton, III was born in Richmond, Virginia in 1970. He was born to the relationship of Richard Redfield Tipton, Jr. of Richmond, Virginia, and Charlene Wilkerson, who lived in New York City. They met while Charlene Wilkerson was visiting relatives here in Richmond. They had married a few years before. Charlene had conceived, gotten pregnant, miscarried her first child after an incident of spousal abuse. She delivered a baby which was at the time diagnosed as being cyanotic. Cyanosis is a condition which occurs as a result of drug use and drug abuse by a pregnant mother, among other things. The relationship between Richard Redfield Tipton, Jr. and Charlene Wilkerson was one marked by drug abuse and drug addiction, as well as by physical violence.

Shortly after Richard Tipton was born, there was an act of violence that you will hear about which caused Charlene Tipton, his mother, to take her

children, Richard and Martrice, back to New York to live with her mother, Catherine Wilkerson. This was at approximately age two when Charlene, Martrice and Richard moved in with Catherine Wilkerson. That is where her family was. At the time she was living in Upper Manhattan with her husband, Henry, Charlene's brother Jerry, her brother Anthony, his wife Joyce and their three children.

When Charlene Tipton arrived in New York with her family, she tried very hard to kick a drug habit that had plagued her ever since the time she was 15, 16 years old. She had been using heroin regularly, using cocaine, smoking pot, and consuming alcohol. Shortly after her arrival in New York City, ladies and gentlemen, a trauma shook the Wilkerson household. Charlene's brother, Jerry, who was under medication for depression, was seeking some support and assistance from family members. Because the family members did not take it as seriously as they could have or should have, Jerry Wilkerson shot himself in the home of Catherine Wilkerson in full view of Catherine Wilkerson, Charlene Tipton and Joyce Wilkerson, shot himself with a shotgun. Manny was about three years old at the time. Manny, as I will often refer to him during the course of the day, is a nickname that Richard Tipton got when he was a small child. It came from names that he was called by his grandfather, Henry, and by his mother. It flowed from their characterization of him as the little man of the house.

After Jerry's death in 1973, Charlene Tipton basically fell off the wagon. She entered into a period of heavy drug addiction, primarily heroin and cocaine, that lasted for approximately the next 20 years. Within a year or two after Jerry's death, she met a man named James Carson. James' nickname was "Pimp." "Pimp" lived around the corner from the Wilkerson household. You will hear that her relationship with him was basically a reign of terror when it came to their children: drug addiction like they had never seen before, violence like they had never seen before on a regular, weekly serious basis. For Manny, life was complicated by a series of very serious illnesses, including hospitalizations: high fevers, problems with hearing. At age four he was hit by a car. At age seven he was run over by a truck, hospitalized, and as you will hear, left alone for long periods of time in the hospital. Serious problems in school also marked this period in Manny's life. The evidence will show, ladies and gentlemen, that there was very little positive in Richard Tipton's life. He had a

good relationship with his grandfather, Henry, but there was very little room for him at the Wilkerson household. Manny's uncle, Anthony, his wife Joyce, and three children, were living with them at the time. There was no other room. You will hear about the apartment that "Pimp" and Charlene had. It was a one-bedroom apartment right around the corner where Manny and his sister basically shared as a bedroom what amounted to a walk-in closet.

You will hear about the drug use in the presence of children. You will hear about the violence in the presence of children. And you will hear how they responded and reacted along with the rest of the family.

In 1978, when Manny was seven years old, the second grade was concerned about his behavior and his progress. They contacted his mother, they contacted Social Services, and they requested an evaluation because of fights, very aggressive behavior, and very poor schoolwork. In April of 1978, Charlene Tipton got around to taking her son, Manny, to the Child Psychiatric Crisis Clinic in New York City. Richard was brought in by his mother, Charlene, where he is making a poor adjustment to second grade, having been transferred to this new school the past two weeks ago. The parents separated in 1970. The mother is verbal, cooperative, overanxious. She seems to have a loving and positive attachment to him, but is aware that she is inconsistent in disciplining him, structuring him, and finds him unresponsive to her until she threatens him or gets angry. She notes that he tends to behave like the man of the house and is very protective of her.

Richard has a history of being excessively accident-prone. In the past few years he has had major injuries. At age four he was hit by a car. Last summer he was run over by a truck and hospitalized for three weeks. After discharge, he fell while running with a bottle and cut his hand.

He has never seriously hurt anyone else, told her he is very bright and can hold a difficult conversations. Richard is an attractive seven-year-old, very engaging and alert, who appears spontaneously verbal and very imaginative. He denies suicidal or homicidal thoughts, but does complain that it is sometimes hard to fall asleep, and he has bad dreams about monsters. He describes himself as smart and happy. He says his mother and father love him very much. He wants to be an artist when he grows up because policemen get hurt.

Richard has a variety of fears, particularly of monsters and spooky places, such as the basement of

his apartment building.  At night he imagines streetlights in his eyes and is very sensitive to noises in the environment.  He watches TV a great deal and cannot really distinguish his own imagination from voices around him.  He likes school, and projects all the blame for fights onto his peers, who he claims pick on him, kick him, and bother him.  He likes his teacher, but admits that he does get into a lot of fights which he cannot control.  When he fights he is physically as well as verbally abusive and aggressive.

The clinicians after taking this history from Charlene and her son, called the school guidance counselor.  They were very cooperative.  Richard cannot read at all.  He is academically far behind the grade level.  He does appear to be a bright child, but has learned virtually nothing.  The school which transferred him was rather chaotic.  When he gets into arguments he curses and hits violently, and is very rough for a child his age and can easily frighten and bully his peers.  His bravado may partially represent a response to academic failure, but the school does not consider him an emergency problem at the time.  Impressions and recommendations:  Conduct disorder, hyperactivity, learning disability.

Now, while a conference was held on June 22nd of 1978 and the plan was to refer Manny to Dr. Greenhill to assess his need for medication for his distractability.  Dr. Greenhill was contacted and has no record of any follow-up.

And, ladies and gentlemen, Richard Tipton, who could not read and who had learned virtually nothing, passed the second grade.  The next six years, from 1978 to 1984, were marked by another series of illnesses, high fevers, ear infections, resulting in hearing loss which further interfered with his schooling.  The dysfunction at home continued.  In 1980, his sister, Martrice, could no longer stay at "Pimp" and Charlene's and she was able to find space.  Manny hit the streets.  Between 1984 and 1986, he contacted the Covenant House in New York City.  It was basically a shelter for kids who were on the streets or who had run away from home.  Unfortunately, the workers there were taken in by Charlene's story that Manny simply didn't want to be around the house because she had put him on restriction for bringing home bad grades.  This happened twice, and finally, in 1986, Manny moved to Virginia, first to live with his uncle, Vincent, but that didn't work out because uncle Vincent, Richard Tipton's paternal uncle, was told by the paternal

grandmother, Ruby, be careful with Manny. He grew up on the streets of New York. Vincent gave up on him and Manny moved in with Brenda Williams. Brenda Williams was a woman who you will hear from later on today who took up a relationship with his father and had a child by him. And in 1986 Manny moved in to live with her. And you will hear what she has to say and how he responded to her.

In 1987, approximately six months after Manny had moved in with Brenda Williams, he felt as though

3426

he had become a burden on her. They were very poor. She had two other children to support. She was barely getting by herself. He told her, "I have to leave." And he hit the streets again. By 1987, as you have heard, his relationship with people like Maurice Saunders, "May-May," Hussone Jones, Antwoine Brooks, had solidified to the point where he could now support himself on the streets.

Ladies and gentlemen, your decision this week as it relates to Richard Tipton is based in large part on your consideration of what you have come to know as aggravating and mitigating factors. The aggravating factors are those which tend to support the imposition of the death penalty. Those mitigating factors are those that suggest that life without any possibility of release or parole is a just disposition of his case. As you have been told, there are two kinds of aggravators, statutory and non-statutory. The government as well as the Judge has told you about the classes. But we are here today to talk about mitigators, those factors in Richard Tipton's life which we believe the evidence will show mitigate against the imposition of the death penalty.

There are basically two kinds of mitigators.

3427

There are those which are set forth in the statute which controls this case. There is a broad range of mitigators, and they range from his mental state and the extent of his involvement in a particular crime, to any factor in his, quote, background or character which mitigate against the death penalty, close quote. There are also non-statutory mitigating factors. These include factors which we feel are proven by a preponderance of the evidence, but which are not included in the statute. And those which you, as jurors, sitting in judgment of Richard Tipton, are able to identify on your own. And remember, ladies and gentlemen, you are never required, regardless of your findings on aggravating and mitigating factors, to impose the death penalty.

Now, the mitigating factors which we will ask you to consider include the following: Richard

Tipton was youthful at the time of his involvement in these offenses. He did not have a significant prior criminal record. Another person equally culpable in some of these offenses will not be punishable by death, and we speak specifically of Jerry Gaiters in connection with the Church Hill killings. Richard Tipton will be sentenced to life in prison without any possibility of parole if he is not executed.

3428

Richard Tipton was subjected to emotional and physical abuse and to neglect when he was a child. He suffers from learning and hyperactivity disorders which went untreated as a child. He has a history of birth complications, illness, disease, head injury, brain dysfunction, which has affected his ability to function, as well as his ability to think. His capacity to conform his conduct to the requirements of the law was impaired, regardless of whether you find that that capacity is a defense to these charges, and obviously you have found that it is not a defense. But you are still entitled to view his capacity, what he has learned, his environment, how he was brought up, how it affected the way in which he thought and looked at his actions. He was introduced to addictive drugs and alcohol at an early age. He is impulsive and impaired in thinking about the consequences of his actions and adjusting his thinking to changing events.

In proving these mitigating factors, we will offer the testimony of a number of individuals. First will be Tina Wilkerson. She is 30 years old. She is Manny's first cousin on her mother's side. She was one who lived in the household of Catherine and Henry Wilkerson in New York City. She is one who

3429

observed on a regular basis the actions of Charlene Tipton and of James "Pimp" Carson and the consequences that they had on Manny and his sister, Martrice.

Second will be Hans Selvog, a licensed clinical social worker. Mr. Selvog has been involved as a social worker in this case for the past eight months. He has had occasion to conduct extensive interviews of all the family members, gather, collect, review various records, hospital records, school records, Covenant House records, and the like.

Next will be a pediatrician with 25 years of experience who, while he has never interviewed or examined Manny personally, has seen the social history report.

Ladies and gentlemen, this is the social history report prepared by Mr. Selvog. (Document displayed.) It is complete with all the records that we have been

able to uncover. This is something that will be introduced into evidence. This is something that we hope you will take the time to review before you make a decision about Richard Tipton. The pediatrician has reviewed that, as well as the results of a neuropsychological examination conducted on Mr.

3430

Tipton. And he will tell you about his diagnosis regarding learning disability, regarding personality problems, regarding how these kinds of problems can translate into behavior.

And next you will hear from a neuropsychologist, James Evans, who actually conducted the neuropsychological examination. He will tell you about the tests that he conducted on Richard Tipton. He will tell you about the results. He will tell you about the physiological basis for his findings, as well as what those findings mean in terms of his conduct.

And finally, ladies and gentlemen, we will offer to you the testimony of Brenda Williams, who will tell you about where Manny was in life at age 16, what he was doing, how he was acting towards her, what the status of his relationship was with his father.

Ladies and gentlemen, I want to apologize in advance for any gaps or pauses or other interruptions that you may notice or perceive in the presentation of this case in mitigation for Mr. Tipton. As I'm sure you can imagine, putting together the life story of someone whose life is marked by such transience and dysfunctions can be a difficult task. But please

3431

understand this. We are not suggesting that the evidence will prove that Richard Tipton is a victim of circumstances. The evidence here today, ladies and gentlemen, is offered to educate you as to what Richard Tipton is all about. It is offered to educate you as to his life, and hopefully give you a little insight into his life. The evidence that has been presented by the government has proven beyond a reasonable doubt that Richard Tipton was guilty of capital offenses, crimes, terrible and horrible.

The evidence is not offered to change those crimes. It is not offered to sweep them under the rug. It is not offered to make you forget them or pretend as though they did not occur. Our evidence simply is presented to give you that insight into the person whose life sits in your hands.

We hope to show you that there are factors in his life, some which he may have control over, some which he may not, which mitigate against the imposition of the death penalty.

Ladies and gentlemen, you have been urged over

and over again for the past few weeks to do your job.  Your consideration at the guilt phase in my mind shows that you have the capacity to do that job.  You have three more things to do.  First, you

3432

must determine whether or not you have the legal authority to impose the death sentence on Richard Tipton.  You do that by finding beyond a reasonable doubt, unanimously, the aggravating factors that have been presented by the government.

Secondly, you have to determine, after consideration of mitigating factors, whether there are any reasons, whether there are any factors why life without the possibility of parole, while life without any possibility of release, is a more just sentence for Richard Tipton.

And finally, after you have made those determinations, after you have considered all the factors, based on those findings, or regardless of those findings, you have to make that choice: life or death.

Ladies and gentlemen, I want to remind you that in your consideration of mitigating factors, you act as individuals.  Your collective actions as they relate to this penalty phase are to unanimously find aggravating factors if that is possible, and to unanimously vote in favor of the death penalty.  Individually, any of you can find a mitigating factor regardless of whether you are joined by your fellow jurors.  Individually, you are free to consider any

3433

reason in your own mind why Richard Tipton should not receive the death penalty.  Individually, each and every one of you has the power.

THE COURT:  Call your first witness, please.

MR. WHITE:  I call Tina Wilkerson, Your Honor.

TINA WILKERSON,
called as a witness by and on behalf of defendant Tipton, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WHITE:

Q    Good morning.

A    Good morning.

Q    Would you please state your name for these ladies and gentlemen of the jury?

A    My name is Bettina Wilkerson.

Q    How old are you?

A    32.

Q    Where do you currently live?

A    In New York City.

Q    And where in New York City do you live?

A    Washington Heights.
Q    Whereabouts in the city, which of the five

3434

boroughs is that located in?
A    Manhattan.
Q    Who do you live with?
A    I live with my grandmother and my mother and
father and my aunt.
Q    And you work for a living?
A    Yes.
Q    Tell the ladies and gentlemen of the jury what
you do.
A    I'm a customer service trainer, customer contact
skills for Time-Warner Communications in New York,
and I have been there for about six years.
Q    High school graduate?
A    Yes.
Q    Addicted to any drugs?
A    No.
Q    Ever been convicted of a felony?
A    No.
Q    Do you know this man here in the blue shirt?
A    Yes, I do.
Q    What's his name?
A    Richard Tipton.  I call him Manny.
Q    Who is Catherine Wilkerson?
A    That's my grandmother.
Q    How old is she now?

3435

A    Good question.  I don't know.  I guess she is in
her 70's, I think.
Q    And who is Charlene Tipton?
A    That's my cousin Manny's mother.  That's my
aunt.
Q    And she lives with you now?
A    Yes, she does.
Q    How about Martrice?
A    Martrice is my cousin.  That's Charlene's
daughter.
Q    Where does she live?
A    Queens.
Q    She has a child?
A    Yes, Eric.
Q    Who is Nicole?
A    Martrice's sister and Manny's sister.
Q    Where does she live?
A    Downstairs from my grandmother.
Q    Did you ever come to meet a man by the name of
James Carson?
A    Yes.  We call him "Pimp."
Q    How did you come to know him?
A    He is Nicole's father and he lived with my aunt.
That was my aunt's fiance', husband, whatever you
want to call him.

3436

Q    Is he still alive?
A    No, he is dead.
Q    Did you ever meet Manny's father?
A    Richard?  Yes.
Q    Tell the ladies and gentlemen of the jury when you met Richard.
A    I met Richard a long time ago down in Virginia. And he used to beat my aunt a lot.
Q    Did you ever observe any of those beatings?
A    Yes, I did.  I came down here to Richmond to stay with my aunt.  And my aunt, you know, rocks.  My brother rocks, too.  My aunt used to rock herself to sleep.  And that annoyed him one day, and he started beating her.  And we were all sleeping in the same bed except they were in another room, and he chased her into the bedroom where we were sleeping and he punched her in the face.  And my aunt asked me to go get some help and he said, "Tina is not going to help you."  And at that point -- it was a house.  And I got out the bed and climbed over the balcony and just -- because it wasn't that far of a drop -- and dropped down to the grass and went to the neighbors' house underneath and knocked on the door and asked them if they would call the police.  And she did and they came and got him.

3437

Q    Was Manny around at that point?
A    He was a baby, I believe.
Q    Was he in the same bedroom?
A    All of us were in the same bedroom.
Q    Do you recall a point in time when Charlene and Manny and Martrice moved back to New York?
A    Vaguely, uh-huh.
Q    Do you recall about when that was?
A    I had been living, we moved our house when I was about ten and-a-half.  It was Halloween.  I think Manny was about two years later about, I think.
Q    You would have been, in 1970, you would have been ten years old?
A    Yes.
Q    So around 1972 or so?
A    Yes.
Q    Now, when Manny and Charlene and Martrice moved to New York, where did they come to live?
A    They lived where I live now on the second floor.  It is like a two-family house, but it has three floors and a basement.  And they lived on the floor that I live on.
Q    Now, tell the ladies and gentlemen of the jury who Jerry Wilkerson was.
A    That's my father and Charlene's brother, and he

3438

killed himself.

Q    And do you recall when that was?
A    I think I was in my teens.  I remember that.
Like my mid-teens, about 15, 16 years old, somewhere
in there.
Q    Where did that occur?
A    In our house, in the basement.  I wasn't there.
But my grandmother and Charlene and my mother and
Manny was there.  And he shot himself with, I think,
a 12-gauge shotgun in the heart.
Q    Do you recall how soon  --  well, prior to
Jerry's death, was it before or after Jerry's death
that Charlene took up a relationship with "Pimp?"
A    No, I don't remember how long that time span
was.
Q    Where did "Pimp" live?
A    "Pimp" originally lived around the corner, but
when they got together they both moved on to 178th
Street, which is  --  you know, in my neighborhood,
there is a highway.  There is no buildings on the
other side of the street.  So there is just always
trucks and stuff.  So they lived on 178th Street and
we lived on 179th Street, but you can clearly see
where they lived.
Q    Did you ever have occasion to visit that

3439

apartment where "Pimp" and Charlene lived?
A    Yes.
Q    Who was living there at the time?
A    "Pimp," Charlene, Manny, Martrice, and Nicole.
And on occasion, they had other people that kind of
stayed there.
Q    Do you recall how many bedrooms they had?
A    They had one bedroom, and I guess you can just
say like an over-sized closet, maybe about the size
of two of these boxes here that I am sitting in.
Q    Who stayed in that room?
A    Most of the time, Manny did.  And I think
Martrice and Nicole basically slept in the living
room, or sometimes they would all be in that room.
It was like kind of like a bed.
Q    Do you ever recall any drug activity with "Pimp"
and Charlene in that time frame?
A    Yes.  They were addicted to drugs.  So they were
for the most part always pretty high.  Charlene, when
Charlene didn't live in New York she didn't use any
drugs.  Then when she came down here to Virginia and
met my uncle Richard, and he was in Vietnam, he came
back a heroin addict from the war and introduced her
to drugs.  And so when she came back to New York and
met "Pimp," it was just a continual type of thing.

3440

She was just high at that point.
Q    Do you know what kind of drugs she was using?
A    She was shooting some heroin.

Q    Have you ever heard the phrase "nod" before?
A    Yes.
Q    Tell the ladies and gentlemen of the jury what that means to you.
A    You know, you see a lot of drug-addicted people in New York, and a lot of people use heroin.  And generally, if you are having a conversation with someone who nods out on you, they can be in the middle of the conversation and all of a sudden just kind of  --  seems like never hit the ground, and then snap out of it.  So a lot of that went on in this way.
Q    Charlene, did you ever see Charlene actually overdose from heroin?
A    Yes.  And my parents had to walk her around the room I sleep in now.  Had to walk her around a lot.  And that's for me when I really understood, I guess, what overdosing meant and the procedures.  It was like something that you kind of saw in the movies, but you never really had to experience it, and then I saw her do that.
Q    How often would you see Charlene and Manny on a regular week?
A    Them coming over, mostly every day.  About five out of the seven days.
Q    How often would it be your impression that they were high on drugs?
A    Practically every day, from my perspective.
Q    What kind of condition did they keep their apartment in?
A    Well, the laundry didn't get done a lot.  You know, it would just kind of pile up and pile up.  It wasn't the greatest.  I mean, if you were going to compare my house and their house, it was two different worlds, even though we were all one family.
Q    How did "Pimp" and Charlene support themselves in that habit to the best of your knowledge?
A    They would sell like food stamps and stuff, you know, the monies you get for welfare.
Q    Also ever try to bum off other family members?
A    Yes, my aunt a lot.
Q    Tina, did you ever see -- was there a violent side to "Pimp" and Charlene's relationship?
A    Yes.
Q    Could you please describe that for the ladies and gentlemen of the jury?
A    One time "Pimp" beat Charlene with a bat and she had to be put in the hospital.  Another time he punched her in the face.  Charlene was always getting beaten.  Just it was just kind of a regular thing for her.  And she used to get beat a lot.

Q    Did any other family members try to intercede or do something about it?

A    Yes.  The time when I was younger, my father and my uncle Jerry, when he was alive, I remember them coming down to Virginia one time when she was with Manny's father Richard, and they drove down here to kind of intercede and try to find out why he was beating her.  And when they moved up and she was living with "Pimp," one of us sometimes would go over there, sometimes Manny would come over or sometimes Martrice would come over, Manny's sister, say, "Will someone come and help?"  Sometimes I would go over there and try to find out what's going on, be a little tough kid and try to find out what's going on over there.

Q    Approximately how much older are you than Manny?

A    I'm 32.  About ten years.

Q    What did you see to be the result of all this? Or how did Manny act in response to all of this?

3443

A    Well, when my grandfather was alive, I think that for Manny, he was more like a father, you know. Because he always had to make his own decisions since he was a baby.  And that's why I always called him a little man, because it just seemed to me his destiny.  I was the one started calling him Manny. He was really born Richard Tipton.  Just watching him, it seemed like he was a little man.  He made decisions the way any man would without all the ingredients that we have.  And after my grandfather died, he was really into "I have to survive and I have to take care of myself" and that's really it, you know.  "I have only me.  And if I don't take care of me, nobody will."  And as far as I'm concerned, that was basically true.

Q    Do you recall when your grandfather died?

A    Yes.

Q    When was that?

A    That was about 1986, somewhere in there.

Q    Had he been sick for awhile before then?

A    Yes, he had cancer.  He had cancer; I believe it was in the bladder.  My grandfather used to hunt and fish a lot, so he took his hunting and took his fishing and stuff, went up to the country.  He was part of a hunting lodge.  It was called the Twelve

3444

Beavers' Club.  So he would take us, my parents would take my sister and brother and I a lot.  But Manny, you know, Martrice and those guys, they didn't go as often as we did.  My parents took us.

Q    Tina, why in your mind do you think that you have gotten where you are in life?

A    I think basically because I had my parents, you

know.  I think we all have some problems in our family.  My dad is a recovering alcoholic.  But my mom is very strong.  So we as a family were able to get through that.  Sometimes I say if I didn't have my mom, so to speak, you know, it is the will of God at that point.

Q    You have a brother and sister, right?

A    Yes, I have a brother and sister.

Q    What's your sister's name?

A    Doreen Wilkerson.

Q    What's she do?

A    Works for a pharmaceutical company as an executive secretary.

Q    Your brother?

A    Henry.

Q    Your brother is here in Court today?

A    Yes, he is.

MR. WHITE:  Could you stand up, please?

(Courtroom spectator stood.)

That's your brother, Henry?

A    Yes.

Q    What does he do for a living?

A    He works at the same company my mother works, Executive Enterprises in New York, a publishing company that deals with seminars for corporate America, so to speak.

MR. WHITE:  Could I have a minute?

(Counsel conferring with co-counsel.)

BY MR. WHITE:

Q    Tina, when did you arrive in Richmond to testify here?

A    Yesterday.

Q    And did you speak to Charlene before you left?

A    Yes, I did.

Q    Did she ask you anything before you came here?

A    She asked me to -- I want to be exact -- she asked me to make sure I painted a good picture.  Yes.  She asked me to paint a good picture and have a good time.

Q    Did she say anything about herself?

A    Yes.  You know, she basically said paint a good picture for herself.  That's what she meant.  "Make me look good."  That's what she said, to be exact.

"Make me look good."

Q    What did you tell her?

A    I told her that I will tell the truth.

Q    Why are you here?

A    Because I love my cousin.  And I'm not here to try to excuse anything that he may have participated in, but I think that, you know, that it is important that people understand or get a clear perspective of both sides of the story.

MR. WHITE:  I would ask you to please answer the questions of these gentlemen.

CROSS-EXAMINATION

BY MR. VICK:

Q    How are you doing today?

A    Fine, thank you.

Q    It is fair to say, isn't it, that you are leading a very successful life, correct?

A    Yes.

Q    You are employed, no crime problems?

A    Right.

Q    No drug problems?

A    Right.  Except my Napercin.  I take medication for my arthritis.

Q    But you have no criminal problems?

A    No.

3447

Q    No drug problems?

A    No.

Q    Your brother, Henry, the same?  Very productive man?

A    Uh-huh.

Q    Works hard?

A    Yes.

Q    Your sister, very productive?

A    Yes.

Q    It is also fair to say that you came out of pretty much the same background that Manny or "Whitey" came out of; isn't that right?

A    No.

Q    Same grandparents?

A    No.  The same type of background?

Q    Right.

A    No.

Q    Didn't he almost grow up as brother and sister with you in that house in New York?

A    No.  Not as a brother and sister, no.

Q    Weren't you a very close family?

A    Yes.  We are a close family, but as I had said to Eric, we were worlds apart, you know.  We really, even though he would come to our house, it was still just worlds apart, you know.  I think that he would

3448

just basically come to our house to escape.  You know it is there, family.

Q    At the house he found the love of your grandmother?

A    Yes.

Q    Very much found the love of his grandfather?

A    Yes.

Q    Had a very nurturing environment there, didn't he?

A    More or less, yes.  From my grandfather.

Q    Off and on lived at that house with you?

A    No, he always lived at his house.  Martrice, his sister, and Nicole came to live at my grandmother's, but there was really no space for Manny to live there.
Q    Weren't there times when he had moved back to Richmond and came back up where he stayed at that house?
A    He did until they moved out.
Q    So there were some times he lived at that house?
A    Yes.  For like about, I guess, until they moved across the street.
Q    Very positive environment at that house, isn't it?

3449

A    For the most part.  I mean, yes.  We have our problems.
Q    Despite that and despite the fact everybody else in the family turned out to be successful, law-abiding, productive citizens, Manny has exhibited, since he has been very young, a very violent, aggressive side, has he not?
A    Since he was young?
Q    Right.
A    Just --
Q    Let me ask it this way.  Wasn't he always getting in fights at school?
A    To be honest with you, I don't know.  I know sometimes, yes, I'm sure.
Q    Was he always getting in fights in the neighborhood?
A    That I don't know.  Probably my brother knows more.
Q    The report prepared shows he was constantly in fights in school.
A    Okay.
Q    Manny has a very short temper, doesn't he?
A    See, that part I haven't had a chance to like really see.
Q    You have never seen him get angry?

3450

A    Not in front of me.  We have a different type of relationship, so in front of me, no.  But to say that he has not gotten angry is a whole different story.
Q    He gets angry often, doesn't he?
A    I don't know that.
Q    He is very impulsive, isn't he?
A    Impulsive, yes.
Q    Very impulsive?
A    Yes.  Reactionary.
Q    When he gets angry and impulsive, he is liable to do just about anything, isn't he?
A    Well, if you say running away is just about doing anything, then perhaps.  But if you ask me have

I seen him smack someone upside the head or something like that, then no, I've never seen that. I've never seen that.

Q    But his anger and impulsiveness lead to violent activities on occasions, didn't they, fights at school?

A    I assume so.

Q    He has never been able to really control his anger and impulsiveness, has he?

A    Has he been able to control it? You are asking -- if you are asking me from the perspective of me seeing that, then I can't --

3451

Q    From everything you have ever heard.

A    From what I have heard?

Q    From everything you know about Manny, he has never been able to control his anger or impulsiveness, has he?

A    From everything I've heard according to what has happened here in Richmond, it definitely appears to me he hasn't been able to control it. But from -- can I just say something?

Q    Say whatever you want.

A    All right. See, I think that my relationship with Manny, one of the reasons why I'm this saying to you from what I have actually seen is that I think Manny has a certain amount of respect for me. So, you know, there are things that I've seen, like when Manny dropped out of school he started going to the library. We would talk about that. So he may not have flown off the handle in front of me.

Q    You talked about that with him. He knows he can't control himself.

A    No. You mean dropping out of school and going to the library?

Q    Right.

A    We talked about that.

Q    He knows he has a very bad temper and tends to

3452

fly off the handle and hurt people when his anger and impulsiveness kick in?

A    We didn't talk about that. We talked about stuff like school and the importance of finding peace within yourself and the importance of, you know, if school is not your answer, then just being able to still educate your mind.

Q    And isn't it correct to say --

        MR. GEARY: I object to the constant banging on the podium by the prosecutor when he is examining the witness.

        THE COURT: Stop it.

BY MR. VICK:

Q    Isn't it correct that his anger and impulsiveness and his inability to control his anger

and impulsiveness continues and has resulted in the murder of a number of people here in the City of Richmond?

MR. WHITE:  I object.  How could she possibly know that?

THE COURT:  Sustained.

REDIRECT EXAMINATION

BY MR. WHITE:

Q    Tina, you have spoken about an anger and an impulsivity in Manny that you have seen over the

3453

years.  Have you ever seen Manny victimized by any physical abuse by Charlene or "Pimp?"

A    His mother used to punch him.  I remember one time I was in front of the house and Manny didn't want to go home because he knew he was going to get a spanking.  A spanking at my house and a spanking in Manny's house was two separate things.  I wouldn't want to go there, because granted, he may be a boy, but my aunt, she has always had to hold her own on the street and be able to hold her own.  So she may not hit a child the way I may hit a child, or maybe one of you guys may, if you have children, spank your kid.  She would ball up her fist.  "You have to smack this nigger, you know."  I said, "You can't be hitting a kid upside the head with your fist like that."  So if that answers your question  --

MR. WHITE:  No further questions.

THE COURT:  You may stand down, ma'am.

(Witness stood aside.)

Call your next witness.

MR. WHITE:  I call Hans Selvog.

HANS SELVOG,

called as a witness by and on behalf of defendant Tipton, having been first duly sworn by the Clerk, was examined and testified as follows:

3454

DIRECT EXAMINATION

BY MR. WHITE:

Q    Good morning, sir.

A    Good morning.

Q    Would you please state your name?

A    My name is Hans Selvog.

Q    How are you employed?

A    I'm employed with the National Center on Institutions and Alternatives.

Q    And sir, how long have you been employed with the National Center?

A    For approximately eight years now.

Q    Okay.  What is the field of your expertise?

A    I am a licensed clinical social worker.

Q    How long have you been a licensed clinical social worker?

A    For two years now.  And I've been a social

worker for approximately 15 years. And my area of expertise is in forensic social work, doing social histories and providing direct mental health therapy to a variety of client populations, which include substance abuse, juvenile delinquency, and their families, the chronically mentally ill, dual-diagnosed people with mental illness and mental retardation, and treating survivors of sexual trauma, people with impulsive sexual disorders, and in these social histories for use in the courts at sentencing and other mental health-related evaluations.

Q    Have you ever had occasion to be involved in a capital case before?

A    Yes.

Q    Would you please tell the ladies and gentlemen of the jury how many capital cases you have been involved in?

A    Over the past eight years, approximately 30 cases.

Q    Now, sir, you have had occasion to prepare a report on Richard Tipton?

A    Yes.

Q    Would you please tell the ladies and gentlemen of the jury in its broad terms what you did and where you went and what you obtained in order to put that report together?

A    Yes. I interviewed the defendant first, and then sought to interview all of his family members, which would include his mother and father, grandparents, siblings, aunts and uncles, cousins, and then collected any record that we could try to find of Mr. Tipton, including his school records, birth records, birth certificate, any employment history records, medical records, and reviewed all of those. I attempted to contact the people in the records who had contact with Mr. Tipton and interviewed them, and then put all of this information in a chronological narrative about his life.

Q    Sir, I would like to show you a document here and ask if you could identify it, please.

(Document proffered to witness.)

A    Yes. This is the full report that I prepared.

MR. WHITE:  If the Court please, I'm going to show Mr. Vick the cover sheet. He has not seen that.

(Document proffered to counsel.)

MR. WHITE:  If the Court please, have you identified that?

THE WITNESS:  It is the report I prepared.

MR. WHITE:  We would move its introduction as Tipton Number 1 at the penalty phase.

THE COURT: Admitted.

MR. WHITE: We would ask for leave at some point after Mr. Selvog testifies, we have copies of the chronology and summaries for each of the jurors.

THE COURT: All right.

BY MR. WHITE:

Q   Now, Mr. Selvog, did you run into any problems or resistance from anyone, people, in terms of preparing your report on Mr. Tipton?

A   Well, the entire side of Richard Tipton's natural father and his side of the family refused to be interviewed, participate in the history-gathering process.

Q   Were you able to determine where that resistance was coming from or  --

A   Yes.  It was the grandmother, paternal grandmother, Ruby Tipton, who had made it clear to her family that she did not want any of her sons or Richard's father involved in this case in any way or she would do something.

Q   You had occasion to interview Charlene Tipton?

A   Yes.

Q   Did you encounter any resistance from Charlene?

A   Yes.  Richard Tipton's mother would only allow certain information for me to gather and certain records for me to collect on her.  She was very concerned about some information becoming known to me.

Q   Do you know the time frame that was covered by the information that she refused to give up?

A   Yes.  Beginning after Richard Tipton was born to the present time.  Her medical records.

Q   Now, have you had occasion to divide Mr. Tipton's life into a series of areas?

A   Yes.

Q   Would you please tell the ladies and gentlemen of the jury how you came to do that?

A   Well, the best way to approach it, Richard Tipton's life can be easily divided into six areas: from the time his parents married through his birth until, and that was here in Richmond, until about a year after his birth was the first period.  The second period is when the family moved from Richmond back to New York City and lived with his grandmother from 1972 to 1974.  That's the second period.

MR. VICK: I have obviously no objection to this, but it is all chronicled in the written report which has come in, speaks for itself.

THE COURT: Objection overruled.  Mr. White?

BY MR. WHITE:

Q   Go ahead.

A    1974 to 1978, Richard's mother and her boyfriend that she had just met, his half-sister Martrice, and his younger half-sister moved into an apartment across the street from the grandparents. And that's the next period. The next period is from 1978 to 1980. This is after a psychiatric referral to a hospital there. He was referred by the school. And from 1980 to 1984 is the period when Martrice and Nicole had left the apartment and Manny stayed with his mother and stepfather. And from 1984 to 1986, when he had run away and attempted to find shelter in the Covenant House, a home for runaway youth in New York City.

Q    Directing your attention to that first phase of Manny's life, from 1967 to 1971, can you give the jury some overview of your findings with regard to that period?

A    1967 is when Charlene married Richard Tipton. At that time -- prior to that time, when she was 16 years old, was when she began abusing heroin. During their marriage, beginning in 1967, they abused heroin together. Mr. Tipton was in the service. They went to Germany. She was in a wreck when she was pregnant and her husband was driving recklessly there. There was drug use there. When they returned in the latter part of 1968, Charlene, Richard Tipton's mother, was pregnant at that time. She told me that her husband had violently beaten her, causing her to hemorrhage. She was rushed to St. Mary's Hospital here in Richmond. What they diagnosed was a spontaneous abortion. It was a very critical condition for a couple days until the placenta was passed, also. And the fetus was noted as cyanotic, which means that the fetus prior to the hemorrhaging was not receiving enough oxygen, or else, because of the beatings, it was not receiving enough oxygen.

Also, it was noted by Martrice, who is Manny's half-sister, older half-sister, she was born in 1967 -- I'm sorry, 1966, approximately a year prior to the parents being married, so at the time in 1968, 1970, and 1971, she was two to four years old. And she recalls vividly the parents' violent fighting between each other, hitting, screaming, and yelling. Tina Wilkerson, Manny's paternal first cousin, also recalls instances of physical abuse between the parents during that period of time when she was here visiting when she was ten or eleven years old, which would be in 1970-1971.

One very vivid recollection Martrice has of this period of time is when their mother, Charlene, had just injected heroin. And she describes the nodding process that a junkie, heroin junkie, has once they

inject where the body just becomes very limp.  And it is a very sort of like a slow-motion sort of effect where the body droops.  She could be standing or sitting and practically droop to the floor.  This occurred in one of the apartments they were living in here.  She tumbled down the stairs and was unconscious in front of Manny and Martrice.

There are many occasions where the family in New York City was contacted by Charlene because of the physical abuse between the parents, and they would rush down here and take Charlene, Martrice, and Manny, that's Richard Tipton's nickname that the family has given him, and take them back to New York until things settled down.  She always returned.  This happened on several occasions.

Q    So there did come a point in time where Charlene and her children moved back to New York?

A    Yes.

Q    That is the beginning of the second phase?

A    The second phase.  I just wanted to note that before the second phase, they moved constantly from place to place.  And also, the reason that they were calling New York and New York was coming down is because the relationship between Ruby Tipton, even then, was very cold.  And Martrice, who was making the phone calls warning the family about the abuse going on, was not comfortable with Ruby Tipton or knew that she would not get any support there and called New York instead.

After they moved to New York City, what marked that period of time in 1972, Charlene has two older brothers, Anthony, who is Tina Wilkerson's father, and Jerry Wilkerson.  Jerry Wilkerson in 1972 had been depressed for two weeks, was on Valium, which was prescribed by a psychiatrist to him.  In the presence of Catherine Wilkerson, the grandmother, and Charlene Wilkerson, he committed suicide in the basement of their home at 513 west 179th Street, the street where the family was living.  Manny was approximately two years old then and in the home at the time.  The family went through a very severe period of grief and depression because of that suicide.

And Tina Wilkerson described the family, the mother and grandmother, the grandmother walking around the house day after day for weeks at a time with their hand over their chest where the brother shot himself.  It was a particularly depressing and grieving time for the family.  Also during that time, between 1972 and 1974, before they moved into the apartment, there is just many accounts of the mother's open heroin use, injecting with needles into

3463

her arms with her friends, at a friend's apartment, always taking Manny, Richard Tipton, and Martrice with her, day after day, to these apartments where she would use drugs with her friends. And they would basically be left alone from the middle of the afternoon until late into the evening while the adults who were injecting the heroin would be in the other room injecting, laughing, talking, abusive language, nodding out. And they essentially would have nothing to do during that period of time but to entertain themselves or to just be with each other.

I also found that she had several, at least one or two, overdoses then and the family was aware of that. Tina observed that, Henry did, Martrice and Manny all observed her overdoses where they would have to walk her around the living room waiting for the ambulance to come to rush her to the hospital during that period of time. The effects of all this was documented in the records. Manny had a severe infection in October of 1973, during this period of time. He was hospitalized for ten days. The infection was a normal cold that had developed into this huge cervical mass, they call it, on the side of his neck. And in those medical records, it is noted that his sleep was very much in distress and that he

3464

was quite irritable when awake. He cried for his mommy a lot. He woke from sleep crying for his mommy. He was approximately three years old at that time. Also during that period of time, Martrice, because of the stress, experienced medical problems. She was, it would be, seven or eight years old at that time. She had lost all her hair and had some severe headaches during that period of time. She was brought to the hospital and treated with some medication for the headaches. She had to wear a wig in elementary school for several months before her hair grew back. And the reason she was given for her hair loss was stress.

In 1974, Charlene met Richard Tipton's common law stepfather, a boyfriend. His name was James "Pimp" Carson. They called him "Pimp." And they moved across the street to 500 West 178th Street in Manhattan in a one-bedroom apartment. The bedroom was shared by Charlene and "Pimp," and the only other room was a small kitchen and a large walk-in closet where Martrice -- between the living room and the walk-in closet -- shared living quarters with her brother, Richard Tipton, Manny.

Q    This is the third phase?

A    This is the third phase now. They were both

3465

junkies. Both used heroin regularly. The family

tells that it was basically a drug house where there were drug parties almost every night going on at all hours of the night; that Martrice -- I'm sorry, "Pimp" and Charlene, the mother and boyfriend, would fight and yell and scream at each other at all hours of the night, keeping both children awake. It was a very small place. All this happened practically on top of them. Martrice vividly remembers her mother's drug-induced hallucinations and paranoia where she, in the presence of the children, of Manny and Martrice, would claim that someone was coming in the window. It was very frightening for them. She would walk around with a broomstick checking behind the doors, under the bed, with the children behind her, looking for someone in the house. There were also incidents where Richard Tipton saw his mother stab "Pimp" in the leg with a knife. They would threaten each other constantly with knives. They would threaten to kill each other with guns constantly. Manny and Martrice both witnessed "Pimp" beat their mother, Charlene, with a baseball bat, broke her ribs, and she was rushed to the hospital. They choked each other in the presence of the children. The police were being called constantly. Police were

always coming to the house, either called by the parents -- I'm sorry, by the grandparents across the street, or by neighbors who would hear the commotion and couldn't take it any more. When Martrice would come home from school there would always be strangers in the house. Sometimes "Pimp" and Charlene weren't around. This frightened her very much. And once Charlene and "Pimp" did show up, basically they, the children, were pushed away into the back room or the large walk-in closet where they had to stay the rest of the night while the adults had their drug parties in the adjoining room.

Also, Martrice and Manny both talk about the discipline they received from "Pimp" and their mother at that time. The discipline was grabbing. "Pimp" would grab Manny by the arm, either pull his pants down or strip him naked completely and beat him with a belt. Charlene, as witnessed by Tina, the cousin, and Martrice and Manny's recollection, was punched by his mother to discipline him, punched in the face. She just landed punches wherever she could. And it was in this environment that that brings us up to 1978, where Manny was in the second grade, which is the end of this third period of his life. In the second grade, he had just transferred from P.S. 132

to P.S. 115 and the school officials there, upon his admission, referred him for psychiatric evaluation because he could not read or write. His behavior was

quite aggressive in school.  He couldn't settle down. He couldn't concentrate.  He was running the halls. And the records indicate that he was hyperactive, aggressive.  He was in a lot of fights.  He couldn't read or write; that he told the person who did the interview about night terrors, having dreams of monsters, having nightmares about monsters, believing that the streetlights out on the street had eyes that were watching him.  The records also note that Manny was unable to distinguish between the voices from the TV set and his own imagination; that the very unreal world of his junkie -- his parents' junkie environment caused him to just sort of deal with this through fantasy.  They also talk about his recklessness, his history of many accidents because of his hospital admissions.  I mentioned age three he was hospitalized for ten days.  At age four he was hit by a car.  At age five he was admitted for postnasal drip, but it was  --  the doctor also noted a psychosomatic behavior, psychological snorting, which he thought  --  he called it attention-getting behavior.

3468

At six years old he was referred to the hospital.  They thought it was impetigo.  He had three-week old lesions on his arms, neck, and face that were bleeding, weeping, and crusted over.  And this condition, by the way, was brought to the hospital's attention by the school rather than by the mother.

At age seven, he was hit by a truck and spent three weeks in the hospital.  The hospital records note that his behavior in the hospital was  --  he was very difficult to examine, yelling and screaming. And his mother was there, but she couldn't control him.  And this all occurred prior to his referral from P.S. 115 in 1978 as an eight-year-old to the hospital.

It was also noted in the records of his sleep disturbance, having difficulty sleeping.  And these conditions that I have just mentioned had been going on from 1972 on until the first intervention was really noted at the hospital in 1978.  And that brings us up to the next period of his life.

After that admission, from 1978 to 1980, the admission by the way was made  --  first reported in March of 1978.  The mother finally brought him in in April of 1978.  The evaluation was not completed

3469

until June of 1978.  The recommendation was to refer Manny to Dr. Greenhill, a psychiatrist, not in the hospital but in the area.  And there was no indication of whether or not that was followed up on.  And the family has no memory of Manny being

treated with medication at that time.

In 1978 to 1980, the next period, he was noted in the medical records being diagnosed with a viral syndrome, meaning rather than just having a virus, it was a syndrome. He was so sick and it was so pervasive throughout his body, so many symptoms throughout his body -- nose, ears, eyes, throat, leg aches, so on -- that they considered it a viral syndrome.

The next period of his life, from 1980 to 1984, which is the fifth period, what's significant about this period is, this is the period that Martrice, the older half-sister, leaves the apartment and goes to live with grandmother permanently. They are always back and forth, but she goes permanently. And Martrice recounts that she begged her grandmother, "Please, let me come live with you permanently. If you don't I'm going to put myself in a home. I just can't take it any longer." She cites the fighting that kept them up all night. She couldn't

concentrate in school. The policemen were in and out. She cites the strangers there in and out. She cites the heroin abuse, the drug abuse. She cites just the constant worry whether or not her mother is going to get killed by her boyfriend, or vice versa. And she cites her concern for Nicole, who after she moves out and lives with her grandmother permanently, she brings Nicole, the younger half-sister, to live with the grandmother, also, and leaves Manny there by himself.

Now, during this period of time, from 1980 to 1984, the medical records recount that at age ten he was seen for laceration to the head where he experienced double vision. Age 11, again there is a reference to systemic disease, which coincides with the viral syndrome that I mentioned two years earlier. So he still has very serious basic health problems. And at the same age, age 11, there are records that indicate severe ear infection where there is pus and bleeding and a perforation in the ear. And this is important, because it is related to his difficulties in school and the hyperactivity and the attention deficit sort of problems, being able to accomplish things academically in school.

At age 13, again more ear pain. Age 14, a

bilateral ear infection with blood and a foul-smelling drainage coming from the ear and having a lot of difficulty hearing at that time.

That brings us to the final period of his life, 1984 to 1986.

MR. WHITE: If the Court please, we wanted to at this point show a videotape of the

neighborhood.  It will take approximately 15 minutes.  I was wondering if the Court would allow us to take a short break, give the jury a short break, get it set up, and I think we will have another 20 minutes or so of testimony.

THE COURT:  All right.  We will do that. Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, we will take about ten minutes and get it set up.

(Recess taken from 11:35 a.m. to 11:50 p.m.)

THE COURT:  All right, let's bring in the jury, please.

(The jury entered the courtroom.)

BY MR. WHITE:

Q    Mr. Selvog, the videotape that the jury is about to see, could you please explain to them how and when

3472

this was made?

A    Yes.  This was made in New York City in December on a Saturday afternoon in the neighborhood or the block of the grandmother's house and the apartment on 179th Street, 178th Street.

MR. WHITE:  May I approach?

THE COURT:  Go ahead.

(Videotape started.)

MR. WHITE:  We couldn't turn it because we were having video problems.

THE WITNESS:  That's the apartment building, the second from the right.  That's where the family lived.

(Tape ended.)

MR. WHITE:  We move this as defendant Tipton Exhibit Number 2, please.

BY MR. WHITE:

Q    Mr. Selvog, you had previously talked about that period of time from 1980 to 1984, that being the pre-teen period, the sixth period that you have broken down?

A    That was the fifth period.  We still have the final one.

Q    The final one was from what period of time?

A    1984 to 1986.

3473

Q    If you would please describe that to the jury?

A    February of 1984, that was the time Richard Tipton entered the Covenant House, which was a home, a shelter for runaways, where kids could go with their problems or a place for shelter where they could stay.  And counselors there would help them with their next step, trying to contact the parents.

At that point the records indicate very clearly that what Richard wanted was not to live with his

mother. There was a lot of communication with an uncle here in Richmond named Vincent, who was willing to take him in. However, after two days, he was released to his mother's care. The records say she was supposed to take him to a psychologist, but there is no indication or no memory by the family of that ever being done. Approximately two years later, he returned to the Covenant House. The records say that the problems that existed two years ago had been unresolved. And at this time, he was discharged to uncle Vincent's care here in Richmond, Virginia.

And that's when he came to Virginia for the first time to change his life. I just wanted to note that between 1980 and 1984 -- I'm sorry, 1984 to 1986, again in 1984 is when he had the ear infections and the blood and the foul drainage coming from the ears, in 1984. After coming here, living with Vincent Tipton in 1986, again he ran into Ruby Tipton, who denied him access to become part of the family here and rejected him. And according to Brenda Williams, who was the girlfriend that Manny's real father was living with at the time, she said Ruby gave Vincent an ultimatum: "Either you send Richard back home to New York or, you know, you are -- I'm not going to have anything to do with you again." At that point, Brenda Williams said she would take Richard into her home. So he lived for approximately six months with Brenda Williams and his father. His father did not stay but less than a month, a couple weeks, and then moved on. And during this period of time, Ms. Williams was having a very difficult time financially. And she said that often, all they had to eat were beans and buttered toast and that Richard never complained. She states that he seemed to like the stability of her home. She did work full time. She came home every night. He spent time with her. She has a daughter named Iosha, who is a couple years younger than Richard, and they would just sit around and watch TV all night. On the weekends for entertainment, they watched TV movies. They couldn't afford a VCR at that time. But Richard, recognizing that his presence was a burden to her, said, "You know, I think it is best I move on," and he returned to New York City.

Q    That would be where your investigation ended; is that correct?

A    That's correct.

Q    Now, Mr. Selvog, based on your investigation, your interviews, and the records that you have reviewed and your findings, are you in a position to draw any conclusions about Mr. Tipton's life?

A    Well, yes. Before I do that, I just want to

state that there is one more set of records, Charlene Tipton entered, in 1990, after "Pimp" died, she was all alone.  She entered a methadone maintenance program to try to wean herself off of heroin.  The records go from about a year-and-a-half.  During the time that she was on methadone, she continued to abuse cocaine regularly and it was a constant issue with her and her counselor.  In fact, she was discharged from that program in November of 1991, still heavily abusing cocaine, refusing to go into detoxification for cocaine.  But she was weaned off the methadone at that point and they considered her treatment unsuccessful, or that she did not cooperate with the treatment.  My conclusion of his life is that from the very beginning, Richard Tipton entered a very chaotic junkie  --  the unreal world of the junkie environment where there was a lot of drug use and all the attendant behaviors: paranoid hallucinations, the violence between the parents, the fists, baseball bats, knives, guns, choking each other, at a very early age.  And those conditions did not cease his entire life until 1986 and he left and came down here for a brief respite of six months.  He was abandoned by his real father, and he was raised by a mother who neglected him and abused him.  He was pushed away.  He and his sister were pushed away, stuck in the corner of that house while the parents really did their thing.

And it is very well-documented in the medical records and the school records of his very serious illness and disease to the point that it went untreated until it just reached very critical proportions.  And then he was treated at that time. The school records document a very emotional disturbance at age eight resulting from these conditions that had been going on since his birth. And once intervention was introduced there through the hospital, those conditions never ceased.  He continued to be exposed to that the rest of his life until he was out on his own on the streets at age  --  between 14 and 16.

He came to Richmond to try to change his life, to try to find a place where he could fit in.  And he was rejected by the family here.  And he returned to the life that he was taught by his parents, by his mother and stepfather, in the streets of New York City.

MR. WHITE:  Please answer any questions of the government.

CROSS-EXAMINATION

BY MR. VICK:

Q    Mr. Selvog, you have testified in some 30

capital cases.  I assume on each occasion you have
testified for the defense, correct?
A    Yes.  Let me qualify.
Q    It is a simple question.
A    I just want to say  --  I have not testified in
all 30 cases.  I have done these evaluations.  I have
testified in, I'd say, approximately 12 cases.
Q    Constantly for the defense, though.
A    Yes, that's correct.
Q    Your job is to go out and interview people and
try to present a positive portrait of the people who
are on trial for capital offenses?

3478

          MR. WHITE:  I object to the
characterization.
          THE COURT:  Your objection is sustained.
          MR. VICK:  There has been nothing  --
          THE COURT:  Mr. Vick, please.
BY MR. VICK:
Q    In preparing the report for today, you don't
have any firsthand knowledge to any of this; all you
have done is talked to people about what you were
going to testify about, correct?
A    Yes, corroborated through interviews and
documents.
Q    Indeed, you talked to these people, the family
members and such, in anticipation of testifying here
in the death penalty phase of this trial; is that
correct?
A    Yes.  It is always a possibility that I may
testify.  Like I said, I haven't testified in every
case.
Q    Now, you wouldn't tell this jury that it is
unusual, unfortunately in America today, that
dysfunctional families of the sort Richard Tipton
came from are fairly usual, correct?
A    I would say some of the symptoms, I think, we
are all familiar with.  But certainly each family is

3479

its own unique thing, just like snowflakes are, you
know.  No one is the same.
Q    In trying to put together this picture of
Richard Tipton's life, I assume you also haven't gone
and spoken to any of the victims of the crimes he has
committed?
A    No, I haven't.
Q    You certainly aren't suggesting to this jury
that people -- that all people from a dysfunctional
background such as Mr. Tipton end up murdering
people.
A    No, I'm not suggesting that.
Q    In your report, you list a Robert Tipton from
Central Gardens and a Robert Tipton, Jr.  He is known
as Robert, Jr., isn't he?

A    I'm sorry, sir.  The uncle?
Q    The report.  The report that you put together indicated that there is a family of Tiptons who live here in Central Gardens headed by Robert Tipton, and he has a son, Robert, Jr.; is that correct?
A    Yes.
Q    They call him Robert, Jr., don't they?
A    I don't know.  Because all I know is that these are the names I was given from not the Tipton side of the family, but from the Wilkerson side of the

3480

family, of who the brothers were of Manny's real father.  And they said one was named Robert and he has a son named Robert, Jr.  I have not talked to anybody from the Tipton side of the family.
Q    In your testimony you have editorialized quite a bit?
        MR. WHITE:  Objection.  He is arguing.
BY MR. VICK:
Q    You have been putting your conclusions upon the facts that you have received from other people, haven't you?
A    I'm not editorializing.  I'm simply putting down the facts, the truth that I have uncovered.
Q    You said, for example, that Mr. Tipton was responding to an unreal world that the parents' junkie environment caused; responding to the unreal world of the parents' junkie environment caused him to deal with it through fantasy.
A    Right.
Q    None of those doctors' reports say that, do they?
A    Yes.  The medical records to the Columbia Presbyterian Hospital in 1978 make that very inference.
Q    They make that inference, but none of them say

3481

the language you said, that the unreal world of parent junkie environment caused him to deal with this through fantasy; that's your conclusion.
A    The record says he couldn't distinguish between his own imagination and the voices that he heard around him and the voices he heard on TV.
Q    My question is very simple.  Your statement there that I have quoted is simply your conclusion based upon reading those records, your interpretation of those records, correct?
A    Yes.
Q    Now, and that's also true in several other instances, for example, your linking the ear infection some two years prior to a sickness later. You are not a doctor and the records didn't say that.  That's your conclusion, that they were stress-related together; is that correct?

A    No, I'm just stating that he was diagnosed with a systemic disease and two years later again the same diagnosis was made.
Q    But you have linked the two together.  The doctors didn't do that, did they?  That's your linkage.
A    Well, the doctors had the patient's medical history, and it is cited in the medical records about

3482

the earlier diagnosis.
Q    But my point is very simple.  The doctors didn't make that same linkage that you have made; you did that based upon your review of the records, right?
A    Yes.
Q    So you editorialized again?
            MR. BAUGH:  Objection to the use of that word.
            THE COURT:  Sustained.
            MR. BAUGH:  Thank you.
            MR. VICK:  No further questions.
            MR. BAUGH:  I have some questions of this gentleman.
            THE COURT:  All right, Mr. Baugh.
                    DIRECT EXAMINATION
BY MR. BAUGH:
Q    My name is David Baugh.  The notes and records that you read from, from 1978, did you go back and put them in the files or were they there?
A    They were there.
Q    They were written by someone who didn't know there was going to be a trial; am I correct?
A    That's correct.
Q    Lastly, sir, how old are you?
A    38.

3483

Q    We have never spoken.  I've never heard the history of this young man before, so far as you know?
A    That's true.
Q    Sir, if you teased, abused, starved, and distressed a dog every day, would you be surprised if it bit you?
            MR. VICK:  Objection.
            THE COURT:  Sustained.
BY MR. BAUGH:
Q    All right, sir, in light of the documented evidence pertaining to this young man, and the abuse to which he was subjected as a child, is it surprising to you that he would be paranoid, defensive, and aggressive?
A    No.  It is very consistent with what he experienced as a child.
            MR. BAUGH:  Thank you.  Pass the witness.
            THE COURT:  The witness may be excused.

MR. VICK:  In light of that, may I ask one other question?

THE COURT:  Go ahead.

RECROSS-EXAMINATION

BY MR. VICK:

Q    Basically, what you are saying is that indeed given his environment, we have had formed here by his environment, if I understand your testimony, a very violent, impulsive young man who has now formed into an adult who is a very violent, impulsive adult.

A    I'm sorry, I can't just say yes to that.  I don't think it is accurate.

Q    How is it inaccurate?

A    It is more than environment.  We are talking about family members, not just environmental stressors, but family interaction, his mother and father interacting with him.  We are talking about things that happened to him directly by his mother and father, not just in the environment.

Q    My point is  --

MR. GEARY:  Let the witness finish answering.

BY MR. VICK:

Q    My point is --

MR. GEARY:  Excuse me.  I'd like the witness to be able to finish.

THE COURT:  Let the witness finish.  If you must ask these questions, let him finish.

THE WITNESS:  I do not believe, and I did not characterize him as a violent young man.  That's not accurate at all.  There isn't any evidence.  He fought a lot, was aggressive.  But there is no evidence that he ever went out and hurt anybody just wantonly.  There is no evidence of that.  I just can't say that.  I would not say he was violent as a youth.

BY MR. VICK:

Q    Often being in fights doesn't show any violence on your part? You don't consider that to be violence?

A    Yes, it is aggressive, violent behavior.  But again, "violent," it is too broad a term to say someone  --  he has an aggressive behavior, but it is too broad a term to say that he is a violent individual.

Q    My point is that whatever reasons have caused him to form as he has as an adult, he has formed into a very violent adult, has he not?

MR. WHITE:  Objection.  He has no evidence of that.  He doesn't know about the facts of this case.

THE COURT:  Your witness is capable of

answering the question.  Go ahead.

THE WITNESS:  He has the potential to act violently based on what he experienced and was taught and modeled for him as a child.

3486

BY MR. VICK:

Q    So again, I ask you, he has formed  --

MR. GEARY:  Objection.

THE COURT:  Sustained.

BY MR. VICK:

Q    That has resulted in his forming into a very violent adult.

THE COURT:  Sustained.  You may stand down, sir.

(Witness stood aside.)

All right, Mr. White?

MR. WHITE:  We would ask the Court to break for lunch now.  We have witnesses coming at one and two, and I would say our afternoon presentation will be concluded certainly before 4 o'clock.

THE COURT:  All right.  We will stop for lunch now and we will have you back in at 1:30.  Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, Mr. Marshal, you may remove the defendants.

(The defendants were removed from the courtroom.)

All right, we will be in luncheon recess until

3487

1:30.

(Luncheon recess taken from 12:25 p.m. to 1:35 p.m.)

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.)

All right.  Mr. White?

MR. WHITE:  Thank you, Your Honor.  Your Honor, we would call George Bright, please.

DR. GEORGE BRIGHT, called as a witness by and on behalf of defendant Tipton, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WHITE:

Q    Good afternoon, sir.

A    Good afternoon.

Q    Will you please state your name?

A    George M. Bright.

Q    How are you employed?

A    I'm a medical doctor.

Q    Where do you practice?

A    I'm the owner and the director of the Adolescent

Health Center in Midlothian, Virginia.

Q    How long have you been so employed?

3488

A    Since 1968 when I came to Richmond, Virginia to establish the adolescent medicine program at the Medical College of Virginia.

Q    Do you specialize in a particular field of medicine?

A    Specialize in children, adolescents, young adults who have medical and developmental problems.

Q    In the course of that employment, do you have occasion to review medical records, social histories of various children and young adults, teenagers?

A    Yes, I do.  In the practice of our approach to health care, we see approximately 250 new families --

          MR. VICK:  We stipulate to his expertise.
          THE COURT:  All right.

BY MR. WHITE:

Q    You have never met Richard Tipton, have you?

A    No.

Q    Have you had occasion to review certain documents relating to him?

A    Yes, sir, I have.

Q    Could you please tell the ladies and gentlemen of the jury what you have reviewed?

A    Yes.  I have the neuropsychological evaluation done January 28th, 1993, and the social history,

3489

which is a 31-page document that is fairly inclusive of this young man, his history and his family history, and extensive family history, and the information from the child psychiatric clinic in 1978.

Q    Now Dr. Bright, based on your review of these materials, are you in a position to confirm any diagnosis about Mr. Tipton with regard to any learning disabilities he may have?

A    Yes, sir.

Q    What is your diagnosis, sir?

A    He has a profile of a young man who has Attention Deficit Disorder, Attention Deficit/Hyperactivity Disorder.

Q    Can you please explain to the ladies and gentlemen of the jury what that is?

A    Yes.  About three percent of the population of young people in our culture have a medical condition that is characterized by three primary behavioral presentations.  One, inattention.  Two, impulsiveness.  And three, hyperactivity.  This condition frequently is associated with developmental problems that occur in families.  In our population, it is more than frequently associated with birth problems, anoxia, hypertoxia, accidents that occur in

3490

perinatal, post-natal.  The history is fairly significant from the standpoint that these young people present with the inability to attend, either in the home or in the classroom.  They are impulsive in their behavior.  They grow up to be young people who have less than adequate information because of the inability to attend in the classroom.  Their behaviors are disruptive.  Their knowledge is spotty because of the inability to attend.

As they go through elementary school, most of elementary school to begin with is visual and auditory, but if they cannot pick up what is being presented to them, then their sense of frustration becomes even greater as they enter middle school.

In the transition from elementary to middle school with the onset of puberty, these young people become even more difficult to deal with because they cannot attend, they have missed information, and they are frequently one or two grade levels behind their peers.  By age ten, the peer group pretty much sets the standard for dress, attitude, and behavior.  If you do not do well in your main job, school, then you are going to look for a peer group who will accept you.

It is my feeling from over 26 years of working

3491

with young people who have developmental disabilities that one out of five young people have developmental disabilities.  These young people tend to group together because they find acceptance with each other.  As they go through middle school, they begin to act out even more their sense of failure and frustration, both at home, at school, and perhaps in the community.  By the time they reach high school they may be developmentally two to three years behind their peers, and this sets the stage for more frustration and more acting out.

In our experience, 80 percent of the young people that we see of that 250 have some form of developmental disability.  Of that group of young people, approximately 80 percent will end up involved with alcohol and other drugs in a form more than experimentally.  Approximately 80 percent will end up in difficulty in the community with respect to involvement with the juvenile justice system  because of their impulsivity, because of their peer group involvement, their sense of failure, and their lack of success.  So over the years, we have worked very hard to provide what we feel young people need, and that's structure.  Structure at home, structure at school, and the appropriate medication to interrupt

3492

the inability to attend, to control behavior better.

When those three components with the appropriate diagnostic work are done, then we can reduce the recidivism of the juvenile justice system, the dropping out, the carnage on the highways, and the acting-out behaviors that we see in an increasing number of young people who present with this profile.

Q    What do you mean when you talk about acting out? What kind of behaviors are you actually talking about?

A    Many of the young people we see are brought to our attention either by the Court system, by an attorney, or by a parent whose child has been arrested for vandalism, trespassing, breaking and entering, stealing, involvement with drug use, abuse, and dealing.  Those are the acting-out behaviors of the older adolescent that we frequently see.

Q    When a problem behavior or a problem child -- I use the phrase loosely -- is brought to your attention, you would start what you call a work-up; is that correct?

A    That's correct.

Q    What kind of factors are you going to cover in the course of your work-up to determine whether or

3493

not you are dealing with an ADD or ADHD child?

A    Our approach to health care is a little bit unique, but it is more comprehensive than most.  If you look at any child -- I'd like to explain a little diagram to you.  Every one of your children, or each child, is an individual.  As such, they are products of an environment.  And that environment is the genetic pool from which they come, which is very important information, and what happens in utero and what happens at birth.  In that environment, the home, the school, the community, occurs a process of growth and development of that child's emerging self concept and self esteem, which is two areas.  Self image, which says, "Who am I, what am I, and where am I going?"  And the other is body image, how tall, how short, how fat, how thin.

As a child grows and develops, they perform. And if they perform evenly to their positive potential in five area: medical, educational, vocational, social, and emotional, for the most part as you recognize, peaks and valleys are part of growth and development.  But they will reach their potential in their late teens or early twenties.  A child who is at risk is a child who has change.  When change occurs in one of those areas, and it is not

3494

interrupted and over a period of time, they do not succeed, but rather, they are failing.  They frequently do not make it.  What we do is to operate

as a team with the physician, the educational consultant, the clinical psychologist, clinical social worker, and a therapeutic outdoor program.  If you were to come into your physician's office with a sore throat and you were an adolescent or young adult, they would do a history, physical and laboratory study.  That study could be a blood count, mono spot test, and certainly a throat swab.  We do the physical examination, but we also look at the other areas of that individual's life to determine why.

The two tests that we normally use are a psychological evaluation and an educational evaluation.  The psychological, consisting of two parts, the intellectual assessment and the emotional assessment.  The educational component is called a Woodcock-Johnson Psychoeducational Test Battery, and it looks at their cognition, brain power.  It also looks at their achievement with respect to grade placement.  And there's a third very important component in children who have developmental problems called Written Language, their ability to put

3495

information down on paper.  Once that diagnostic work is done, then we can go back to the individual or family and prescribe a structured program to help that child, interrupt a pattern of failure to one of success.  That's the approach that we use.  That's a long way around it.  I apologize for taking so long.

Q    Having identified someone as suffering from Attention Deficit Disorder or Attention Deficit/Hyperactivity Disorder, are you in a position to control it?

A    We can help monitor and interrupt if we have cooperation with three major components:  One, the school; two, the family; and three, with the appropriate medication.

Q    So in other words, even if you prescribed the appropriate medication, if you do not have a stable and supportive family environment, the chances of dealing with it effectively are  --

A    They are diminished.

Q    Sir, given a dysfunctional family setting and with a lack of appropriate medication, what do you see occurring in terms of how the child or the young adult deals with situations emotionally?

A    If you have a young person who has those three criteria and is already in difficulty with their main

3496

job, school, and are getting negative reinforcement from their main job, school, and there is not consistent structure at home, it only reinforces the sense of frustration and failure in that child's total environment.  Without the family structure  --

what we try to do with the families where we have that opportunity is to provide them with structure. These young people become very manipulative and they will try to split a mother and a father just to find success.

If you can come up with a program that involves what we call behavioral agreements, behavioral agreements are three columns. This is what's expected with respect to home and to school and community. This is the privilege that you get if you do what you agree to. And this is the loss if you do not follow through. Then that brings the family together and that provides the structure. And it provides swift, appropriate consequences for inappropriate behavior. When you couple that with the appropriate medication, either a stimulant like Ritalin or a neuroleptic like Tegretol, which is used for seizures and under Public Law 504 -- a fairly new law which helps young people who have this medical problem with the appropriate intervention and

3497

accommodations in the school system -- then these young people can turn a pattern of failure into success. That must continue, however, throughout their high school years. The information, unfortunately, in the media that Attention Deficit Disorder goes away at puberty is incorrect, in that we have 40-year-old adult males who have come to us for the diagnostic work-up because they knew something was wrong. We have young adults in college, high school, and all the way through from sixth grade up. So we have the 24 years of experience of seeing the impact of consistency with medication, with intervention in school and home, turning a pattern where they can be successful individuals in the community.

Q   Dr. Bright, I want to show you two documents if I could, please, and ask you if you could identify them.

(Documents proffered to witness.)

A   Yes.

Q   Would you please tell the ladies and gentlemen of the jury what they are?

A   They are two documents that we give to parents and to professionals to help them understand the Attention Deficit/Hyperactivity Disorder.

3498

Q   When you say professionals, those are specifically educators?

A   Educators and other interested parties. One is a breakdown of what you normally see in these individuals with the inattention, impulsiveness, hyperactivity, academic difficulties, anger anxiety problems, self esteem problems, and social problems.

This medical problem is pervasive in every area of a young person's life.  The other document was put together by an educational consultant who has been working with special education students for 20 years.  These are her observations of what a family should look for in a child who exhibits these behaviors who may have Attention Deficit/Hyperactivity Disorder.

MR. WHITE:  We move them for introduction as Tipton 3 and 4.

THE COURT:  Admitted.

BY MR. WHITE:

Q    Now, Dr. Bright, what happens when ADD or ADHD is accompanied by a pattern of substance abuse; for example, repeated use of marijuana?

A    Marijuana is a psychoactive substance.  It has three primary effects on the central nervous system.  One, it increases the difficulty with short term memory.  Two, it enhances or causes more mood swings, and most adolescents have mood swings anyway, but it makes them worse.  The third thing it does is it interferes with normal motivation, your ability to follow through in what's expected of you.  The subtest scores in the psychological evaluation that usually indicate Attention Deficit/Hyperactivity Disorder are those that have to do with short term memory and judgment.  Therefore, the combination of the pre-existing medical problem and then the use of marijuana only compounds a very difficult, pervasive medical problem in all human beings.

Q    Dr. Bright, in the course of your reviewing the social history and the records, you saw information about hearing problems: ear infections, otitis and hearing loss in Mr. Tipton.  Could you please explain the impact of those on ADD or ADHD?

A    Sure.  We have already stated that if you can not attend you cannot pick up information.  And that's nothing to do with the specific hearing mechanism with Attention Deficit Disorder.  If you then have a problem with the hearing mechanism, then you get even sketchier information that goes into the central nervous system, to the computer, and turns off academic information with which to deal on a day-to-day basis.  By the history that I have, he did have difficulty with hearing loss secondary to repeated bouts of ear infection, which would only contribute to frustration.  If you have a hearing difficulty, I'm sure you would recognize that that's a frustrating medical condition.  So that would compound the pre-existing condition.

Q    Dr. Bright, back in 1978, would you say that people were as sophisticated in their recognition of

these kinds of problems as they are today?

A    There was another name for Attention Deficit/Hyperactivity Disorder in the late 60's and early 70's. That was called hyperactivity, just plain hyperactive children. But more and more research has gone into defining, more clearly defining, children who have hyperactivity and do not have hyperactivity with Attention Deficit Disorder. The accommodations, the medications, the new medications that are tried in conjunction with the stimulants are certainly much more accepted. We have much better information with which to make a definitive diagnosis today than we did then. It was known then, but it was known as minimal brain dysfunction or hyperactive children.

Q    Are school officials, including teachers, more educated today or more likely to pick up these kinds of problems early on in a child's educational career?

A    Only in the last five to ten years have more teachers been mandated to become familiar with developmental disabilities. Only in the last three to five years has there been accommodation for young people who have Attention Deficit Disorder under Public Law 504. Unfortunately, this very pervasive problem in the 1970's was not recognized as a problem under Public Law 94192, the Special Education Act. But it is now recognized as a learning difficulty that does require accommodation, and as such, it is under special education.

Q    Dr. Bright, for a young adult, can people in that particular age group be educated as to the nature of the problems, and does that education assist in dealing with the problem?

A    If depends on the age group. But certainly in high school you have a much better opportunity, because of the maturity, to help young people understand and to be compliant. Unfortunately, it is not unlike the horse out of the barn. Once you get into high school, many patterns are already set.

Those patterns, if they are interrupted early in elementary and middle school, you have a much better success rate of helping a young person accept the fact that they have a disability. These are hidden disabilities. If you are an amputee, that's not a hidden disability. Developmental disabilities that affect your process of learning do create a great deal of problems, even with body image. I use the word "body image" in a broad sense, but it does affect your body image from the standpoint you are different, you know you are different, you can't function like everybody else. And in a way, that

isolates you and makes you act different because you are different.

Q   Can you comment on how ADD or impulsivity or hyperactivity translates into the actual judgmental processes that guide an individual in his daily events?  In other words, is a person likely to look before he leaps, or the other way around?

A   I guess the greatest difficulty we see with these young people is their inability to think before they act.  The impulsiveness, I would underscore, is the major reason they repeatedly get themselves into difficulty.  If I might add this morning, I was invited by an attorney to visit a young man in the Chesterfield Detention Center who has been there on several occasions.  We did the diagnostic work-up.  He does have an Attention Deficit Disorder and his impulsiveness is his major problem.  He is a very nice, kind, sensitive young man who has not been on the appropriate medication, who I think we can help.  That's just one small example of it is never too late if you do have the information.  And it does impact their behavior significantly if they would accept what we have to offer.

MR. WHITE:  I have no further questions.

CROSS-EXAMINATION

BY MR. VICK:

Q   It has been many years.

A   Nice to see you, sir.

Q   Nice to see you.  Wish we saw each other under better circumstances.

A   I understand.

Q   Dr. Bright, if I understand your testimony, let me back up a second.  You primarily deal with adolescents?

A   And young adults.

Q   And as I understand your testimony here, it is because, I believe I'm quoting you, they reach their potential late in their teens?

A   Yes.

Q   In fact, you went on and stated later that a pattern is set, that their pattern is set by the time they reached early adulthood or late teens.

A   That's correct.

Q   Let me also note, too, you have never seen Richard Tipton and interviewed him.

A   No, sir.

Q   Basically, your testimony here today is general testimony based upon your knowledge and experience in the field, and is not specific to Mr. Tipton.

A   That's correct.  Other than the information that I reviewed.

Q   Other than what was said in the reports by other

doctors.

A    Correct.

Q    But not specific as to him from your own personal knowledge.

A    That's correct.

Q    All right.  Then as to Mr. Tipton, it would be a fair statement, based upon what I understand your testimony to be, that he is set in his ways now; he is what he is.

A    He is what he is at the present time.

Q    Right.  And based upon a report from Dr. Evans, you have read his report and incorporated that into

3505

your testimony, have you not?

A    My testimony is based on my knowledge of the illness and the testing that was done, yes.

Q    But specifically, the testing by Dr. Evans?

A    Correct.

Q    That was included.

A    That's correct.

Q    Dr. Evans' report says that when Mr. Tipton is confronted with emotionally-arousing stimuli, he is likely to become very active mentally and this may escalate to the point of his judgment being overwhelmed; is that correct?

A    That's correct.

Q    That's what leads to the impulsivity?

A    That's correct.

Q    He gets upset, he gets angry, gets overwhelmed, and reacts, in his particular circumstance, violently and physically, correct?

A    I don't know the history of the case.  That's generally what happens in many of these young people. That is correct.

Q    He is set in his ways at this point, basically?

A    He is set in his ways without medication. Medication can modify significantly the behavior of somebody who has Attention Deficit/Hyperactivity

3506

Disorder.

Q    You say that.  Unfortunately, it is a fairly common occurrence, Attention Deficit Disorder and hyperactivity in children; is it not?

A    Yes.

Q    You treat any number of them?

A    Correct.

Q    As I understand what you have testified about, one out of five of those children have developmental -- one out of five of all children have developmental problems?

A    Some developmental problem.

Q    Out of the 250 figure you gave, of the 80 percent who have Attention Deficit Disorder, 80 percent or so end up having juvenile crime problems?

A    That's correct.

Q    Alcohol problems or drug problems of some sort?

A    Correct.

Q    What percentage of those juveniles that you deal with that have Attention Deficit Disorder go on to murder six people?

A    Very small percentage.

Q    Have you ever seen another one who has gone on to murder six people?

A    No, sir.

3507

MR. VICK:  I have no further questions.

REDIRECT EXAMINATION

BY MR. WHITE:

Q    You made the comment, Dr. Bright, that Mr. Tipton is where he is at this time.

A    Correct.

Q    And you also indicated that with medication, he could improve.

A    I don't know Mr. Tipton.  I cannot address him as an individual.  I can only address the fact that with appropriate medication, people who have Attention Deficit/Hyperactivity Disorder are able to function much more evenly and without the impulsiveness.

Q    With regard to the specific diagnoses that you have testified about today, you are familiar, are you not, with neuropsychological testing?

A    Yes.

Q    And the battery of tests that are routinely included?

A    Yes.

Q    You have had occasion to review all the tests that were conducted by Dr. Evans?

A    Yes.

Q    Do they include all of the tests that are

3508

routinely done in a normal neuropsychological workup?

A    Yes.

Q    Is there anything in your mind either in those test results or in the social history that would be inconsistent with a diagnosis of Attention Deficit Disorder?

A    No.

MR. WHITE:  No further questions.

THE COURT:  Mr. Baugh, do you have any questions?

MR. BAUGH:  No, Your Honor.  Thank you.

THE COURT:  You may stand down, sir.

(Witness stood aside.)

MR. WHITE:  If the Court please, I understand our witness is pulling up to the Court house now.  If we could have a ten-minute break we

would be able to go in sequence and wrap it up shortly after that.

THE COURT:  All right.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

3509

(Recess taken from 2:10 p.m. to 2:30 p.m.)

THE COURT:  Let's bring in the jury.

(The jury entered the courtroom.)

All right, Mr. White?

MR. WHITE:  Thank you, Your Honor.  We call James Evans, please, Your Honor.

JAMES R. EVANS, called as a witness by and on behalf of defendant Tipton, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WHITE:

Q    Good afternoon, sir.  Would you state your name?

A    My name is James R. Evans.

Q    And how are you employed?

A    I am professor at the University of South Carolina and have a part-time private practice in clinical psychology.

Q    And sir, how long have you been employed in clinical psychology?

A    About 22 years.

Q    Okay.  And sir, in that capacity, did you have occasion to perform an evaluation of Richard Tipton?

A    Yes, sir, I did.

3510

Q    Do you see Richard Tipton in the courtroom?

A    Yes, sir.

Q    And could you please tell the ladies and gentlemen of the jury when that evaluation took place?

A    It took place on 1-23-93.

Q    Okay.  And what kind of evaluation was that, sir?

A    It was a neuropsychological evaluation.

Q    Could you please explain to the ladies and gentlemen of the jury what a neuropsychological evaluation is?

A    This is an evaluation where the tests that are used primarily are designed to see if there is any sort of brain dysfunction.  And the tests are, for the most part, quite easy, so that if you don't have any problem, it would be rather easy to complete it, like putting forms in a form board blindfolded.  But if you do have some type of brain dysfunction, they

should be rather difficult to complete.

Q    Now, sir, the tests  --  first of all, how long does it take to administer this battery of tests?

A    This particular battery of tests required five-and-a-half hours, approximately.

Q    Does the battery of tests include a standard set of tests?

A    Yes, sir.

Q    These are tests that are routinely used in this type of evaluation?

A    Yes, sir.  The majority of the tests I gave were parts of the Halstead-Reitan Test Battery, which is the most often accepted neuropsychological test battery.

Q    Now, sir, having completed your neuropsychological examination or evaluation of Mr. Tipton, are you in a position to make any diagnoses as respects his physiological condition or any learning disabilities?

A    Yes, sir.  I would diagnose Mr. Tipton as having suffered from, and actually continues to suffer from Attention Deficit Disorder, and also from some type of frontal lobe dysfunction.  I believe that the frontal lobes of his brain were impaired to the extent that it leads him to have problems with what they often refer to as executive functions; that is, the ability to make advanced plans and stick to those without becoming impulsive or without acting on impulse.  It causes people to very often act on impulse rather than looking before they leap.  Yes, sir.  That's it.

Q    Now, sir, in the course of or prior to performing the neuropsychological evaluation, and after you performed your evaluation, did you have occasion to review any medical records relating to Mr. Tipton's birth?

A    Yes, sir.  I reviewed a lot of different records, medical records, family background records, hospital records.

Q    Was there anything in those records which you find to be inconsistent with the diagnoses that result from your neuropsychological evaluation?

A    No, sir.  They were very concordant with it.  In fact, he had had birth injury, had been in the hospital for like two months following birth, had been cyanotic.  When he was a little child he was accident-prone.  Even through his teenage years, he was accident-prone.  He was diagnosed as being hyperactive.  He was described as impulsive.  There was a time when it was recommended that he be referred for medication such as Ritalin or Cylert, I assume, the type medication that's commonly used with

Attention Deficit Disorder.  They have not mentioned the medication, but they said, "Refer him for medication due to hyperactivity."

Q     Specifically directing your attention to the

3513

birth records, can you tell, explain to the ladies and gentlemen of the jury what cyanosis and perinatal hypoxia are and how they relate to Attention Deficit Disorder and frontal lobe damage?

A     Whenever you suffer a lack of oxygen at birth and you turn sort of blue, they call it cyanosis. And this is often associated with later problems, one of the most common ones being Hyperactivity Attention Disorder.

Q     And sir, you discerned from the records that the cord was wrapped around  --

A     Yes, sir, that would be what led to the cyanosis.

Q     Now, sir, can you please explain for the ladies and gentlemen of the jury the dimensions, as you see them, of Attention Deficit Disorder?

A     There are three basic dimensions.  One of them is the attentional problem, in which it is very difficult to maintain attention on one task and adapt to the fashion.  That is, if the goal would be to study in class or to attend what the teacher was saying, they might be attending to something else, even if they wanted to.  At home, a parent might say for them to do something, and they would forget, would not attend what they said, and forget it in

3514

short order.  So the attention part of it is one dimension.

Another dimension is impulsivity, and that's what I mentioned earlier, about not looking before you leap, not stopping to think before you get into something.  That's a behavior that I noted even continuing today, or continuing to the 23rd of January when we were testing.  Several times I would have to say, "No, no, no, wait, don't jump into it." So it was part of the continuing impulsivity aspect. Then the third aspect is hyperactivity.  And not all attention deficit sort of persons, disordered persons, have the hyperactivity aspect.  But he apparently did as a young child because it was very frequently mentioned that he was an overactive child.  So those are the three dimensions of the attention deficit, sometimes called Attention Deficit/Hyperactivity Syndrome.

Q     How did these dimensions affect one's judgmental processes?

A     Well, if you don't  --  if you fail to be reflective and in fact are quite impulsive, then you would not think things through, and this would impair

your judgment.  Many times this also gets exacerbated when you are emotionally aroused.  And you are liable

3515

to become, you know, more impulsive than ever under emotional arousal.  There is also considerable influence if you are under the influence of drugs or alcohol; this can exacerbate the problem.  And where some people would become impulsive after maybe ten drinks, another one with the Attention Deficit Disorder might become impulsive after just a few drinks.

Q    Based on your experience, how does the existence of Attention Deficit Disorder manifest itself in terms of interfering with one's ability to lead a normal life.  That is, as one approaches teenagerhood, young adulthood, what do we see as the functional problems as a result of the existence of ADD?

A    When a child has this disorder, even beginning in first grade, it is very difficult to adjust to the classroom.  You are expected to sit still and attend and listen to the teacher and so on.  And right off the bat these kids get in trouble because they can't sit still or can only sit still if someone is standing over them.  Given any kind of a problem, any kind of an unstructured environment at all, they may just  --  by "structured environment at all," I mean where there is not someone standing over them

3516

watching them every minute, they are going to become very lacking in control, disorganized.  Teachers are going to be angry, and the other students are going to maybe at first laugh at them and think it is kind of funny, but eventually really reject them.  Large numbers of these kids, if untreated, go on to become angry at society and angry at themselves and sort of loners, or persons who would perhaps gravitate toward others who similarly feel rejected.  And of course many of them then get into problems with authorities because of that.  I mean beyond the teachers, probably police and other authorities.

Q    Would you expect someone with this kind of a disorder and this social background to be able to hold a job or function for any long period of time in any position of responsibility?

A    These problems of attention deficit tend to  -- some people have felt that they were ameliorated a little bit as the person got into the work force after high school.  But then others have said no, it really isn't that they  --  that the Attention Deficit Disorder is gone.  It is that they have picked out jobs where they can move and get about and like drive trucks and work on construction and so on.  But even there, you can imagine what it would be

3517

like to be impulsive on construction jobs.  You
wouldn't last long.  You would get fired.  And if you
had attentional problems, you wouldn't last very long
on many jobs, too, even of that type.  They do often
go to that kind of job and they may not get called
hyperactive with attention deficit so much any more.
But what actually happens to them is that they are
floating from job to job, which of course adds
further to the likelihood that they would end up
getting in trouble with the law.

Q    Do all cases of Attention Deficit Disorder have
a physiological basis?

A    No, I don't think that they all do.  The
Attention Deficit Disorder itself is defined
behavioral, along the lines of the behaviors I just
mentioned.  You have to have X number of behaviors
that are impulsive in nature and X number that show
attentional problems, and in X number they are
hyperactive in order to get the diagnosis.  And those
are all just behaviors.  Those could come from
various sources.  But large numbers of these kids,
many more than would be expected from chance alone,
show abnormal slowing of the EEG.  And they also, as
I mentioned earlier, the children who have oxygen
deprivation around birth have a higher than you would

3518

expect  --  higher than when you don't have oxygen
deprivation -- incidence of these type disorders.
     Furthermore, since so many of these kids do
respond positively to a medication such as Ritalin or
Cylert, the ones on the street are called "speed,"
this is some indication that it must be physiological
in nature for those, or at least there is a
physiological component; otherwise, the introduction
of the biochemical, the medicine, would not make that
big a change.  That's the reason that many people
take in regard to this.  To answer your question more
succinctly, very large numbers of them, I feel, and
most people in that field feel, have a biological
basis.  But that isn't to say that they all do.

Q    Biological basis.  Is that another way of
putting physiological basis?

A    Right.  A basis in brain difference and/or in
biochemical abnormalities.

Q    Do your results of Mr. Tipton indicate a
physiological or biological basis in addition to what
you see as behavioral or social?

A    Mr. Tipton, as I mentioned earlier, showed
indications of frontal lobe dysfunction.  On two of
the Halstead-Reitan subtests which are especially
sensitive to what I said, the executive functions or

3519

the ability to have cognitive flexibility, to think

ahead, make plans, those were the two that he had his lowest scores on. They were well below average, even when corrected for his sex, his age, and his educational level. They were well into the impaired range. So that those were indicators in my opinion of frontal lobe dysfunction. Frontal lobe dysfunction meaning physiological abnormality of the frontal lobes of the brain, which also often are associated with, well, regularly associated with problems of control of your impulses, problems in control of your emotions, advanced planning disorders, many of the things that coincide with Attention Deficit Disorder.

Q    Based on the physiological or biological findings, would you say that  --  first of all, is brain dysfunction necessarily biological or physiological?

A    Would you repeat that?

Q    Are we dealing with brain damage here?

A    There is no way to say that it is brain damage. Even if one could look on a CAT scan or MRI scan, it is unlikely you would see actual structural damage. Perhaps the resolution isn't good enough. But on autopsy they have seen differences in frontal lobes of many persons with this type of disorder. But the dysfunction is inferred from the psychological, the neuropsychological tests.

Q    So based on your review of the birth complications, the nature of the biological bases and the brain dysfunction, would you say that the combination of these things does affect his ability to function in society and affects his behavior?

A    Yes, sir. There's no doubt in my mind that it does.

Q    Would you say that the sociological, the family component, affects it in a different way or does it compound the physiological or biological basis?

A    It can compound it. Another thing frequently found in the backgrounds of children with Attention Deficit/Hyperactivity Disorder is what I would call family cacaphony or lack of harmony in the family. He certainly had plenty of that. This would add to it. In terms of whether the person with the Attention Deficit Disorder/Hyperactivity would in fact manifest, say, criminal behaviors or behaviors that would get him in trouble with authorities in a chronic fashion, it doesn't necessarily mean they are going to, because the majority of persons with Attention Deficit Disorder/Hyperactivity Syndrome do not, of course, end up in prison. But I see it as an analogy being something like a person that maybe was born with a club foot, and you would be more prone to

falling perhaps, but especially if you lived in an environment that had nothing but slippery streets to walk on.  He certainly walked a lot of slippery streets from that analogy.

Q    In your report, there is mention of cognitive rigidity.  Is that something that  --  first of all, can you define that?

A    Cognitive rigidity would refer to not being able to change your mental set.  If you were engaging in one activity and that was not adaptive, you weren't winning, weren't winning the game, say you were playing Nintendo and kept trying and nothing was happening, weren't getting any points, just kept trying the same old thing, that would be rigidity.  Whereas, if you would, let's say, shift sets, try something new, that would be flexibility, cognitive flexibility.  That's something that seems to be served largely by frontal lobe function.  And he showed some indications of this cognitive rigidity.  And if the cognitive rigidity is extreme and you are engaging in a behavior such as I just mentioned, continuing to do the same thing over and over, that would be called perseveration.  You just keep perseverating the same response.  And Mr. Tipton showed that behavior on the test at times.  He would hit upon one thing and wouldn't get off of it.  It seemed especially true when he was somewhat emotionally aroused.

Q    But the perseveration and cognitive rigidity don't necessarily accompany ADD, do they?

A    No, sir.  That's more a symptom of the frontal lobe syndrome than it is of the attentional deficit disorder.

Q    But certainly those problems would certainly complicate the treatment of ADD?

A    Yes.  And they would also be something that would lead you to be more prone to maladaptive behaviors.  And if you continued to do the same thing in class trying to solve a problem and it wasn't working, you wouldn't pass the course, obviously.  If you were engaging in most any behavior, it could be as complex as something like changing your approach to understanding geometry to something as simple as just getting started on some act and continuing to do that act and not stopping.

Q    Could you characterize that as a biological basis which interferes with one's ability to deal with ADD, or physiological?

A    Yes, sir.  Some people can like pull themselves up by their own bootstraps, whatever, adapt their own  --  become adaptive and sort of overcome some of their problems.  Because if this doesn't work, they

try this; if it doesn't work, they try a new strategy.  And I suspect that Mr. Tipton would have not done that consistently because of the perseveration tendencies.

MR. WHITE:  If I can have just a moment, please?

THE COURT:  Sure.

MR. WHITE:  Judge, we have no further questions.

MR. WHITE:  We would move Dr. Evans' report into evidence.

MR. VICK:  No objection.

THE COURT:  Admitted.

CROSS-EXAMINATION

BY MR. VICK:

Q    I am an Assistant United States Attorney named Toby Vick.  You prepared the report going into evidence now about Mr. Tipton, correct?

A    Yes, sir.

Q    In preparing that report, you have indicated that Mr. Tipton has a long history of disruptive behavior; is that correct?

A    A long history of disruptive behaviors in the classroom and school.  Yes, sir.

Q    That behavior was violent behavior, fists, a number of fistfights and attacking other students, correct?

A    Some of that was.  Yes, sir.

Q    All right.  Now, as I understand your testimony here today  --  first, let's cover a certain area. You indicate in your report and you have testified here today that given the condition that you have diagnosed Mr. Tipton to have, that he would have problems with advanced planning.  That does not mean, does it, Doctor, that he could not plan something in advance?

A    No, sir.  It doesn't mean he wouldn't be capable of premeditating something.  It would mean that he frequently would fail to think in advance.

Q    He could premeditate going to the store?

A    Yes.

Q    In fact, he has to, almost, to function in society every day.  He has to premeditate any number of his actions.

A    Yes, sir.

Q    His impulsivity is something that just kicks in from time to time, in essence.

A    It isn't present in every act.

Q    Right.  Premeditation is probably present.  You have to decide to do something before you do anything.  So that's there.  But impulsivity is something that kicks in given his condition.  And

given your  --

MR. WHITE:  Mr. Vick, I think, is testifying.

MR. VICK:  I got a nod.

THE COURT:  Sustained.

THE WITNESS:  A nod didn't necessarily mean I agreed.  I was thinking what was he saying, exactly.

BY MR. VICK:

Q    He has to premeditate doing almost every action he takes, doesn't he?

A    Yes, sir.  But one would have to think a little bit ahead to do most anything.  It is a matter of degree.

Q    All right.  You indicated, too, in your report that when confronted with emotion-arousing stimuli, he is likely to become very active mentally and this may escalate to the point that his judgment is

3526

overwhelmed.

A    Yes, sir.

Q    Is that when his impulsivity kicks in?

A    That would be one time when I believe it would be most obvious.

Q    If something stimulates him, if he is in a violent situation and something stimulates him externally, he is liable to become very, very violent?

A    Yes, sir.  He would be likely to engage in very impulsive behaviors, whether it was something violent that was stimulating him or whether it was something he was happy about.

Q    You have also said that this is coupled with cognitive rigidity on his part; is that correct?

A    Yes, sir.

Q    To a certain extent.  So if I understand your testimony, you have, in essence, said that given his cognitive rigidity he will keep responding in the same way that he has responded in the past.  He doesn't change.

A    When he is emotionally aroused, that would be a more likely behavior for him to engage in.

Q    If his emotional arousal in the past has led him to very violent behavior  --

3527

MR. WHITE:  I object.  That's not what the testimony is.

THE COURT:  He can go ahead and answer.

BY MR. VICK:

Q    If his emotional arousement in the past has led him to very violent behavior, given this cognitive rigidity, that's probably what will repeat in the future.

A    Yes, sir.  There is no reason to think it

wouldn't.

Q    Now, also, a number of ADD  --  ADD used to be called hyperactivity, correct?

A    Yes, sir, hyper  --

Q    A number  --

MR. WHITE:  Objection.

THE COURT:  Sustained.

THE WITNESS:  There have been many terms applied to it over the years.  Many years ago it was referred to as hyperactivity, then hyperkinesis, attention deficit, deficit disorder with or without hyperactivity.

BY MR. VICK:

Q    A number of children suffer from that?

A    Somewhere between four and twenty percent.

Q    Large percentages of those children go on to lead very successful, non-harmful lives, correct?

A    Non-harmful to others, I would agree.  Very successful would be relative to what they might have been had they not had that.

Q    Productive lives?

A    Yes, sir.

Q    In fact, this does not mean that you are doomed to a life of non-productivity or failure?

A    No, sir.

MR. VICK:  I have no further questions.

REDIRECT EXAMINATION

BY MR. WHITE:

Q    Dr. Evans, what kind of things do you usually look for when dealing with a person whose plagued with these problems in order for them to get to a point where they are productive and successful?

A    Usually we look for a good diagnosis of it at an early age, and then some form of treatment.  And the main treatment is for them to go to a physician who would prescribe amphetamine.

Q    Would that also include some social structure?

A    And usually, there is an attempt to bring the family into therapy so that there can be more harmony within the home.  As I said earlier, that's often the scene: it is not only the physiological basis which may respond to the amphetamine, but if you don't do something about the home environment, many times it isn't as effective as it would otherwise be.

Q    In your review of the records that were submitted to you on behalf of Mr. Tipton, did you see anything in his background that would suggest that any steps were taken which would contribute to what you would think would be a successful step in life or functional step in life?

A    Not other than Mr. Tipton leaving the situation and trying to find  --  trying to  --  he became

somewhat of a loner where he perhaps got away from the cacaphony.

Q   Now sir, in your discussions with Mr. Tipton, you did not discuss any information relating to the facts of any of the offenses for which he was charged?

A   No, sir.

Q   You are not aware of any emotional or other kinds of stimulus that he may have been confronted with in connection with any of the activities for which he has been convicted?

A   No, sir.

MR. WHITE:  No further questions.

CROSS-EXAMINATION

3530

BY MR. BAUGH:

Q   Dr. Evans, my name is David Baugh.  I have a couple questions.  One, you talked about impulsivity.  Am I correct that in the book you all use, the DSM or whatever that thing is, that there are actually impulse disorders that have premeditation as a part of them, such as bulimia or impulsive hand washing, where people actually plan ahead but where they have no control?

A   I think of those being more compulsions.

MR. VICK:  No testimony of that sort here. This is irrelevant.

THE COURT:  Overruled.

BY MR. BAUGH:

Q   So when you say that someone is impulsive, does that mean they act right away, or just don't think it out?

A   Both.

Q   So it is possible to have some impulse control problems that take a long time to develop; you go through a period of hours, for instance, before you resolve it.

A   I'm not certain that I understand what you are referring to.

Q   When you say impulsive as a doctor, are you

3531

talking about short duration only?

A   I'm speaking of things such as failing to think before one acts.  The opposite of impulsive in the way I use the term would be reflective, where you know, some people, you could ponder over something forever, that would be an extreme of it.  The extreme of impulsivity would just be if it feels good, do it.  Of course, there are variations in between those two extremes.

Q   You also mentioned that four to twenty percent of the population suffers from this sort of problem?

A   Yes, sir.

Q   It is estimated.

A    People have come up with that wide range of incidence.

Q    People who suffer from this problem can learn to compensate if there is intervention at a young age, medication, structure, and behavioral modification; am I correct?

A    Yes, sir.  Many people do.  Yes, sir.

Q    If you have a family that's concerned with you and take you to a good doctor and see that you take your medication, there is a good possibility you can learn to compensate for this problem?

A    Yes, sir.  That probably accounts for the

3532

majority of them turning out to be more or less successful and free from a record, criminal record.

Q    But if you don't have those supports, then you are probably going to be in the group that doesn't learn to cope with them; am I correct?

A    Yes, sir.  Especially if you are in an environment conducive -- that otherwise is conducive to it.

Q    This behavior modification and structure, am I correct that that teaches you how to respond to stimuli when it comes in?

A    It attempts to teach you to look before you leap, to count to ten before you do it.

Q    So while the majority of the four to twenty percent that learn to cope with this, the majority of the four to twenty percent learn to cope with this; those that do not have good structure, good support, or have dysfunctional families, are probably those who are not going to overcome or compensate for this problem; am I correct?

A    Yes, sir.  That would seem a logical  --  seems logical to me.

Q    Also, you mentioned a biological problem.  When you say a biological problem, when you talk about a possible biological problem, you are talking about

3533

something wrong in the cells, in the flesh; am I correct?

A    Yes, sir.

Q    You are not talking about something volitional.

A    Yes, sir.

Q    We are not talking about weak morale.  It is like somebody has a bad leg, blue eyes, black skin, there is something there.

A    Yes, sir.

Q    All right.  Is one of the developing symptoms of ADD lack of self esteem?

A    It certainly is.

Q    And with lack of self esteem, is a natural consequence of that also paranoia or aggressive response to certain behavior?

A    Those are frequent results.  If you are feeling bad about yourself, you are liable to think that others are even feeling bad towards you and get suspicious.  It would tend to go with that.

Q    Are there adults with ADD?

A    Yes, sir.

Q    Are there adults with ADD that take medication now?

A    Yes, sir.

Q    So they can be productive members of society?

3534

A    Yes, sir.

Q    Is that medication available in the United States?

A    Everywhere.  It's one of the most frequently prescribed medications.

Q    All you need is someone to direct you to it.

A    Yes, sir.

Q    Or someone to care enough to send you to a doctor.

A    Yes.

MR. BAUGH:  Thank you, sir.  No further questions.

THE COURT:  All right?

RECROSS-EXAMINATION

BY MR. VICK:

Q    If medication were prescribed, it does not mean that the people who have ADD would quit exhibiting antisocial behavior?

MR. BAUGH:  There has been no manifestation of antisocial behavior.

THE COURT:  Sustained.

BY MR. VICK:

Q    Doesn't mean they would conform their behavior to the norms of society in all circumstances?

A    No, sir, not necessarily.

3535

Q    Of the people you have examined with ADD, how many have gone on, given their problems, and committed six murders?

MR. BAUGH:  That is outside the scope of direct.  He is talking about a percentage.

THE COURT:  Objection sustained.  You may stand down, sir.

(Witness stood aside.)

Mr. White?

MR. WHITE:  If the Court please, we would call Brenda Williams.

BRENDA WILLIAMS,

called as a witness by and on behalf of defendant Tipton, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WHITE:

Q    Good afternoon.
A    Good afternoon.
Q    Would you state your name?
A    My name is Brenda Williams.
Q    Ms. Williams, what do you do for a living?
A    Tax auditor with the County of Henrico.
Q    How long have you been employed there?
A    14 years.

3536

Q    Where do you live?
A    In Central Gardens, on Beck Street.
Q    That's at the corner of Catchpenny and Beck?
A    Yes, it is.
Q    Now, do you know this man right here?
     (Counsel gesturing towards defendant Tipton.)
A    Yes, I do.
Q    How do you know him?
A    I have a son by his father.
Q    And what's this man's name?
A    Richard, Jr.
Q    And when did you first meet Richard, Sr.?
A    In July, I think, of 1992.
Q    1992?
A    No, 1982.
Q    You have a child by Richard Sr.?
A    Yes.
Q    What is his name?
A    Vincent LeNay Tipton, II.
Q    You have another child; is that correct?
A    Yes, it is.
Q    Both children live with you?
A    Yes, they do.
Q    Ma'am, did there come a point in time where this Richard Tipton came to live with you?

3537

A    Yes, he did.
Q    Can you please tell the ladies and gentlemen of the jury when that was?
A    That was roughly in the year of 1986.
Q    Could you please explain to these ladies and gentlemen of the jury how he came to be in your house?
A    At that time, his father and I were together. And I think he wanted to leave New York to get his life and stuff together.  He was supposed to have come down and stayed with an uncle.  That fell through.  By me being with his father, I am a mother, also, I couldn't let any child stay out.  So he came and he lived with us.
Q    Ma'am, do you know any of the details about why it fell through with his uncle, Vincent?
A    That was uncle Vincent, yes.
Q    Could you please tell us what happened?
A    I don't know all of the reason why it fell

through.  But from what I can understand, they didn't want him to be here.  They wanted him to go on back to New York.

Q    When you say they, can you say who "they" was?

A    Grandma and the son.

Q    Now, Ms. Williams, when Richard first moved in with you, where were you living?

A    I was living on Cleary.  That's still in Central Gardens, but around the corner.

Q    All right.  And while you were living in Central Gardens you came to know some of his friends?

A    His friends basically were made through my daughter.

Q    Okay.  And what was he doing when he was living with you?

A    He was trying to get himself into school, and he did go in to Highland Springs.  He got a job.

Q    Where did he work?

A    It was at  --  it wasn't Hardy's, it wasn't McDonald's, but it was a fast-food place.  I can't remember the name right off.

Q    Okay.  And how would you characterize his attitude around the house; how would he relate to you?

A    Just like a son would to a mother.  "What do you need to be done here?  I'll take the trash out." When my daughter came home from school and it was homework time, he would quiz her and go over her homework with her.  My son was two-and-a-half or three.  He would play with him.  Basically, he stayed around the house just with us.

Q    What was the normal routine for your household?

A    We just stayed together.

Q    Ms. Williams, was there a period of time when he moved in with you that Richard, Sr. was also there?

A    Yes.  That was in 1986.

Q    Could you please tell the ladies and gentlemen of the jury your perception of how they interacted with each other?

A    To me, it was like "Hi, dad, I'm almost grown, I'm almost a man, but I want your love.  I'm reaching out to you for your love, for your understanding." It was like a long-lost father and son just meeting, just being together, just living together for the first time, trying to know one another.

Q    Did Richard, Sr. stick around in an attempt to return that?

A    No, we broke up after that.  But Richard, Jr. stayed with me.

Q    Now, Richard, Sr., does he support your child?

A    No, he does not.

Q    How long would you say Richard, Jr. -- do you

call him Manny?

A    No, I don't.  I call him Richard, Jr.

Q    How long did Richard, Jr. stay around your house?

3540

A    It was almost six months.

Q    Okay.  And do you recall him leaving?

A    Yes, I recall him leaving.  Because I didn't really want him to go.

Q    Please tell the ladies and gentlemen of the jury how that came to be and why he left.

A    I really didn't want him to go.  It was tough with another mouth and me as a single parent with Pampers and formula and all, but I didn't want him to go.  But he came to me and said, "Since everything fell through and the monetary support you were supposed to have and you didn't get, I think I'm going to leave and go back home because I can see it is a lot on you."

Q    Okay.  Was he free to stay?

A    He was free to stay, yes.

Q    And you have stayed in touch with him as best you could?

A    Yes.

Q    Ms. Williams, why are you here today?

A    Because I am a mother.  I have children in this world.  And I couldn't have lived with myself if I hadn't come.

        MR. WHITE:  Please answer the government's questions.

3541

                CROSS-EXAMINATION

BY MR. PARCELL:

Q    Ms. Williams, what year was Mr. Tipton living with you?

A    That was the year of 1986.

Q    And when is the last time you saw him?

A    This is 1993.  Roughly, 1992  --  not 1992  -- 1991, November-December.

Q    At that point in time, ma'am, do you know how he was supporting himself?

A    No, I don't.  When I would ask, he would say, "I'm doing okay."

Q    You didn't know he was supporting himself with selling crack cocaine, did you?

        THE COURT:  She just said she didn't know.  So why are you going to ask her another question?

BY MR. PARCELL:

Q    At that point in time, had you ever met Cory Johnson?

A    Yes, I had met him.  I had seen him.

Q    How about James Roane?

A    Yes.  I had met him and seen him.

Q    Maurice Saunders?

A    I need to see a face.

Q    Hussone Jones?

3542

A    Hussone graduated with my daughter from Highland Springs.  Yes, I know him, and he lives across the street.

Q    Ma'am, can you tell us who Robert, Jr. is?

A    Can I tell you who Robert, Jr. is?

Q    Yes.

A    Do you have a last name?

Q    Robert Tipton, Jr.

A    That is my son's cousin.

Q    Which would be this defendant's cousin, also; is that correct?

A    That's correct.

Q    Do you know where he lives?

A    No, I do not.

Q    And Ms. Williams, is it safe to say that when this defendant was staying at your house, you treated him with love and respect and provided for him in that environment; is that correct?

A    That's correct.  He did me the same way.

Q    And when he assisted your daughter with her schoolwork, he was able to read and assist her in her education?

A    Yes, he would quiz her on what she had already put on the paper or what was in the book or what she needed to go over.  Yes.

3543

MR. PARCELL:  Thank you, ma'am.

THE WITNESS:  You are welcome.

THE COURT:  All right, ma'am.  You may stand down.  Thank you.

(Witness stood aside.)

MR. WHITE:  If the Court please, defendant Tipton rests.

THE COURT:  All right.  Ladies and gentlemen, we are going to stop there for today and start up tomorrow with Mr. Johnson's presentation in mitigation.  Again, the same admonishments I continue to give you, please adhere to them as closely as you possibly can.  Do not listen to or review any news items relating to this case, and do not discuss the case with anyone.  We will see you tomorrow at 10 o'clock.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

We will be in adjournment until 10 o'clock in the morning.

(Proceedings adjourned.)