# APPENDIX 3C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,

                                    Plaintiff;

        v.                                      CRIMINAL ACTION
                                                   92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                                    Defendants.

----------------------------------------
                          VOLUME XX

                    February 10, 1993
                    Richmond, Virginia
                       10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                   JEFFREY B. KULL
               OFFICIAL COURT REPORTER

                    P-R-O-C-E-E-D-I-N-G-S
          THE CLERK:  Case Number 92CV68: United
States of America versus Richard Tipton, Cory

Johnson, and James H. Roane, Jr., the twentieth day of trial.  Are counsel ready to proceed?

MR. VICK:  Government is ready.

MR. McGARVEY:  Defendant Johnson is ready.

MR. GEARY:  Defendant Tipton is ready.

MR. BAUGH:  Defendant Roane is ready.

THE COURT:  All right.  Let's bring in the jury.

(The jury entered the courtroom.).

THE COURT:  All right.  Mr. McGarvey?

MR. McGARVEY:  Thank you, Your Honor.  May it please the Court, co-counsel, ladies and gentlemen of the jury and of the prosecution:  Folks, why are we here today?  Well, I figured it would be easier to tell you why we are not here.  We are not here to try to excuse the acts of Cory Johnson.  There is no excuse for eight murders.  That's not what this is about.  We are not here to try to tell you that Mr. Johnson didn't know the difference between right or wrong.  When you folks entered your verdict, you decided that Mr. Johnson knew the difference between right and wrong.  We are not here today to ask you

3546

not to punish Mr. Johnson.  The alternatives here are life in the penitentiary without possibility of parole, to die in the penitentiary.  I should think that anyone would think that is punishment.  What we are here today to do is to decide whether or not to kill Cory Johnson.  That's what it boils down to.

Traditionally, the death penalty in this country is reserved for the most severe cases, the cases where the guilty person is completely and totally blameworthy, fully responsible for his actions.  Those factors which tend to lessen blame, which indicate that a person is not fully and totally blameworthy, should indicate that that person does not merit the most severe punishment; i.e., to be killed.

This isn't my point of view.  This is the law.  And the law requires this hearing before anyone can be given the death penalty.  The purpose of this hearing is to assure that you folks consider that the guilty person deserves the maximum sentence of death.  That person is guaranteed the right to this hearing in order to present reasons from our point of view why he doesn't deserve the maximum punishment.  These reasons are called mitigation.  The government has already put on what they called the aggravating

3547

factors.  This is our opportunity to put on what is called mitigation.

The law states that mentally retarded persons cannot be executed.  And the reason that they are excluded is because the law recognizes that mentally

retarded persons are not totally and completely blameworthy. They are not fully responsible for their actions.

Now, I'm not intending to suggest at this juncture or any other juncture that Cory Johnson is mentally retarded. It doesn't suggest that mentally retarded persons aren't responsible for their actions. It just indicates that the law recognizes that they are not as fully and totally blameworthy as an individual who has all his faculties.

Mentally retarded people have capabilities. Most mentally retarded people can hold jobs, raise families, be educated. Mildly mentally remember retarded people can be educated to, say, a sixth-grade reading level. I'm not suggesting that that is the case in the most severe cases of mental retardation, but in mildly mentally retarded cases, they can be educated. They can be arrested and they can be held accountable for their actions. However, because of the limitations that mentally retarded

3548

people have, they are not as fully responsible, as I indicated, not as fully blameworthy.

In this case, Cory Johnson, as I said, is not mentally retarded. But he has substantial mental, intellectual deficits that he has been plagued with his entire life. His IQ is within two points of being classified by the law mentally retarded, and therefore, legally not executable. Two points. He has severe neuropsychological impairment, and he is severely learning-disabled. This was diagnosed back when he was 13 years old, and we will present evidence today by Dr. Cornell here, who has administered tests and neuropsychological tests that have verified this. He has an IQ of 77.

In listening to Mr. Tipton's presentation yesterday, I was struck by the fact that he indicated that these learning-disabled ADD-type people tend to group together. And I think ultimately that's what we are going to be able to show you folks; that they somehow gravitated to each other. And when Dr. Evans yesterday was talking about the fact that learning-disabled people and ADD people have great difficulty in problem-solving, that they are very narrow minded, very focused, inflexible, I believe we will be able to show you folks today that that is the

3549

case with Cory Johnson. I don't just believe it. It is going to be shown. That is coupled with this severe learning disability and an IQ of 77.

Cory's situation, Cory's physical impairment, which I can't overemphasize is not Cory's fault -- what Cory did is Cory's fault, but what Cory's physical problems are are not his fault -- as I said,

they don't meet the standard definition of mental retardation. But his condition is very, very similar. As I indicated, mentally retarded people, mildly mentally retarded people can learn to read up to a sixth-grade level. But from the age of six to seven, Cory has been in special education. At 13, as I indicated, he was diagnosed with this learning disability. And after years and years of special education and the like, he is still only able to read on a second to third-grade level. So when I say that his condition is very similar to the mildly mentally retarded, in some instances it is much more severe. I've just given you an example of that. And this is after years and years of special instruction.

Now, we couple that with severe emotional deprivation as well. Again, when I was listening to Mr. Tipton's presentation yesterday I was struck by the similarity in backgrounds. Cory Johnson had a

3550

family. And I use "family" in quotations. He met his father when he was 12 years old. In the course of his lifetime he has seen his father three to five times since he was 12 years old. From age one until he was 12 years old, Cory Johnson moved at least 12 times. He moved 12 times to some relatives, to some friends, lived principally with his mother. And again, I mean no disrespect to Mr. Johnson, but I use the term "mother" in quotes as well. His mother was a drug abuser. His mother was abusive emotionally and physically to Cory. And to make matters worse, his mother took up with a number of gentlemen who were also drug abusers and physically abusive to Cory and his younger brother.

When Cory was 12-and-a-half to 13 years old, the New York justice system took jurisdiction over Cory and his brother and placed him in a foster care situation; principally, not because Cory had done anything wrong, but because his mother was flat-out unable, to put it charitably, to take care of him.

When I talked about emotional abuse, I'd like to illustrate that. Principally, the emotional abuse from his mother came about as a result of expectations that once again Cory Johnson couldn't meet. And he couldn't meet those expectations not

3551

because of anything that he had done, but because he was born with this severe neurological impairment. Despite that, Cory tried. His mother, believe it or not, expected Cory to go to college. And try as Cory Johnson might have, Cory Johnson couldn't read beyond the second-grade level. When the New York justice system took jurisdiction of Cory, they placed him in a foster home situation. This was the Pleasantville Cottage Home. You will hear from two people who

worked with him in this, the Jewish Child Care Association of New York. And what you will hear from these people and from the reports that we are going to give you is that despite Cory's mental and physical limitations, Cory always wanted to please. Cory was not a mean-spirited person. Despite his background, Cory wanted to learn. He wanted to learn. And I would suggest to you folks it is going to be shown that he wanted to learn because he wanted to please his mother. But there wasn't a darn thing that Cory could do to please his mother.

The reports are rife with references to the fact that Cory was not visited by his mother; that his mother took no interest in the fact that he was trying; and that on the few occasions that his mother actually did visit him, the notes suggest that she

3552

was very rejective of him to the point that the staff there made comments about it; that she would get phone calls from the Home, and she wouldn't return the phone calls. She would call only to cancel an appointment, and not reschedule them. But despite this, Cory tended to treat his mother like a goddess.

There was a quote that you folks are going to have in front of you that I found particularly instructive and particularly touching, and I'd like to read it to you now. This is from a January, 1983 treatment review of Cory Johnson by Gail Turnquest, the caseworker at the Pleasantville Cottage School.

"Child care workers note that Cory's behavior deteriorates when he has no contact with his mother. He can also become quite depressed when he has not heard from or seen her for a period of time. It is the opinion of his child care workers that Pleasantville is good for him and that he is functioning fairly well here. Cory realizes his learning disabilities. However, he struggles to do his homework. He is truly motivated to do well and to succeed, and has not yet given up on himself.

"Cory presents with no real behavior problems. Within the last two weeks, there has been some

3553

decline. Cory fantasizes that his mother will come up in a car and take him to Pizza Hut. Child care workers report that Cory's mood is basically that of a depressed child. He longs for his mother and acts out his realization that in fact his mother is emotionally unavailable to him. However, he denies his feelings when confronted directly. He also struggles to involve his father --" his father who he had seen three to five times in his life "-- who also does not come through for him. Sundays can be very difficult for Cory because he usually doesn't

have any visitors."

From the age of twelve-and-a-half until he was 18, this basically was Cory Johnson's life: attempting to learn and not being able to learn; attempting to be accepted by the only family that he had, his mother, and to be continually rejected by his mother. And you couple that with a childhood that was -- if you can call it a childhood -- basically, Cory took care of himself since he was three years old because his mother was too busy doing drugs and taking care of herself and living with her boyfriends.

When you couple this background of abuse, depression, lack of acceptance, rejection by the one person who mattered most to him, along with the severe, and I'm talking severe, cognitive deficiencies in Cory, it might provide somewhat of an explanation of what happened. As I suggested to you, there is no excuse.

At the conclusion of this presentation, I would suggest to you folks that the question you have to ask yourself is not whether Cory is guilty, not whether he should be punished, not whether he knew what he was doing was right or wrong. Those have already been decided. But whether he is fully and completely blameworthy; whether he is totally responsible for his actions. This penalty phase is, as the Supreme Court says, a narrowing process. Because as I indicated, the death penalty is reserved for those who are totally and completely blameworthy in the most severe cases.

When you ask yourself that question, you have to ask whether or not, after this presentation, Cory is fully and totally blameworthy; whether he is completely responsible for his actions. Has he lived his life as the normal, average person, who might be totally and fully responsible? Or has he lived his life under these situations that I have described.

We will demonstrate to you today that Cory is not a normal young person. He is 24 years old now. He has severe neurological impairment. He is two points above being mentally retarded. And when you couple that with this abusive background, I think you are going to be able to see that he is not as totally and completely responsible as a person who doesn't have those deficits. And life in the penitentiary without possibility of parole is no bargain, either. Thank you, folks.

THE COURT: All right. Call your first witness.

MR. COOLEY: Our first witness will be Dr. Dewey Cornell.

DEWEY CORNELL, called as a witness by and on behalf of defendant Johnson, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COOLEY:

Q    Dr. Cornell, good morning to you.

A    Good morning.

Q    Would you please tell the ladies and gentlemen of the jury your full name and your profession?

A    Dr. Dewey G. Cornell.  I'm a clinical psychologist and associate professor.

Q    And where are you employed?

A    University of Virginia.

Q    And is your title there associate professor?

A    I'm associate professor of education in the programs in clinical and school psychology at the University of Virginia.  I am also a faculty associate of the Institute of Law, Industry and Public Policy.

Q    And what are your professional duties as an associate professor?

MR. VICK:  We would stipulate as to his expertise.

MR. COOLEY:  I very much appreciate that, Your Honor.  I would like for the jury to know something about him.

THE COURT:  Go ahead.

BY MR. COOLEY:

Q    Doctor, what are your professional duties as an associate professor?

A    My principal duties are teaching, research, and service at the University of Virginia.  I teach graduate courses in our training program that trains Ph.D.s in clinical and school psychology.  I teach courses in personality assessment, in psychopathology; that is, in mental disorders.  I am

I am also the assistant director of our training clinic, which is a clinic that provides psychological assessments, and I'm in charge of the psychological assessments that our university clinic provides.  I also am involved in the training of psychologists and psychiatrists who specialize in forensic mental health, and I conduct research in those areas as well.

Q    I see.  Doctor, can you describe briefly your educational background and any training that you had in clinical psychology?

A    My training in clinical psychology began at the University of Michigan.  I obtained my Master's degree in 1979 and my Ph.D. in 1981 at the University of Michigan from the Department of Psychology, from

the training program in clinical psychology.  As part of my doctoral training, I had course work in clinical psychology, in diagnosis assessment, treatment of individuals with mental and emotional disorders.  I also had internship training, clinical practice training.  I worked at the Yorkwood Center, which was a children's psychiatric hospital working with emotionally disturbed children and adolescents. I also worked at the University of Michigan psychological clinic, which is a psychotherapy clinic

3558

for young adults with emotional problems.

I also worked at the learning evaluation clinic by the School of Education in the University of Michigan, which is involved in the diagnosis and assessment of learning problems in children.

I completed those training experiences and my doctoral research in 1981, and at that point I accepted a post-doctoral position as a post-doctoral scholar in psychology in the Medical School at the University of Michigan, where I worked in the adult psychiatric hospital providing diagnosis assessment and treatment of individuals, of adults, with mental disorders.  And I conducted research there on these same problems and disorders.  I was there for two years.

Q     All right.  Doctor, would you explain to the folks, the ladies and gentlemen of the jury, the distinction between clinical psychology and forensic clinical psychology?

A     Yes.  Clinical psychology is the branch of psychology that is concerned with clinical practice, with working with individuals who have emotional disorders or problems in living that require treatment.  Forensic clinical psychology is a subspecialty.  It is the application of clinical

3559

psychology to legal matters.  And it is an area in which the person may evaluate individuals who have been charged with crimes, or may assist the Court in some way in answering legal questions that require some psychological information.  So it is a specialty of providing information in psychology that's relevant to legal questions.

Q     Doctor, have you had any special training in the field of forensic clinical psychology?

A     Yes, I have.  Beginning in 1983, I began specialized training and practice in forensic clinical psychology.  I was employed as a forensic clinical psychologist in Michigan at the Center for Forensic Psychiatry.  This is a state institution, a hospital, which provides diagnosis and treatment to individuals who have been charged with serious crimes, individuals who are violent, who are either

not competent to stand trial, or who might be considered legally insane, or for other reasons cannot be managed in the legal system or in the prison system. And those individuals are treated at the forensic center. I completed six months of training at that agency and became a certified forensic examiner for the State of Michigan and worked and conducted research and provided treatment

3560

in that setting.

Q    Doctor, have you conducted forensic evaluations of criminal defendants?

A    Many. Hundreds of them.

Q    And did those include defendants charged with murder?

A    Yes.

Q    Have you treated individuals who have committed murder?

A    I have treated dozens of individuals who have committed murders of various kinds.

Q    Doctor, in terms of your professional background, are you licensed in clinical psychology?

A    Yes. I'm licensed in the State of Virginia as a psychologist and as a clinical psychologist.

Q    Are you a member of any professional organizations in psychology?

A    I am a member of the American Psychological Association, the Virginia Psychological Association, several divisions of the American Psychological Association, the Society for Personality Assessment, the American Orthopsychiatric Society, and several other professional organizations.

Q    Within your profession, have you presented any papers in the area of forensic clinical psychology,

3561

any conferences? And if so -- or professional meetings -- if so, briefly tell the ladies and gentlemen of the jury about them.

A    I am very actively involved in the forensic field and in conducting research and presenting the findings of my research at meetings of professional organizations. This would include presentations I've made at national conferences of the American Psychological Association, the American Psychiatric Association, as well as state and local conferences as well.

Q    And have you published any books or articles in the area of forensic clinical psychology?

A    I have published a number of articles, particularly in the area of homicide. I have published a book with Eliza Benedict on juvenile homicide, a series of articles on the origins and development of violent behavior in young persons. I have also conducted research on malingering, which is

the tendency of some individuals to present false symptoms or to try to deceive mental health professionals. I have also published research on the assessment and diagnosis of mental disorders that are found commonly in individuals who are charged with violent crimes, such as depression, borderline

3562

personality disorder, other types of personality disorders.

Q    Your curriculum vitae indicates that you are a journal reviewer for national journals. Would you tell the ladies and gentlemen of the jury what a journal reviewer is?

A    Scientific journals in the field publish research articles and theoretical articles only after an extensive review process. Articles are submitted to the journal. They are then reviewed anonymously by a panel of experts in the field, who evaluate and critique the articles, reject the majority of them, and accept a small number of them as acceptable for publication. And I have had the opportunity to be selected as a journal reviewer for a number of journals in the forensic area: Law and Human Behavior, Behavioral Sciences and the Law, for example.

Q    Have you received any grants to conduct research in forensic clinical psychology?

A    I received a series of grants to conduct research on violent behavior; on the family background, personality, and development of individuals who commit violent crimes. I have received grants from the State of Michigan and

3563

national grants from the Guggenheim Foundation.

Q    Have you had any experience in training others to work in the field of forensic clinical psychology?

A    In my current position, which I've held since 1986, I have been involved in training individuals in the State of Virginia to be certified to conduct forensic evaluations. That is, the state has a training program to train psychologists and psychiatrists to do court evaluations. And those individuals come to our agency at the University of Virginia for training. I'm a lecturer there, also a supervisor of the cases that we conduct there.

Q    You indicated a little earlier that you had personally conducted forensic evaluations, somewhere between 400 and 500 criminal defendants; is that correct?

A    Probably 400 to 500 criminal defendants that I have evaluated for forensic purposes, yes.

Q    Did the referrals requesting you to do those evaluations, did they come from the prosecution, or

do they come from the defense?

A    They come from both sides of the case.

Q    And when you were doing these in Michigan, where did the referrals come from?

3564

A    Michigan has a system whereby the referrals come from the court.  The referrals that I received were from the court, not from either one side or the other.  I would submit a report and then either the prosecution or the defense would call me depending on which side felt my testimony would be of value to them.

Q    How many times altogether, Doctor, have you been called to testify in court proceedings?

A    Including other states other than Michigan, probably 40 to 50 times.

Q    And during the course of that testimony, was it more often for the prosecution or more often for the defense?

A    I have been called many times by both sides.  I would guess that I have been called more by the prosecution than by the defense.

Q    And you have testified not only here in Virginia, but also in some other states; is that correct?

A    Yes.

Q    Those would include Maryland and Michigan and Wisconsin?

A    And Virginia, yes.  Those four states.

Q    And that would also include some experience

3565

being qualified as an expert in federal courts in Virginia; is that correct?

A    On one occasion I have testified in federal court in Virginia as well.

Q    If we can, let's turn to your role here today.  I'd like for you to help us clarify that for the ladies and gentlemen of the jury.  You are aware that Mr. Cory Johnson has been convicted of seven murders in the course of or in furtherance of a Continuing Criminal Enterprise; is that correct?

A    Yes.  I am very aware of the charges and his conviction on them.

Q    In addition, one other murder that was not related to the Continuing Criminal Enterprise for a total of eight; you are aware of that?

A    I am aware of eight, yes.

Q    All right.  Are you here today to testify that Cory Johnson is not responsible for his actions in committing those crimes?

A    No, I am not.

Q    Are you here to testify that Cory Johnson should be excused for the crimes for which he has been convicted?

A    Absolutely not.
Q    Now, if you believe that Mr. Johnson is

3566

responsible for his actions and shouldn't be excused
for his crimes, tell the ladies and gentlemen of the
jury what the basis of your testimony is today.
A    The basis of my testimony is very narrow.  That
is, when a person is charged with a capital crime,
there is a capital sentencing evaluation.  And the
purpose of that evaluation is to provide the jury
with as much information as possible that they would
need to make a decision of mitigation.  And in this
case, the decision on which my evaluation is based is
whether there is information relevant to the jury's
decision of receiving the death penalty or life in
prison without parole.  And so all of my testimony
and evaluation today is only intended to give the
jury information on making that distinction, and I
want to make that very clear: that it is not an issue
of whether Cory should be excused for the actions or
not considered responsible for the crimes that he has
been convicted of.
Q    Now, Doctor, you have been asked to evaluate
Cory in a number of capacities; is that correct?
A    There are three issues that I was asked to
evaluate him for, one being mitigation, the capital
sentencing evaluation that I am testifying about.
There are two prior issues that I also evaluated him

3567

for.  One was whether he was competent to stand
trial, whether the trial could proceed because he was
capable of doing that; and the other was whether he
could be considered criminally responsible or not
responsible -- that is, insane -- at the time of the
offenses.  And so I did separate evaluations of him
addressing  --  I addressed those questions
separately, I should say.
Q    Now, Doctor, so let's take them individually.
As to the evaluation as to Cory's competence to stand
trial, did you find that he was competent or
incompetent?
A    Well, despite his intellectual limitations, I
thought he met the very low standard for being
considered competent to stand trial, minimally
competent to stand trial.
Q    As to your evaluation relating to what would
commonly be called sanity at the time of the offense,
did you find that Cory was insane or not criminally
responsible, or did you find that he was sane and
criminally responsible?
A    I could not support a finding that he was insane
or not responsible.
Q    Your testimony today relates only to the area of
presenting to the ladies and gentlemen of the jury

3568

those elements and conditions which might be considered by them to be mitigating; is that correct?

A    That's right.

Q    If you would, let's focus on the mitigation evaluation.  Would you describe for these folks what you did that constituted a mitigation evaluation?

A    Yes.  Mitigation evaluation for capital sentencing should be a very thorough evaluation.  And first of all, there are several parts to my evaluation.  The first part of my evaluation was that I met with him individually and interviewed him.  I met with him on three occasions.  I spent approximately 15 hours with him, interviewing him and giving him psychological tests.  I tested his intelligence, his school achievement, his personality.  I also obtained from him a complete account of his life, from his earliest recollections up to the present time, in order to provide the jury with a complete account of who he is and how he became the person that he is today.  That is the first part of my evaluation.

The second part of my evaluation is really to review as much collateral information, independent information, as I can to either confirm or disconfirm

3569

what Cory Johnson tells me, and also to add additional information that he did not touch upon.  For that purpose, I had really extensive records that I received to evaluate him.  I had records received from the prosecution  --

MR. COOLEY:  Judge, if I could, those would be the items that I am holding up here; is that correct?

THE WITNESS:  That would be about the right size of it, yes.

BY MR. COOLEY:

Q    These were items supplied by whom?

A    My understanding is that they were supplied by the prosecution, describing the allegations and the offenses.

Q    I'm sorry to interrupt you.

A    I also received additional records, school records, from New York City Public Schools, records from the Jewish Child Care Association, where Cory spent time at a residential treatment center there for about four years.  So there are about four years of records there.  He also spent some time in a group home, over a year there, and I received records from them.  He also spent some time in Riker's Island jail in New York City, and I received records from them.

3570

Q    Let me ask you, if I may, are those records

contained in these four notebooks?

A    I have a copy very much like that, four binders with those records in them.

Q    Quantity-wise, this would appear to be consistent with the records that were available to you and reviewed by you?

A    That's right.

Q    Were those records reviewed in depth?

A    Yes.  And they were well over 500 pages of records that I reviewed.

Q    In addition to your meetings with the defendant, with Cory, did you have occasion to interview anyone else relating to developing your mitigation testimony?

A    I conducted additional interviews.  I had the opportunity to meet and have a face-to-face interview with his mother.  I also conducted telephone interviews with individuals who worked with Cory when he was at the Pleasantville Cottage School in New York, and Elmhurst Boys' Home in New York.  There were about six individuals, staff members there, two psychiatrists, a psychologist, and several social workers that I interviewed as well.

Q    And two of those folks are here today; is that

3571

correct?

A    Yes.  I had the opportunity to meet them this morning face-to-face.

Q    I see.  Doctor, did you also refer Cory for any specialized testing which has been made a part of your evaluation?

A    Yes.  Based on my initial testing, I felt that there was strong evidence of brain impairment.  So I referred him for a more specialized testing, neuropsychological testing by a neuropsychologist, Dr. Edward Peck.  And I received a written report from Dr. Peck, and then I also spoke with him about his report and got an oral report as well from him.

Q    Doctor, based on all of the information that you had at your disposal and that was made available to you, you prepared a mitigation report; is that correct?

A    Yes.

Q    Did you prepare anything beyond that report?

A    In addition to the report itself, I also assembled together quotations from the records that I reviewed, quotations that I thought best summarized the mitigation reports, my mitigation report.  I also assembled Dr. Peck's report, a series of materials that I felt summarized the basis for my mitigation

3572

report; that is, the primary findings that I relied on, including some charts of my own psychological test results.

Q    All right.  And did you include certain things such as definitions of some of the conditions that Cory has?

A    Yes.  I also included the federal and accepted professional definitions for learning difficulties, learning disabilities, and mental retardation as well.

MR. COOLEY:  Your Honor, with the Court's permission, we have a copy of the full report and appendages for each member of the jury.  The government already has their copies, and also a copy for each defense counsel and the Court.

THE COURT:  All right.

(Documents proffered to Court, counsel, and jury.)

MR. COOLEY:  If I could be so bold as to request of those folks who have received a copy if they could try to follow along with us as we go through it rather than leafing through, which I think is a tendency, naturally.  We would appreciate that in presenting it in the form Dr. Cornell has set it up.

THE COURT:  All right.

BY MR. COOLEY:

Q    Doctor, if you would, we would like to start with a review of Cory's life and ask you, based on your evaluation and various sources of information that you have described to the ladies and gentlemen of the jury and obtained during the course of your evaluation, did you formulate an opinion about the psychological background, development of Cory Johnson?

A    Yes, I did.

Q    Could you summarize for us what you concluded?

A    When I put all the information that I reviewed together, I think there are two primary factors that I felt the jury should be informed about for purposes of mitigation.  The first of these is Cory Johnson's upbringing in a severely unstable, neglectful, and abusive family environment, which had a devastating effect on his psychological development and his emotional maturity.

The second main factor that I felt was important was his degree of brain impairment, which is exhibited as a very severe learning disability, a speech impairment which he suffered during his childhood years and still has remnants of today, and his generally impaired intelligence, which places him just above the level of mental retardation.  Those two factors in combination, I feel, made Cory unprepared to function in society, unprepared to survive on his own when he left institutional care

and had no place to turn to, and made him unable to cope and adapt to society in a way that a normal individual would.

Q   I'd like for you to explain to me and to the ladies and gentlemen of the jury, if you would, how you came to those conclusions. Can you tell the Court what information about Cory's background led you to this, or these, conclusions?

A   This would take some time. First, regarding his upbringing, I looked at his life as being in three phases: the first phase being his life with his mother up until about age 13; and then the years that he spent in institutional settings; and then finally, the third phase, after he left the institutions and was out pretty much on his own.

During that first phase of time when he was with his mother, or at least mother had formal legal custody of him, he lived in an extremely unstable situation. He actually was under his grandmother's care initially as an infant. When I interviewed his

3575

mother, she had very poor recollection of his upbringing and was not very involved in his child care. That was either taken care of by her own mother, when she lived at home for a couple of years, or he was left basically unattended for long periods of time. The mother could not recall details of his life, basic things that most mothers can recall about their children, such as when they learned to walk and talk, and how they were potty-trained, and how they did when they were in school. Stories from their childhood.

She was not around very much during his upbringing. She was involved in jobs that she held. She was involved in relationships with a series of men. And as she said a number of times, he couldn't fit into her life, and neither could his half-brother, Robert. The father, of course, was not in the picture at all. He was in prison. He had no contact with Cory. Cory was led to believe by his mother that his father was actually a man named Robert Butler, who was actually father to Cory's brother. Cory only met his father, basically by coincidence, when he was 12 or 13 years old. And up until that time, he thought the man named Robert Butler was his father. This was a man that his

3576

mother lived with for a short period of time. He was abusive. They had a parting of the ways and he was one of a series of men that she lived with at various times who were abusive to her and to the children, and who were involved in drug abuse. And at various times, those individuals moved in and out of the residence.

Now, it was very difficult for me to determine where Cory lived and how many times he moved. I know that at least 12 times, his mother changed residence. But there were many more times in which Cory was sent back and forth to other relatives. He didn't have a stable place that was his home. He didn't have a single individual that he could regard as a parent in the sense of someone who is going to always be there, be there and take care of him. His mother nominally would be his parent, but his involvement with her was neglectful and abusive. And he and his brother had evidence of serious emotional problems well before they were teenagers.

He had troubles with enuresis, bedwetting, up until age 11; encopresis, fecal soiling of pants, when he was 10 and 11 years old, which are signs of quite serious emotional disturbance. His brother Robert, at a young age, I believe ten or eleven, made a suicide attempt and was hospitalized for five months in a psychiatric setting. So both these boys were quite emotionally troubled; understandably so, given the kind of extremely unstable environment that they grew up in.

And I mentioned also that there were abusive boyfriends. And the mother related to me a number of violent incidents in which either she or the boys were physically assaulted and threatened by various boyfriends. And Cory had quite serious difficulties with one boyfriend, to the point that she did not think it was safe for him to stay in her residence any longer. That is basically the first phase of Cory's life up until about age 13.

Q    If I could ask the ladies and gentlemen of the jury to go, and you as well, to the green tab and to turn that over to the chronology of events in Cory Johnson's life.

You have basically described what would be the top third of that chronology, I believe.

A    Yes.

Q    And he was, of course, born in Brooklyn, and his birthdate was in November of 1968. You have indicated a number of movements by Cory with his mother or without his mother during the time frame from birth to the age of 13, at which time he was committed by her to the state, and ultimately placed in foster care; is that correct?

A    That's correct. At approximately age 13, he was placed in the Pleasantville Diagnostic Center, a residential facility for diagnosis of children with emotional disturbance. He was there for two months of evaluation, and at that point they felt it was more appropriate for him to be placed in an

institutional setting.  It is called the Pleasantville Cottage School.  It is called Cottage School, but actually what it involves is that he lives in a home that's supervised  --  in a cottage with several other emotionally-disturbed boys on the grounds.  There is also a school that he would attend during the day.  And he was placed there basically because the Court determined that his mother was not appropriate, and that he could not be well-raised at home.  He remained there from about age 13 to 16.

Q    If I could refer the jury to the blue tab in your book, open that first document that is behind the blue tab.

Doctor, you have blown that up, I believe.  You have taken a quotation from the petition which removed Cory from the home and indicated -- and I don't want to belabor this because I know that each person who has this can read for themselves -- but in that petition, and this is the language from the Court itself, there was a determination that the child, Cory, had been removed from his home on February 1st, 1982, and that the parent was unable to make adequate provision for his care, maintenance, and supervision; is that correct?

A    That's correct.  And in this tab are the quotations that I selected.  Now, in order to give you the context for these quotations, the next tab has the report, the legal petition, for example, that the quote comes from.  So I'm going to focus on the quotation, but it is possible for anyone to look at where that quotation came from and to read what came before it and what came after it.  In addition, there are other reports as well.

Q    If I can, so that everyone can understand what we are doing, the volume that's behind the blue tab are quotations which you have drawn from reports from the child care agencies.

A    Right.

Q    The specific reports from which these quotations are drawn are behind the orange tab.

A    That's right.

Q    We do not intend to read all of those reports or to require you to read them, but they are there in case there was a concern that your quote had been taken out of context; is that correct?

A    That's correct.

Q    And the items that are behind the orange tab are excerpts from the reports that are contained in these volumes that were supplied by the child care agencies.

A    That's right.

Q    If you would, can you relate to the ladies and

gentlemen what occurred and how things were occurring once this second stage arrives in Cory's life, where he has been voluntarily, by his mother, removed from his home or her home and placed with the state?

A   Yes.  Once he was placed with the state he had a series of psychiatric, psychological, and educational evaluations.  He had those initially when he first came there so that they could decide what needed to be done, and then he had further evaluations repeatedly over the years that he was there as they tried to monitor his progress and refine their treatment to help him.

And what I have done is I've gone through all of those records page by page, and what I have selected here are the ones that I felt that were most influential to me in formulating my opinion, and which I think accurately reflect his time spent at this institution.  And then I follow that up by contacting the authors of most of these reports.  I talked to six individuals that I could identify, and spoke with them about the reports to make sure I understood what they were saying and that I had an appropriate interpretation of what was said.

First of all, from the very beginning, they assessed that he had serious emotional problems.  They reported emotional disturbance that he had prior to coming to the child agency, and then they described what he was like once he is there.

The first psychiatric evaluation, which actually is page six of these quotations, describe that he was cooperative, that he related well, but that he had a slurred speech, and he said he doesn't want to come home for awhile so that "I can straighten my head and my mother can straighten herself out."  Quotations that he made to the psychiatrist who saw him, Collimuttam.

Cory feels he has problems with learning and reading.  He likes the school and the counselor here.  Cory feels sad when his mother keeps telling him about his father being in jail.  He has felt at times like wanting to stab himself, but has never done anything to hurt himself and doesn't think he will ever do it.  Cory talked about his brother trying to kill himself, "because of my mother," he said, and says that he feels very sad about it.

Q   Cory's brother was younger?

A   His brother was two years younger.  He made a suicide attempt and was placed at another agency called Children's Village, and he was there for awhile and then later was switched to Pleasantville as well.

Dr. Collimuttam I thought, summarized well his

early impression on page seven.  He says, "life has been very chaotic for this family with Cory's mother having had financial problems, having difficulties with her job and her relationships.  Mother appears depressed and unavailable to the child emotionally.  There have been frequent moves, stays in the homes of relatives often with the mother and children being in different homes.  This was followed up with a period of being with the mother's boyfriend, who Cory did not get along with and would steel from to get back at home.  Cory is a child who has been reacting to the chaotic life in the last four years.  In

3583

addition, he has shown evidence of mild to moderate neurological deficits of dyslexia and speech impairment."

And then Dr. Collimuttam gave him diagnoses using our standard diagnostic manual, the DSM-III.  He saw him as having an adjustment disorder, which means he was reacting to stressful events in his life with symptoms.  He was diagnosed as having a special developmental reading disorder.  It is another term for dyslexia.  It is another term for learning disability.  Those are all interchangeable terms.  He was also diagnosed as having positive soft neurological signs, which means that there was evidence that he had brain damage.

He was then given a psychological evaluation by a psychologist.  This is a little bit out of order.  This is on page five.  Dr. Cary Gallaudet gave him a series of psychological tests.  He described serious problems, deficits in nonverbal abstract reasoning, perceptual organization, visual perception and perceptual motor functioning.  These weaknesses were also evident in his Bender-Gestalt test, which was characterized by rotations and distortions.  Performance was comparable to a child five years below his chronological age, an underlying

3584

neurological deficit.

Q    Cory was age 14 at this point in time.  Then he would have been operating at the level of a normal nine year old?

A    At the level of a 9 year old, yes.  Yes, in these areas where he showed brain impairment.  It says, "In summary, Cory is a sensitive and dependent boy who is struggling with issues revolving around independence.  An underlying organic component," that means brain damage, "serves to exacerbate the anxiety, dependence, affectional needs, and hostile impulses, and as a result, Cory has an extremely hard time trying to integrate emotional challenges.  Although evidence of a learning disability exists, he continues to be an ambitious boy who is motivated to

improve his situation and would benefit highly from both remediation in academic areas as well as psychotherapy."

What's surprising about this statement and other statements that follow is that Cory remained very motivated. He remained cooperative, eager to learn, and willing to take on the challenge of his disability. If any of you have had experience with learning-disabled youngsters, you know that even mildly disabled youngsters become discouraged. They try to avoid their disability, understandably so. What was unique about Cory was, first of all, that he had a very severe learning disability -- I'll talk more about that later -- but that he continued to be motivated to try to overcome it. He had an educational evaluation. That's page eight of the quotations, by an education specialist who again pointed out that he was reading on the second-grade level. Third-grade level was too difficult to read. His spelling was second-grade level. His arithmetic was mid-third grade. It said that he couldn't multiply by three. He couldn't divide a number by two. He couldn't read digits of more than four digits. He could recite the months of the year only up to August. He knew there were 12 months, but he couldn't say them all. So this is when he is 13 years old. And he doesn't know all the months in the year, he can't read and do arithmetic beyond about a second or third-grade level. Of course, he has moved at least 12 times and had to change schools and classrooms, and I'm sure that he wasn't given much of an opportunity for teachers to work with him while he was in schools.

I also looked at part of this at what his mother was like at this time. Because a very important part of any kind of treatment is to get the family involved and to work with them. And I got very consistent descriptions of his mother, who was the only family member that they had any contact with. This is on page nine, Gloria Caro, caseworker assigned to work with him, they have a conference report. This conference involves a psychiatrist, a psychologist, teachers. The mother is invited to come, although most of the time she did not come, and Cory participates in parts of these conversations. But the caseworker -- he had a series of caseworkers -- the first one said, "Ms. Johnson is an attractive, stylishly-dressed woman who works as a receptionist. She is an articulate woman who reacted to my statement with anger, indicating she is trying to put her life together. She says right now she does not have too much energy or time for her kids.

She believes they will have to understand it.

"The message is, if her kids can live her life right now, okay. If not, she can't see them. She says she loves her kids, but putting her life together comes first.

"A joint interview with Cory elicited almost no comment from Cory, who stared at the ceiling while his mother pretty much lectured to him on how insensitive he was to 'where I am now and have to be.' It was not concern for him and his situation, being separated from family, being institutionalized."

She continues. She says, "It is difficult to see how Ms. Johnson can be engaged unless her needs are seen as primary. She refuses referral for treatment for herself. Further contact will reveal how fixed she is in this narcissistic, self-focused stand."

This is June. He has been in the setting for about four months. They are concerned that they cannot work with the mother, and this continued. In January of 1983, this is page ten, he now had a new caseworker, had a change in caseworker. He has now been in the institution almost a year. And here we have the quotation you may have heard before: "Child care workers note that Cory's behavior deteriorates when he has no contact with his mother. He can become quite depressed when he has not heard from or seen her for a period of time. It is the opinion of the child care workers that Pleasantville is good for him, that he is functioning fairly well here. Cory realizes his learning disabilities. However, he struggles to do his homework. He is truly motivated to do well and succeed, and he has not yet given up on himself. Within the last two weeks, there has been some decline. Cory fantasizes that his mother will come up in a car and take him to Pizza Hut. Child care worker reports that Cory's mood is basically that of a depressed child."

It continues to report that Cory wants to have contact with his mother, wants to have contact with his father. He tries to maintain the view that they are available to him. He cares about them, but not accepting that they are not available to him.

Q    If I might, obviously, these reports being written by his workers in 1982 and 1983, and for that matter, the remaining ones that you are going to comment on, obviously were not done in anticipation of a trial proceeding.

A    That's right.

Q    These are excerpts taken from the reports of evaluations being done of Cory in an effort to help

him adjust to the problems that he had; is that correct?

A   That's right.

Q   Different from, obviously, your report which has been prepared in anticipation of this trial.

A   That's right.

3589

Q   But these excerpts are not so.

A   That's correct.

Q   Go ahead.

A   These individuals had no inkling of what would happen in Cory's future.  In fact, when I interviewed them they were shocked at what had happened, very troubled by it.  As one of them said, "There is lots of boys that I work with here that I wouldn't have been so surprised if you told me what he was charged with," but they were very shocked to hear this about Cory.  Cory was one of the better-adjusted boys at this school.  But he was hampered because he was one of the most severely learning-disabled boys that they had seen.  And they reported that he worked and worked, and try as he might, he couldn't read above about a second or third-grade level.  And over a period of months and years he became extremely frustrated by that.  He was given some educational tests after he had been there one year.  They did a fairly comprehensive reevaluation of where is he, why isn't he learning, what is the problem here.  This was Dr. Barish, a clinical psychologist called in as a consultant to test him to try to find out why isn't Cory learning in school, why is it that he appears motivated but isn't able to learn.

3590

Q   I am going to ask if we could put the easel close enough for the jury to see.  This is a blow-up of what is already included on page 13.  The jury may want to make reference to that.

    (Easel displayed to jury.)

    The second psychological evaluation that's now before the jury on page 13, what did it show?

A   Well, it showed that he was severely learning disabled.  This psychologist gave him not only tests of his school achievement and found that after a year in this setting he still is reading at the first percentile, he has spelling at the first percentile, arithmetic at the second percentile.  That means compared to other children his age, he is in the bottom one percent.

Q   Is it possible under the testing that was available then, and I suspect available now, for one to test lower than the first percentile?

A   That's as low as you go.  He was at the bottom. That is, 99 percent of other kids were ahead of him despite his being in special education, despite his

good motivation.  He could not learn to read or spell.  He is a little bit better in arithmetic, and that turned out to be a little bit better for him later on.  He was also given neuropsychological tests similar to what Dr. Peck gave him this year, which also confirmed that there was brain impairment; that this was not a problem that he wasn't motivated, or was emotionally disturbed, but the brain was not functioning properly for him to learn.

"The present test findings confirm the presence of severe learning disabilities in reading, spelling and arithmetic.  There is an abundance of findings which strongly suggest diffuse neurological dysfunction with associated impairment in many aspects of cognitive functioning."

I spoke with the doctor.  He said this is the most severe case of learning disability that he has, up until now, ever encountered.

Q    For those of us who are not -- I'm certainly one -- not familiar with the phraseology, can you tell these folks what "diffuse neurological dysfunction with associated impairment" might mean?

A    Pardon me for just rushing over that.  Diffuse neurological dysfunction means that there is evidence of impairment in his nervous system in his brain.  It is diffuse, meaning that it occurs not in one specific area, but in a number of different areas in the brain.  So that this is one of the reasons he couldn't learn.  Many individuals with learning disabilities have local deficits, or specific deficits.  They can't process visual information very well.

They learn to compensate for that.  Most learning-disabled children can learn to compensate.  If they can't learn one way, they learn another way.  If they can't learn by reading something, they have it read to them.  Or, if they can't learn through writing, they learn orally.  They can learn a number of different ways and they compensate.  The problem with Cory is that his  --  his disability was so severe, so diffuse, he couldn't compensate.  There was no area that was unimpaired so that he could rely on that area.  These scores, they also have standard scores, 66, 64, 64.  Those are all in the mentally retarded range.  Scores in the 60's are in the mildly retarded range.

Q    On the chart that is before the ladies and gentlemen of the jury on the easel, as well as on page 13, not only was he testing in the lowest possible percentile on two of the three, and in the second percentile in arithmetic, but his standard test scores at that time would have put him

well-within the mentally retarded range?
A    Yes.

3593

Q    Is this the same point in time where those workers who were dealing with him and working with him were reporting that he remained highly motivated, was trying to learn, trying to do the best he could?
A    That's correct.
Q    Was there anything in these reports at that point in time that indicated in any manner that Cory was, for instance, faking or refusing to participate in these tests, trying to score low?
A    Well, not -- certainly not faking.  Certainly he tried his best whenever he was tested.  However, I think they report that there were times he was very frustrated by this.  And I don't want to give the impression that any 13-year-old is always motivated and always on task and always trying to learn.  I think there were undoubtedly times when Cory was less motivated, would give up on something he was trying to learn.  But what is most striking, very different from other records I've seen and other kids I've seen, is the level of motivation he showed at this time; that he was trying very hard.
Q    Psychologists, of course, are trained to watch for things which would suggest that the person was intentionally trying to do poorly.
A    Absolutely.

3594

Q    Is there any indication in any of these tests that they found these tests to be invalid?
A    No.  I don't have any concern about these test results.  They are very consistent.
Q    If I could ask you to refer back to Page 11. This remains under the blue tab.  Page 11 and 12 are the reports that indicate his treatment review and progress in school immediately preceding the testing that is currently sitting on the easel and also on page 13.
A    Yes.
Q    Would you comment as to those two pages, either read or clarify them?
A    The statement "His progress in class has been very, very, very slow, almost to the point where one might feel he is not learning.  He received remedial reading two to three times per week.  However, his reading and spelling is on a second-grade level."
    This is why they did this kind of extensive evaluation.  The teachers were frustrated.  They were working with him, they saw him trying, and they saw no progress.  And so it was very mysterious to them how this could be, and why he wasn't performing better.  Because in many respects, Cory looks like a normal young man.  He can act like a normal young

man.  So, you know, if he had been disfigured, if he had looked like someone who was maybe mentally retarded with a syndrome that involves facial abnormalities or something, then that would make some sense to them.  They would see evidence that he wasn't normal.  Instead, they don't see that.  All they see is a motivated boy who can't learn.
Q     The second paragraph on Page 11 makes reference to the fact that he had been referred to his speech therapist at that point in time.
A     Yes.
Q     Back on the quotation from page two in November of 1983, he had been early on -- there was a determination that he had significant speech disorder.
A     Yes.
Q     And can you comment briefly on what that would have involved?
A     Individuals with learning disabilities and with brain impairment may also have speech problems.  And they noticed slurred speech and other speech problems early on.  They referred him for speech therapy.  He was very eager to receive it, because in fact it was very embarrassing for a youngster to talk funny, as he would have put it.  And he was referred -- they did not have available staff to give him speech therapy.  Actually, he got a very extensive evaluation at an independent center, independent hospital, and had a very thorough evaluation which again confirmed a learning disability and speech impairment, quite serious speech impairment.  And they strongly recommended that he receive speech therapy.
     And after several months, they did a follow-up, found out he still wasn't receiving speech therapy, and they wrote a rather heated letter saying, "What's happened here, why hasn't he received that speech therapy that he needs?"
Q     The third paragraph on Page 11, and this would have been the point in time where Cory, by age, would have been 14 years old  --
A     Yes.
Q       --  that paragraph indicates that he still was a well-related, but depressed, anxious, and severely learning-disabled boy.
A     Yes.
Q     And it also makes references to his continuing experience with his mother.
A     That's right.  This continues to be a problem, that they can't make contact with the mother.  They can't get the mother to be involved in treatment.  He

would go home to spend some weekends with her, but he wouldn't have much contact with her.  She would go off and do her own thing and he would be on his own to do whatever he found that he could do on his own. She couldn't get her involved in treatment.  They became concerned that she was verbally abusive of him.  That is, she would deride him and castigate him because he couldn't do better in school.

And they tried repeatedly to explain to her that he had a learning disability, that this was not his fault, that he wanted to learn, and that there was no way, as they found out, that he could do better than he was doing.  I mean, it is analogous to if a child had a handicap and couldn't walk and the mother says, "You have got to get up and walk," and there is no way he could.  Because his disability was not visible, it wasn't tangible, the mother wouldn't accept it.  She wanted him to go to college.  She told him he was dumb.  And Cory was very devastated by this, to have the only person, really, in his life, the only family member that he could have some connection to other than his brother, telling him to do something impossible.

Q    You indicated in your preliminary remarks to the jury that your conclusions, you had come to the conclusion that there were two factors that affected Cory's psychological development and his ability to adjust in society.

A    Right.

Q    And you indicated that one of those was the unstable family circumstances and rejection of his mother.

A    Yes.

Q    And the second was his severe learning disability.

A    That's right.

Q    And in January of 1983, when he was age 14, Ms. Turnquest's comment in that third paragraph on Page 11 is simply that, that Cory is a well related, depressed, anxious, severely learning-disabled boy who has experienced his mother's rejection and emotional unavailability."

A    Yes.

Q    So that diagnosis is certainly not a new one for Cory; is that correct?

A    That's right.  This is not my retrospective diagnosis.  This was written time and time again in the records.  This is echoed later on in further records, too, that we can come to if you wish.

Q    On page 12, the December, 1983 treatment review, can you touch upon that?

A    Yes.  "Cory readily states he does not want to

go home at this time and that he needs to work on his problems. Cory's primary concern is his learning difficulties. He is quite frustrated by his reading disabilities and worries about his future. Cory receives remedial reading three times weekly."

Then it says, "It is important to note that Ms. Johnson spent the entire day with Cory and child care workers observed how extremely rejecting his parent is towards Cory. In the cottage later in the day, she had almost nothing positive to say to him."

Consistently, when the child care workers saw Cory with his mother, they became discouraged and concerned, because she was so habitually negative and demeaning to him. And this just simply aggravated his low self-esteem, his sense of himself as not good enough, and uncapable.

Q    I don't want to take you out of an order that you want to follow, but if we could address the speech and language disorder problems and the testing which followed that.

A    Right. That was November of 1983 is when they sent him to Phelps Memorial Hospital Center and gave him a very extensive evaluation. That's on page two and three. It is out of order here.

Q    That is the initial diagnosis, and then was there a testing done of him, and is that contained on page three?

A    Page three are some of the test results from that November, 1983 evaluation. So he has been there a year-and-a-half now, and had this evaluation. Chronological age is 14 years, and on these tests he ranges from nine years to 12 years in his level of functioning on these speech and language-related tasks.

Q    The Peabody Picture Vocabulary Test, where he had a demonstrated standard score of 69 and that would equate to a roughly nine-and-a-half year old child --

A    That's right. That's in the mentally retarded range.

Q    That would have --

A    That's the performance of somebody 14 years old who is mildly mentally retarded. They did not view him as mildly retarded because they knew of his learning disability, but his function in that area was that low.

Q    Dr. Cornell, as Cory aged over a period of time to his current age, did he advance or did his abilities stay at this age level?

A    Well, they advanced somewhat, but he wasn't advancing at his chronological growth rate. That is, he was falling behind. And the older he gets, the

further behind he would fall.  In the area of reading, though, he has advanced very little if at all.  In arithmetic, he advanced up to about the sixth-grade level, I found in my testing.

Q    On page four there is a reference that I think you mentioned earlier in your testimony.  Did Cory want to be treated for this speech disorder?

A    He wanted treatment for it very much.  He got increasingly frustrated that he did not get speech therapy.  He was promised it, he looked forward to it.  For him it was one of the reasons why he was agreeing to not be at home.  No kid wants to live in an institution.  But to his credit, he wanted to live there to get help.  And he did not get this help while he was there.  This was frustrating to him.  It was also frustrating to the other staff, who were upset that he was not receiving it.

Q    The third paragraph down on page four indicates that Cory had a very intensive evaluation in September of that year.

A    Right.  That's the scores that I just mentioned.  Yes.

Q    It indicates that in those five appointments, he was most cooperative during this analysis and is anxious to start therapy.

A    That's right.

Q    And that pervades these reports; is that correct?

A    That's right.  For a number of years, he kept up very high motivation and ambition to do well.

Q    That speech difficulty, did it also  --  was there evidence of stuttering or such problems as that?

A    There had been stutterings, marked stuttering when he was real young, and then he continued to show some stuttering problems later.

Q    Is it normal for such disability as speech difficulty to affect one's self-esteem?

A    Absolutely.  That's one of the most serious negative consequences.  People who stutter or have other speech problems become acutely embarrassed.  Other kids tease them about talking funny.  And Cory was very sensitive about that.

MR. COOLEY:  Now if I might, Your Honor, if we might, we still have a ways to go with Dr. Cornell.  I don't know if the Court feels it is an appropriate time for a short break.

THE COURT:  We will take a brief break.  All right, everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

THE COURT:  All right, Mr. Marshal, you may

remove the defendants.

(Defendants removed from courtroom.)

All right.  We will take ten minutes.

(Recess taken from 11:35 a.m. to 11:57 a.m.)

THE COURT:  Let's bring in the jury, please.

(The jury entered the courtroom.)

BY MR. COOLEY:

Q    Dr. Cornell, I want to call your attention, if you could at this point, to page 14 behind the blue tab.  This is a point in time where Cory has had a second psychiatric evaluation, and a report is made as to his circumstances at that point in time.

A    Yes.  This evaluation is by Dr. John Stadler, who is a psychiatrist and who is the clinical director of the facility.

He says, "At the Cottage School Cory has a reputation of being a good boy, one who stays out of trouble, even though he lives in a cottage where there is a good deal of trouble.  He does not drink or smoke pot.  He does not run away.  I have never known him to be suspected of stealing.  On the other hand, his learning disorder is not responding to any of our teaching methods."

He did not give him an Axis I disorder, although he noted a history of parent/child problems and of conduct disorder which he says are not present now.  He did give him a diagnosis for the learning disabilities, that's Axis II, "Longstanding Developmental Reading and Arithmetic Disorders, Severe."  He also noted positive soft neurological signs and evidence on psychological testing of central neurologic dysfunction, diffuse.  I realize some of this is repetitious.  But my concern is that there was consistency across experts, across time, when people saw him.  And I spoke with Dr. Stadler and asked him about his evaluation.  He remembered Cory.  He remembered that he was very troubling to the staff because he was so well-adjusted, yet so impaired.  He also complained as the director of the agency that they had not had a speech therapist and sufficient remedial reading teachers to assist him as they wanted to, and that that was a chronic problem which they still had to the present day.

Q    On the following page, page 15, that contains -- this, time-frame-wise, we are now at a point in time where Cory has just turned 16.  He remains at the school at that point in time.  He remains in a residential program rather than being at home, and he has been transferred at this point in time from a cottage that contained younger boys to a cottage called a senior cottage; is that correct?

A    That's right.

Q    That transfer was made in the summer of 1984.

A    They made the transfer, started giving him summer employment jobs, doing manual labor. He held a variety of summer jobs. He was proud of the fact when I spoke with him, Cory was, that he stuck out those jobs. He worked at them even though he didn't particularly like the manual labor that he had to do. He also was placed in a more vocational-oriented program called BOCES. It is a special educational program in which he was learning carpentry and did reasonably well. He tended to do best when he did things with his hands that did not involve language. Anything that involved language, he had serious impairment in.

Q    The last sentence in that first paragraph on

3606

page 15?

A    Yes. "He is supposed to receive remedial reading and speech therapy, but for reasons not clear, has had no one-to-one instruction for several months." This is a report of another psychiatrist, Dr. Clemmens. This is, I think, the third psychiatrist to see him. And again, they had trouble providing him with the special services he needed, and for some reason these services lapsed at various times.

Q    And this certainly was in spite of his desire to be -- to have this treatment, to address his problem; is that correct?

A    He voices it here. I think now at 16, he has been there several years. He says, "Cory was sarcastic and extremely resentful about receiving neither remedial reading or speech therapy." The psychiatrist quotes him. "'School-wise, they haven't done a thing for me.' When I questioned the lack of remedial reading he answered angrily, 'They get my hopes up high and then you do no shit. That's why I want to depend on nobody no more. You are all full of shit, every one of you. Nobody has raised a finger."

     He had an angry outburst to this psychiatrist

3607

over his frustration. And then when I read that I thought well, he is now starting to really bad mouth the institution and show a more negative attitude. I wondered what the staff think of him. Dr. Clemmens in that report says -- he agreed with him. She said, "Outside of being raised in a problematic family he has to cope with a severe learning disability which is highly frustrating and embarrassing. It is understandable that he feels bitter and resentful about not receiving adequate help. In addition, it is difficult for him that he

had to relate to five different social workers within one year."

I spoke with Dr. Clemmens. She also remembered Cory well despite the passage of time, and she similarly expressed frustration. She was not offended at his criticism of his treatment. She agreed with him that he had not received the kind of treatment that he had been promised, and that he was very frustrated by that.

Q    On page 16, and what has just been placed before the jury, is a report of the fourth psychological evaluation of Cory, being done in March of 1985.

A    Right. He is sixteen-and-a-half. A psychologist who had seen him before who had first diagnosed the severe learning disability came back, did a second evaluation, and found a decline in his performance, found that his scores, his IQ scores, had dropped and were now in the mentally retarded range or close to the mentally retarded range, depending on the particular score. In the verbal area, his verbal IQ was 68 to 70. That is in what he calls "mentally deficient," same thing as mentally retarded borderline range. His performance IQ was slightly higher. His ability to form non-language, nonverbal tasks with his hands, 78 to 81. That's in the borderline to low average range. So he is better in that area. His full IQ, though, which combines those two, was 69 to 74, which is in the mildly retarded range. It is right on the edge, on the upper limit of the borderline mentally retarded range. But it falls into a range of mentally retarded individuals. Dr. Barish says these scores reflect a significant decline since Cory was tested in 1982. "This decline is difficult to account for. However, several factors may be involved. The current scores may reflect in part the increasing demands of the task presented..." that is, the tests are now harder because he is an older fellow, so he is getting harder questions, as well as Cory's failure to learn at an expected pace, that he is not learning at a regular pace. He is falling further behind.

He also says, "They also undoubtedly reflect the effects of Cory's severe discouragement and depression with respect to cognitive tasks." That is, he is starting to become discouraged and to give up. And elsewhere in this report, not quoted here, Dr. Barish points out that when he gave Cory some extra help and gave him some extra opportunity, he showed that he could do a little bit better. But he is becoming discouraged.

He also did personality testing, and this last

paragraph says that. "Personality assessment reveals a thoughtful, highly reflective, but affectively constricted adolescent. Cory expends considerable energy in his efforts to suppress anger. He appears vulnerable to periods of depression and frustration. There is also evidence of feelings of aloneness and a desire for help that is not being heard. Several responses suggest that Cory feels he is not being listened to. Cory's test responses also reveal an effort toward maturity that is particularly impressive considering his severe learning disabilities."

So they are noting mounting frustration, mounting difficulties, continued motivation, continued attempts to do well, but considerable stress that he is showing now.

Q    If you would continue on to the March, 1985 treatment conference. Paraphrase that, if you will.

A    They summarized, sort of did a summary of why he was there, what kind of problems he had when he came there. They point out in this quotation that it was arranged for him to have remedial education. They say, "However, due to Cory's reluctance to attend, and staff's miscommunications around the time of the appointment, sessions were infrequent, irregular, and this was not beneficial to Cory."

They shift some of the blame on to Cory for not showing up for some of the classes. They also do acknowledge, this person does, that there were some problems with arranging services. As I've mentioned before, I talked with Dr. Stadler and Dr. Clemmens about that, and they felt that they did not have the appropriate staff to give him services at those times.

Q    Now, on page 18 in the March treatment conference, March of 1985, they continue to see difficulties with the programs being able to have any meaningful contact or for Cory to have any meaningful contact with his mother; is that correct?

A    That's right. Now he has been there several years. This is a time ordinarily when you send people back to their home. And they have had very little contact with the mother. She has not been available. And in fact, she seems to withdraw more. They say, "Ms. Johnson withdrew more from Cory. She requested home weekend trips go back to two times a month. Cory had been going home weekly, and refused a visit at the last minute. Cory reacted with anger, and it was seen as a good sign that for the first time he was able to verbally state his anger with her. Cory regressed somewhat during this time period. He refused to attend school on several

days.  He was despondent, depressed, acting inappropriately in the cottage, making animal noises, and he avoided sessions with the worker.  Cory was able to mobilize self and pull out of the depression before acting out in any serious manner.  This is seen as a positive progression for Cory."

As his mother pulls away from him, he becomes very upset and frustrated and his behavior deteriorates.  He is still attached to her; he very much wants to be with her.  She is someone that he admires.

Continuing this report:  "Ms. Johnson continues to be surfacely involved with Cory and PCS.  Though available to attend some meetings with the agency, she has frequently canceled appointments for apparently valid reasons.  She does not visit Cory on campus.  Ms. Johnson is a self-focused woman concerned primarily with her own needs.  Though verbally expressing her concern for Cory, her actions continue to speak to her emotional unavailability to him."

This is very strong language for somebody to put in writing.  I can tell you from working at agencies like that that you are very careful when you criticize a parent and you don't write things like this unless it is quite serious and you can back it up.  So when I read this, I was quite impressed by this level of criticism of her.

Q    The Freedom of Information Act would allow her to get this and potentially file an action against these folks?

A    Absolutely.

Q    Could and probably would have.  Whatever.

A    We are all concerned about this when we write these things.

Q    The petition that is shown on page 19, this involves a change of manner in which Cory is going to be held, or the type of facility that's going to be available for him?

A    Yes.  The usual plan in Cory's situation and in all similar situations is to return home.  Children are placed in institutions temporarily, and the goal is to return them to their parents.  It is unusual for a change in that plan.  They felt they had to change that plan; that Cory's mother was not capable or willing to take him back.  The Court petition, Family Court of the State of New York, says, "Father is not involved.  Mother is involved in her own personal problems and shows only minimal interest in child.  She does not cooperate with agency in planning for child, and reveals only scant information about herself.  Child is equally

secretive about his mother's lifestyle and will not discuss it. However, he has adjusted well in the group home and is on good terms with staff and peers."

This reference to the secretiveness is because they had concerns that she was involved in criminal activity and drug use. They could not prove it or establish it, although subsequently she was arrested,

and although Cory revealed that he learned of it himself. But they worded that very carefully in this legal statement here.

Q    That petition placed Cory in a group home, occurred when he was 17 years old; is that correct? This came from June of 1986.

A    June of 1986. That's right. They decided that rather than send him back to his home, they would try to find a group home for him. Initially, they didn't have a place. They didn't know where he was going to go, but they felt he couldn't go to his home. And eventually an opening became available in an apartment in Queens, New York, in a large apartment building where they had several boys of his age living there with some foster parents who took care of him. So there was an opening and that became the goal, for him to go live there. This was, of course, quite disappointing to him. All along he had been planning to return to live at home. He had been making weekend visits home, and then that wasn't going to happen. He was going to have to go somewhere else, live in Queens.

Q    This additionally would have been a change in setting for this young man; is that correct?

A    A very big change. He is going to be living in

a large apartment building, highrise, in an apartment in that building. He is not going to be in the Cottage School, which is basically a campus that has its own athletic facilities, own school, own residential area. There are comments not included in the record where he expressed apprehension about that; that he felt protected and safe in the Cottage School. He didn't want to go back into the streets of New York where he had  --  where he had been threatened, been assaulted, where he had seen a lot of violence take place. And he was none too happy to go live, not with his mother, but with strangers in an apartment there.

Q    The report there by Odette Noble, a social worker on page 20  --

A    Yes, this is a change. Odette Noble began to work with him when he went to the group home. That is, he left Pleasantville Cottage, went to the foster group home, Elmhurst Boys' Residence. It is an

apartment in a highrise.  A social worker is assigned to meet with him weekly, to meet with the mother, and to continue to work towards Cory eventually going home.  That's the plan.  She expressed in this quotation her frustration.

"Ms. Johnson is extremely elusive.  I have made

3616

numerous appointments with her and she has not kept them.  She will call and cancel, but she will not follow up and make another appointment.  She is also not terribly responsible about calling and arranging for Cory to come home over the weekend.  Even though Ms. Johnson is quite irresponsible in her relationship to Cory, Cory talks about her as if she is a goddess and is terribly responsible in relation to her.  It is as if he is compensating for her real neglect of him."  This is stated several times in the records.

Q    Ms. Noble makes a second report in the group home conference report on page 21.

A    Right.  It is now 1986, six months later or so. "On the whole, Cory continues to be using the residence well, and would seem to want to remain living there.  He has made relationships with both the house parents and the boys, and is liked by both.  Cory continues to be quite active and assertive in how he handles himself.  And he can be a bit of a monopolizer.  But the boys continue to take this in their stride and not seem to mind it.  He talks a lot, apparently, in group meetings.  Part of the boys' acceptance would seem to be related to Cory's ingenuousness and decency.  Cory is very in

3617

earnest about succeeding and articulates that point of view to the other boys."  At another place, they talk about him sort of almost like having a preacher quality.  He is telling the other boys they have to do well.

MR. VICK:  The editorialization, I thought, was not appropriate.  I object to it.

THE COURT:  The objection is overruled.

BY MR. COOLEY:

Q    That reference is not  --  that's coming out of the reports, isn't it?

A    I'm referring to portions of the report that I read, that are not in the quotation, to try to explain them.  Let me just read verbatim what he says here.  "One senses that periodically Cory might feel the wish to live with his mother, but he doesn't discuss it openly and, I think, deep down he knows that his mother is just not able to provide a stable, secure home for him.  Cory is quite secretive about his mother's lifestyle and doesn't share with me and, I don't believe, with the house parents, some of his

chagrin at what his mother does.  We only pick it up by his behavior and what he does not say."

Q    Finally, Doctor, the difficulties with his mother continued to be reported in the June, 1986

3618

report.  They had not seen her or had any contact with her at that point in time?

A    Right.

Q    And then Cory became aware of her own  --  of her, being his mother's, difficulties with the authorities.

A    That's right.  It says at the beginning of March '86, Cory learned that she was arrested and was in jail in New Jersey.  He told his house parent to inform me, and then Cory and I discussed it.  I haven't heard from her or any other family member.  Cory states he doesn't believe his mother is guilty and that she was framed.  He acknowledged it had something to do with the use of credit cards.  I suspect Cory knows the truth, but is keeping it from us."

Q    Doctor, let me ask you if you would to go back to the chronology, which is behind the green tab at the front of the book.  At this point in time, you have brought him down through the summer of 1986.

A    Yes.

Q    In the summer of 1986, the entry there on chronology that shows his age, 17, he was involved in something that brought him into the criminal justice system.

3619

A    Yes.  That's right.  During this time he became aware of his mother's increasing involvement in drug abuse, crack addiction.  He was very upset by that.  His attitude declined dramatically.  And he became more involved with several of the other boys, Dwight and Mitch, who lived in the group home.  And he related to me that he wanted very much to be accepted by these boys; they were his friends.  He felt like they were  --  like he was loyal to them.  And one fellow, Mitch, whom he looked up to, told him he was having trouble with another boy.  He referred to him as a Hispanic young man.  And Mitch encouraged Dwight and Cory to go with him to try to intimidate this other boy.

And Cory related to me that they in fact did go up to this boy and threatened him, and that this boy, somewhat to his surprise, pulled out his paycheck -- Mitch and this boy worked together -- and gave it to them.  So in essence, they robbed him.  He told me at first they hadn't intended to do that, but when they saw that this boy did it, they went back and did it a second time.  And when that happened, the police were contacted.  Mitch was arrested.  Mitch then was

interviewed by the police and revealed that he was assisted by Cory and Dwight. Cory and Dwight then

3620

spoke with their foster care people and went down to the jail or to the police department and turned themselves in.

Q    He was, in fact, incarcerated at that time at Riker's Island?

A    He was put in jail initially. He was bailed out by the foster parents. He then pled guilty and received a sentence of, I think, ten to twelve days in Riker's Island, which is a rather well-known, rather rough jail in an island in New York City. And he was very distressed by that experience. That was a very troubling experience. He had never been exposed to quite that kind of environment before. But he had got involved with Dwight and Mitch, wanted to be accepted by them. Mitch wanted to take revenge on another boy, and Cory, who I don't think really knew this boy, wanted to be loyal to his friends and do what his friends did, and he got himself involved. He admitted this candidly do me.

Q    No disputing he was guilty of that?

A    No. He told me he was guilty. He told me what he did. He told me he was in jail.

Q    He continued after that to stay at Elmhurst for some months; is that correct?

A    Well, he came back to Elmhurst, after his time

3621

in jail. He showed a real decline in attitude. He seemed very uncooperative with the foster parents there. He expressed a lot of anger. They continued to press him about what was going on with his mother. He got angry. He was offended by that and he defended his mother. And at one point, I believe in February, several months after this arrest, he had an argument with the staff and they laid down the law to him. They told him "Look, if you aren't more cooperative, if you don't agree to follow our rules, you are going to have to leave." I checked into it carefully. He had not assaulted anyone. He had not broken laws there. But he was showing a bad attitude and they didn't accept boys there who didn't show that they wanted to be there. So they told him that he would have to temporarily go home until his attitude improved. And so he abruptly left, and he did not return.

Q    And thereafter, was there an occasion in which he was charged with an offense?

A    That's right. He returned home to his mother, continued going to school, was suspended from school for squirting a teacher with a fire extinguisher the last week of school, did not attend his graduation.

Q    Was he to receive a diploma if he graduated?

3622

A     Well, there is  --  the mother couldn't tell me.  She didn't know.  My best understanding from the records and from what Cory told me is that he was to get a certificate of completion; that he couldn't get a full diploma because he was in the occupational training program and he could not pass the literacy test to get a diploma.

Q     Thereafter, he got into some trouble; is that correct?

A     Yes.  After that time, he was arrested and accused of another robbery with several other young men.  He was put in a police line-up and he was identified in the police line-up.  He strongly indicated to me and also indicated in the record at that time that he was mistakenly identified; that he was not  --  that he did not commit this offense.

Q     So as to that alleged attempted robbery, he denied that he was indeed the person who had committed that?

A     Yes.  That's the only thing he ever denied to me.

Q     From the birth through age 21.

A     Ever.

Q     In discussing those items with him, he acknowledged guilt and wrongdoing at any point where

3623

it was raised.

A     Yes.

Q     But as to this issue he did not, and in fact adamantly proclaimed his innocence; is that right?

A     That's right.  He acknowledged to me a number of extensive involvement in some drug dealing and illegal activity.  This is the only incident of which he was accused which he told me he did not do and that he was falsely accused.

Q     In spite of his proclamation of innocence, based on one-on-one identification of Cory, he was indeed convicted.

        MR. COOLEY:  And Judge, we would reference for the record, I believe it is Government Exhibit PP-1, which is the conviction for attempted robbery.

BY MR. COOLEY:

Q     And he received what penalty?

A     I don't know the exact penalty.  He decided to plead guilty because he was told that he would receive several years in prison if he were convicted, and that he would be convicted.  And he decided that if he pled guilty he would get a period of up to a year.

        MR. COOLEY:  And indeed, Judge, if we can ask the Court to take judicial notice of that, that

3624

exhibit, there is a one-year sentence to Riker's

Island.

BY MR. COOLEY:

Q    And that is when he went to Riker's Island the second time; is that right?

A    That's right.

Q    During that period of time at Riker's Island, did Cory express to you any circumstances which concerned him?

A    Well, he was  --  after he pled, he became distraught.  He regretted his decision.  He became upset.  He had had some plans and hopes of entering into the military, of joining the Navy, and came to the belief that because of this conviction he would not be allowed to do that.  I don't know whether that's true or not, but that was his belief.  He also received a letter from his father which was very upsetting to him and he began to have nightmares and to be very troubled, appear very troubled in the jail.

He was seen by a chaplain in the jail who was sufficiently concerned about him to refer him to a psychologist, who then saw him weekly for, I think, about two months up until the time he was released. This psychologist reported that at that time, Cory was expressing regret that he had pled guilty to something that he didn't do, a great deal of emotional distress over what had happened to him, and he was seen as someone in need of psychological counseling for this time in jail.  And subsequent to that, he finished out his time at Riker's Island and was released.

Q    Now, the first visit when he admits he got into the situation where he went down and turned himself in but spent some days at Riker's Island, he was 17 at that time.  At the time when he receives this 12-month or one-year sentence at Riker's, he is 18 and serves during his 18th and 19th year; is that correct?

A    That's correct.

Q    In terms of his one year at Riker's Island, of what are you aware in terms of any visitation by family or others?

A    Well, the records indicate that he complained that he did not receive visitors during the lengthy time period that he was there, and he was quite despondent that he didn't have family contact while he was there.

Q    And based on your discussions with him during the course of that one year, did his mother or any other family member ever visit him?

A    He told me that she did not.  His mother told me, quote, "I wasn't there for him."  She said she

was too involved in her drug problems and her relationship with her boyfriend, and that she could not be available, and that she regretted that but she couldn't.

Q    Following release from Riker's, he went back to New York, or did he move to another area?

A    After he was released he went to North Carolina for several months and spent part of that time with his half-brother's father, I believe, Mr. Butler, a person that he had lived with when he was young who agreed to take him in for a period of time.  He spent several months there in North Carolina, and then subsequently returned to New York.

Q    All right.  He ultimately, after working for awhile with a warehouse job loading or unloading trucks, he then moved to New Jersey and became involved with drug distribution?

A    He met some young men while in New York whom he had met on the streets who told him that he could make a much better living selling drugs in New Jersey.  He had by this time already become involved in using marijuana, and had sold marijuana, he told me.  And he began to sell marijuana to support himself at this time.

Q    Ultimately, after that he moved back to New York for a brief period of time, and then came to Virginia in the fall of 1991 at the age of 22; is that correct?

A    That's correct.

Q    All right, sir.

MR. COOLEY:  Your Honor, in discussions with the government, and I will ask the Court for its preference in this, we have still more to produce through Dr. Cornell.  We have two witnesses, one of which we would like to call out of order.  I think the government does not object.

MR. VICK:  I have no objection.

MR. COOLEY:  We would like to call one of those witnesses before lunch, or if the Court prefers immediately after lunch.  The second witness we would like to put after lunch, and then finish with Dr. Cornell.  That witness I would anticipate being roughly 20 minutes.  Whatever the Court's preference is.

THE COURT:  I think we may have to put it off.

(Court conferring with Clerk.)

All right, let's say about 20 minutes.  Let's go ahead and try to get that in.

MR. COOLEY:  If we could excuse Dr. Cornell for just a moment and call Mr. Jerry Lefkowitz.

(Witness stood aside.)

GERALD LEFKOWITZ,
called as a witness by and on behalf of defendant
Johnson, having been first duly sworn by the Clerk,
was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COOLEY:

Q    Good afternoon to you.  If you would address
your responses to the ladies and gentlemen of the
jury.  Would you tell them, please, your full name?
A    My name is Gerald Lefkowitz.
Q    Your profession?
A    I am a social worker.
Q    And do you have any particular education or
license, any background?
A    I have a Master's in social work degree from
Adelphi University in Long Island.
Q    And you are employed by whom?
A    I am employed as the director of the
Pleasantville Diagnostic Center, which is a branch of
the Jewish Child Care Association.

3629

Q    How long have you been associated with the
Jewish Child Care Association, and specifically, with
the Pleasantville facility?
A    Eleven years.
Q    All right.  Can you tell the ladies and
gentlemen of the jury, please, the components of the
facility there at Pleasantville?
A    There are two basic programs in the residence.
One is the Pleasantville Diagnostic Center, which is
a short term two-month program where kids come for an
evaluation.  And the second part of the program is a
long term residential treatment center called the
Pleasantville Cottage School.
Q    Now, the diagnostic center is associated with
the Jewish Child Care Association?
A    Yes.
Q    And on the facility grounds, is there a school?
A    Yes.
Q    And what is the name of the school?
A    The Mt. Pleasant Cottage School.
Q    And is that school, that academic school,
associated formally with the Jewish Child Care
Association?
A    It is not part of the Jewish Child Care
Association, although it is mandated to provide an

3630

education for all the children who are on the grounds
of the Pleasantville Cottage School and the
diagnostic center.
Q    Is it affiliated with and licensed by New York
State?
A    Yes.
Q    Now, in your capacity there, the Pleasantville

Cottage School, does it involve a residential program for youth?

A    Yes.  The kids live there.

Q    And they are educated at, I take it, Mt. Pleasant Cottage School, they live at Pleasantville Cottage School, and before they are allowed entry to either of those they must pass through a diagnostic center called Pleasantville Diagnostic Center?

A    Not everyone comes through the diagnostic center.  Some of the kids come referred from the Family Court or from the Department of Social Services or from other agencies.

Q    I see.  The residential treatment center is set up with what type of residences?

A    The kids live in cottages.  There are about 14 kids to a cottage, four staff members working in taking care of the kids in the cottage.

Q    Are there potential goals once a youngster comes through or comes to the school, is placed at the residential facility?  Are there goals set up for that child?

A    There are goals that are set up immediately when we interview the child and the family upon admission.  Then there is an initial treatment plan in which goals are set up.  That's done two months after a child is there.  And then those goals and plans are evaluated every six months thereafter with the team, with the child, and with the family.

Q    Mr. Lefkowitz, the ultimate goal for any child who is brought into the program, are there indeed three ultimate goals, one of which must be selected?

A    Well  --

Q    In terms of the ultimate placement of the child?

A    In the State of New York all children coming into foster care, and this is part of the foster care system, there can only be three possible goals for the child.  It is either return home or free the child for adoption, or when the child becomes fourteen, a goal can be for him to, or her, to go to independent living.  So those are the three possibilities, possible goals.

Q    Mr. Lefkowitz, during the mid-1980's, 1982 and 1983 and 1984 and 1985, did you have occasion to have contact with the young man seated over here, Cory Johnson?

A    Yes.

Q    And did Cory come into your facility by first passing through the diagnostic center?

A    Yes.

Q    And he was, I believe, placed there by a voluntary petition from his mother which would have

brought him into that circumstance; is that correct?

A    That's correct.

Q    You have reviewed --

MR. COOLEY:  And for the jury and the Court, I would make reference to page one under the blue tab.

BY MR. COOLEY:

Q    There is a petition that was entered, or a ruling entered by the Family Court of the State of New York which indicated that it had found and determined that Cory Johnson, said child, was removed from his home on February 1st, 1982; that the parent is unable to make adequate provision for the care, maintenance, and supervision of the child in her home, and it is determined to be in the best interests and welfare of Cory that  --  his interests would be promoted by removal of the child, Cory, from his home.  And in your discussions with me regarding that, what is the necessity of that finding by the Court?  Why was that made?

A    Those findings are applied to voluntary placements.  And shortly after a voluntary placement is made between the mother and the Department of Social Services or the parent and the Department of Social Services, the Court must review that that agreement was in fact something that the parent has knowledge of, understands, and is in agreement with.  And that was the nature of that document.

Q    For a youngster, once they arrive there where a parent has voluntarily turned them over, even so, the state prefers that that child be returned to the home; and in order for the child to stay, a review must be made after two months to determine whether the family, or the mother in this case, is ready to take him back, able to take him back.  And if not, this ruling would allow the child to stay in foster care?

A    Not quite.  The purpose of that review was that the parent understood the nature of what the placement was going to be; that she agreed with it; that not only did she agree with it, but she understood what she was agreeing to.  And a Family Court Judge would oversee that.  That was the case.

Q    During those years I've described, 1982 to 1985, what was your role at Pleasantville?

A    I was unit administrator.

Q    And your duties would have involved what?

A    I was in charge of a unit that consisted of three living cottages and all the staff associated with those three cottages.  That's child care staff, social work staff, psychiatrist, psychologist.  I did the liaison work with the school people and

recreation and that kind of thing.

Q    You were the head man of that unit?

A    That's correct.

Q    And you were supervising these other folks and you also, I believe, were in charge of discipline; is that correct?

A    That's correct.

Q    All right.  Did you have occasion -- and I don't want to give the false impression by having asked you the question about discipline -- but did you have, in the course of your dealings with the staff and such and the children that were placed there, have occasion to see the students, to see the children who were in the care?

3635

A    I would see the kids in the course of a working day daily.  I would visit the cottages, see them at school.  When they came in for their social work appointments or testing, they would stop by and I would get a chance to see them.  And I would also see the kids when they were brought into me for disciplinary reasons.

Q    Now, in the course of your day-to-day functioning and supervising, did you have occasion on a daily basis, or near daily basis, to see Cory Johnson?

A    Yes.

Q    I take it that was not in a disciplinary mode on a daily basis?

A    No.

Q    Or anything like that; is that correct?

A    That's correct.

Q    Do you recall Cory during those years?

A    Yes.

Q    Can you give a brief description to the ladies and gentlemen of the jury of your impressions of Cory when he first came to the program?

A    When he first came to the program?

Q    Yes.

A    Anxious youngster, a good kid, a kid who was not

3636

a troublemaker, a kid who knew that he couldn't read, knew that he had learning problems, wanted to do something about it.

Q    Was he motivated to improve his skills?

A    He was motivated to learn.

Q    In the early years that he was there, was it your impression that Cory saw himself as ultimately being able to conquer these problems and to advance and to live the normal American life?

A    I believe that he felt that he could learn and that he wanted to learn, even though there was nothing in his experience that would lead him to believe that.  I think we held out the hope that he

could learn and he would learn.  And I think he wanted to.  He was one of the few kids who did not hide that fact from the other kids.  I think everybody knew that Cory had this problem because Cory let everybody know in those early years.

Q   That he couldn't read?

A   That he couldn't read, that that was a problem for him, and that he wanted to do something about it.

Q   And in terms of  --  let me ask you just briefly about his family.  There was a point in time where he had a younger brother that actually was placed as

3637

well at this institution; is that correct, this facility?

A   His brother, Robert, was placed at another facility before Cory came into placement, another institution, another residential treatment center similar to ours.  His brother was the first of the two boys to be placed.

Q   Did there ever come a point in time where Robert was transferred to Pleasantville as well?

A   Robert left that agency, went home, and within  --  I don't remember exactly how many months, but within a number of months he began to be problematic seriously at home and he went to the Pleasantville Diagnostic Center for an evaluation while Cory was in placement with us.

Q   Now, as relates to the goal for Cory, when Cory first came to Pleasantville the three goals you indicated of ultimately getting either back home, independent living, or adoption, which of those goals was set by the staff along with Cory?  What was designed for him ultimately when he left Pleasantville?

A   To return home.

Q   To return home.  Was that his desire?

A   That was his desire.

3638

Q   And during the course of the time he was there, did there come a point in time where a change in his ultimate goal had to be made?

A   Well, I don't know if it had to be made.  We made the change.  At about the halfway point, for many reasons, we changed the stated goal from return home to independent living.

Q   For most of the kids who come through there, the goal is to return home; is that correct?

A   That's correct.

Q   For most of the kids that come through there, they do ultimately return home?

A   That's correct.

Q   But for Cory, that just never happened.

A   No, it didn't happen.  He didn't go home from

Pleasantville.  He went, after three years, to a group home.

Q    And normally, before a final discharge, kids are allowed to start visiting with their home, go home for weekends and such; is that correct?

A    Well, right from the beginning, the kids go home.  We have a calendar of visits, and it is about every other weekend.  And Cory would go home most of the time every other weekend, and then there was a time when, upon his request and for many different reasons, we increased it to every weekend.  I recall it because it was  --  there was contention in the team in that we had changed the goal to independent living, and yet we were sending him home every weekend.  Some of the team felt that there was something incongruous about that.

    And those of us who prevailed felt that he needed to come to grips with the reality of his situation at home, and the more frequent visits would bring that home to him.  Plus there was another advantage: that he would be able to negotiate the  --  become more independent with the traveling by himself, be able to do those things that would make him more independent.

Q    So at the same time the goal was changed to independent living, rather than to return home, he was asking to go home more often?

A    That's correct.

Q    That was allowed because he wanted it.

A    Right.

Q    And also, because of you all's hope would be that he would begin to recognize, as he matured, the facts of life at home; that he really wasn't wanted there, and that there were other problems.  Is that fair to say?

A    Yes.

Q    All right.  Now, in the course of things, do you recall having discipline problems with Cory?

A    Not many discipline problems, no.  Not in the sense that he was a troublemaker or that he broke rules or that he fought a lot.  Not in that sense. Where we would have some problems with him was when he would kind of like shut down.  He would not go to school for a couple of days or not come to a conference or not come to his social work appointments.  It was that kind of problem that you had to help him get through, rather than discipline problems of an acting out or a criminal nature.

Q    As he stayed for the second and third years there at Pleasantville, and it was not aiming at that point to go home, he still of course suffered from this severe learning disability; is that correct?

A    Well, he never really progressed much with it at all.

Q    And as the other kids got older and as Cory got older, did the disparity between what he should be able to do and what he could do increase?

A    Yes.  Obviously, it increased.  What also increased was his  --  you know, I wouldn't say he gave up, that he really gave up, but he became

3641

terribly frustrated, terribly angry.

Q    As he got further and further behind, that frustration got more and more?

A    Yes.

Q    Obvious, I suppose.

A    Yes.

Q    Now, the mother's role in assistance there, was she ever a factor, a help, a benefit to you all?

A    That's a very complicated question.

Q    Let me break it down.  Was she easy to contact for you all?

A    Well, let me say she didn't come up to the institution much.  She didn't participate very much in our meetings.  She would come to her appointments in the city.  We have an office in the city, and the social workers would come to the city on a regular basis and she would come to those.  But she was unpredictable in the way in which she worked with us.

Q    Do you recall a specific incident in which Ms. Johnson called upon Cory, while he was there as a child, for help, for him to help her?

A    Yes.  I didn't know Ms. Johnson very well, because she didn't come up to the institution very much.  I might have had contact with her three or

3642

four, maybe five times in the three years.  But there was one time that I did, and that involved her asking Cory for a loan.  And I remember this very well because I have a very, very firm policy that I never, ever altered.  And that is that when kids had the opportunity of working and earning some money, I made them open up a bank account and save half their money.  50 percent of what they earned they had to put in the bank and they couldn't touch that.  They couldn't touch that money, even though they always argued with me about the fact that it was their money.  The other 50 percent they could do what they wanted with, within reason, but that 50 percent of the money, I was adamant that it was theirs when they left and they would have some kind of a stake when they left the Cottage School.

And I never varied from that except in this one instance, where I believe the mother asked Cory for the loan.  Cory came to me and said she was going to

pay it back. And I vaguely recall that it was for the payment of rent, that she was falling behind. I think she always presented that she had financial problems, but this was, you know, unique. And I went with them to the bank to take out the money. And I went with them because I was afraid that if I didn't

3643

go, that the bank book would be wiped out. And I think it was a couple of hundred dollars, $250 maybe, maybe half of what he had earned over a couple of years. And I don't think he ever got that money back.

Q    She took the money from the bank?

A    Yes. She was going to pay it back.

Q    To the best of your knowledge, that was never returned.

A    No.

Q    There came a point in time where Cory aged out of one cottage and was placed in another. Was that an easy transition for him; was he anxious for change or did he resist change?

A    I don't think change was ever easy for Cory. In his first cottage he was comfortable. He was comfortable with the people there, comfortable with the routine. I think he understood that he had to move on, that he was older, you know. The kids in the older cottage were doing things that were more age-appropriate. With Cory, it kind of took longer to prepare him, to get him to accept moving on. He eventually did, eventually did okay.

Q    Now, Mr. Lefkowitz, he then ultimately was moved on to Elmhurst; is that correct? To the group home

3644

program?

A    Right.

Q    And was that because he was difficult to deal with or lacked motivation or what occurred when that time frame came?

A    It was time to move on. He had been there a couple of years. It didn't look like we could pin the mother down to plan with us to take him back, and then it was a question of what would happen to him. He was in a vocational program, doing okay in the vocational program. You know, there comes a point of diminishing returns and it seemed like that was happening for Cory. He was getting more frustrated with being here and being with us.

Q    And his inability to advance in terms of academics?

A    I think we were all kind of stuck. And he needed to move on. That's what we felt. Cory accepted it, you know. Cory was the kind of kid at that time who kind of accepted, you know, whatever you wanted to do for him. He would accept it.

MR. COOLEY:  Mr. Lefkowitz, if you would, answer any questions that either counsel for the government might have.

THE COURT:  Do you have any questions for

3645

this witness?

MR. PARCELL:  Briefly, Judge.

CROSS-EXAMINATION

BY MR. PARCELL:

Q   Good morning, sir.  Are you aware that I think it is the orange tab, that the young man was tested at your school in February of 1982; is that correct, given a psychological evaluation?

MR. COOLEY:  I don't think he has this book.

MR. PARCELL:  I will ask him to be given it.

(Document proffered to witness.)

BY MR. PARCELL:

Q   Just the fifth tab, sir.  If you would go to the fourth page.

A   Yes, sir.

Q   And at the top it says, "In the verbal area Cory achieved his highest score in comprehension"; are you following me?  Page two?

A   Yes.

Q   Would you read this first three lines, if you would?

A   "In the verbal area, Cory achieved his highest score on comprehension."

3646

Q   Next two lines, also.

A   "His average score here suggests that Cory has a maturing conscience and moral sense.  His thinking is appropriate and his ability to use practical judgment in every-day social situations is a strength."

Q   And then you indicated he was doing well in school.  And I would ask you to look at what's been given to the government labeled Mt. Pleasant Cottage School Report Card, 1983 through 1984.  And would you please read the writing on periods three and four?

A   "Cory's attitude has greatly changed since the first two marking periods.  He has become much more difficult behaviorily in class. He often comes without homework assignments.  His overall academic development and personality suffered.

Q   Thank you, sir.  Your facility is one that's funded and established by the State of New York?

A    It is a private agency that gets its funding from the New York City Department of Social Services.

Q   And you all try to have a very caring, supporting environment for the students?

A    Yes, we do.
Q    And the other gentlemen who testified before you

3647
has indicated that Mr. Johnson was better adjusted than most of your students; is that a fair statement?
A    I think he was less problematic in terms of antisocial behavior than most of the students, yes.
Q    And is it safe to say that his biggest problem at your school was his learning disability?
A    I think that was a major problem, yes.
Q    You understand he stands before this jury convicted of eight murders?
A    I understand that.
         MR. PARCELL:  No further questions.  I will ask that that card be returned.
         MR. COOLEY:  Could I see it, please?
         THE COURT:  All right.  May the witness stand down, Mr. Cooley?
         MR. COOLEY:  One question.
              REDIRECT EXAMINATION
BY MR. COOLEY:
Q    Mr. Lefkowitz, from that 1982 form that you were asked to read from which is not yours, but the comment about his efforts at the beginning, did that change as his frustration level increased, as he began to lose ground over those next few years?
A    Are you referring to the conscious and moral

3648
sense?
Q    Yes, sir.
A    It is a hard question.  Cory for the most part kept away from some of the things that were going on, the kids -- some of the things that his friends were doing.  Whether they were smoking pot or they were sneaking out of the cottage or fighting with each other, he kept away, and for a period of time expressed contempt for that.  I had a sense that as he left, that was not as strong a position that he felt and took.
         MR. COOLEY:  Thank you very much.
         THE COURT:  All right.  You may stand down, sir.  Thank you very much.
     (Witness stood aside.)
     All right.  We will stop here for lunch and we will get started up at around 2 o'clock.  Everyone remain seated while the jury leaves the courtroom.
     (The jury left the courtroom.)
     All right, Mr. Marshal, you may remove the defendants.
     (The defendants were removed from the courtroom.)
     We will be in recess until 2 o'clock.
     (Luncheon recess taken from 1:05 p.m. to 2

3649

o'clock p.m.)

(In Chambers.)

MR. GEARY:  We requested an ex parte meeting with you.

THE COURT:  All right, Mr. Vick, go outside.  You may have to come back in.

MR. GEARY:  We have asked for it, not to raise anything that the government would be required to be here, but simply to state what we perceive as a problem for the record for later on if that becomes necessary.  In the joint penalty phase of the case, the problems are developing which we can't actually go to the other counsel with on the defense side or the prosecutors.  Fingerprints, yesterday Mr. Baugh's cross-examination of Dr. Evans was totally unexpected.  We sit there wondering what is going to open up.  This morning, Mr. McGarvey's case for Cory Johnson will show that Johnson was a leader.  The obvious question the jury  --  excuse me, a follower.  If he is the follower, whose the leader?  That's replete with what he said in the opening and in their documentation.  We just want to alert the Court to the fact that we are aware of these things and I think we have a duty to make it known in some shape or form to the Court.  Eric and I discussed how

3650

you do this.  You really can't be antagonistic to the other lawyers.  But I think we need to preserve for the record, and I think that's the reason we have to come back here.

THE COURT:  I understand what you are saying, especially about Mr. Baugh.  I don't know what you can do about that.  But I certainly was shocked to see him stand up to ask anything.

MR. GEARY:  One thing off the record.

(Off the record discussion held with the Court, Mr. Geary, and Mr. White.)

THE COURT:  All right, let's bring in the jury, please.

(The jury entered the courtroom.)

All right, call your next witness, please.

MR. McGARVEY:  I call Odette Noble, Your Honor.

ODETTE NOBLE, called as a witness by and on behalf of defendant Johnson, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. McGARVEY:

Q    Good afternoon, ma'am.  Would you tell the ladies and gentlemen of the jury your name, please?

3651

A    My name is Odette Noble.

Q    And what is your profession, ma'am?
A    I'm a social worker.
Q    And back in 1985, let's say 1985 through 1987, were you employed as a social worker?
A    Yes, I was.
Q    Will you tell the folks your background, educational?
A    I have my Master's in social work, which I received in 1973, and I worked even before I got my Master's as a social worker.  And then in 1973 I started working at Jewish Child Care Association.
Q    And you were employed there from 1985 until 1987?
A    From 1973 to 1987.
Q    But you were employed there during that period of time?
A    Right.
Q    Now, during that period of time, did you have an association with Elmhurst Residential Home?
A    Yes, I did.
Q    Will you tell the folks what that residential home was?
A    It was a group home in the community, in Queens, where eight teen-aged boys lived who essentially were

3652

not able to live with their families.  They went to school in the community; they made friends in the community.  And I as the social worker met with each boy every week for an hour a week and also ran a group meeting then with the boys and the house parents every other week.
Q    How about physically the layout of the house?  Where was it situated?
A    It was in an apartment unit in Queens, in kind of a shopping neighborhood, residential neighborhood.  It was a residential community, Queens is, about 40 minutes from my office in Manhattan.
Q    So in order to get to your office, the individuals at the house had to take a bus or cab?
A    They took the subway.
Q    They took the subway.  Now, how was the house set up?
A    It was two apartments made into one.  So there was one room that had just one boy and then there were, I think, two with three in them, so that eight boys could live there all together.  The house parents lived with the boys.
Q    Who were the house parents?  Not names, but generally what were their duties?
A    They alternated sleeping in.  One would maybe

3653

come on a Monday and stay until Wednesday; another one would come Wednesday and stay until Thursday.  Sometimes there would be two people on at the same

time.  But only one house parent slept in with the eight boys.

Q   And always there was some house parent there for supervision?

A   Yes, always.

Q   Were they controlled by someone else or were they supervised by someone else?

A   Well, the agency was very involved because the people downtown like myself, we were very closely involved.  So they came down every other week, the house parents, for treatment team meetings with the psychiatrist and the psychologist and the director and myself.  They also came downtown every other week for group meetings with myself and the boys.  And they had their own staff meeting, so there was a lot of effort to try to help them be more successful in their relationships with the boys.

Q   Can you give us just an overall view of what kind of boys came to that group home?

A   Well, they were generally about 14 to 19, youngsters who for various reasons couldn't live with families.  And they had kind of come to the determination that while we wanted to help them maintain good relationships with their families, that living together was not something that was possible.  So that our goal with almost all the boys in the residence was that they would eventually be able to move into the community and function independently, get jobs, do what they needed to do.

Q   Now, do you know Cory?

A   Yes, I do.

Q   Can you tell the ladies and gentlemen of the jury when you met Cory and in what capacity?

A   He came to the Elmhurst Boys' Residence from Pleasantville Cottage School.  He moved in in June of 1985.  We had had a preparation process where he came to the residence and met the boys and then went back to Pleasantville and talked about it, and then he moved in in June of 1985.

Q   And how long was he there?

A   He left in February of 1987.

Q   And during that period of time, you were his only social worker; is that correct?

A   Yes.

Q   And you saw him on a weekly basis?

A   Yes, I did.

Q   Did you get to know Cory pretty well?

A   Yes, I did.

Q   Will you characterize Cory for us during that period of time, that two-year period of time?  What kind of a boy was he?

A   Cory was a really sweet guy.  I mean, teenagers

are never completely easy, but Cory was very  --  I related to him very well.  He could listen.  He seemed to care about succeeding.  He wanted to do well in school.  But he had, you know, he had serious learning difficulties which mitigated against him, you know, doing as well as he wanted to do, and as well as maybe his mom would have liked him to do. But in fact, in looking back on my notes, I described him as ingenuous, not mean-spirited, certainly not one of the more difficult boys that I worked with in my years of working with teenagers.

Q    Compared to the other boys that were in the home at the time, was Cory aggressive?

A    Well, Cory was assertive, ingenuous.  He could take a stand with the boys if he felt that it had to do with right, if it had to do with being decent.  He certainly wasn't afraid to assert himself and stand up.  But he generally stood up for what he perceived as good values and good things.

Q    From a physical standpoint, did you see any evidence of aggression outside of the arrest?

A    Well, I mean, he was arrested.  But that was kind of to help a boy out in the residence who had gotten into a  --

Q    We will get to that.

A    But we were very strict in the residence that there was no physical confrontations.  And Cory and all the other boys abided by that.  I mean, if he got into stuff in the street, I don't remember it being a problem.

Q    Anything major?

A    No.

Q    Would you characterize his relationship with the other boys as a leader or a follower?

A    Well, he was a follower in the sense that if they had an idea that he thought he would go with, he would go with it.  But he was a leader in terms of his ingenuousness and his assertiveness and his kind of openness, you know.  So the boys would look to that because they knew they could go to Cory if they had a plan or an idea, that he would be ready help out and do.  So I mean, it was kind of mixed.  He was both a leader and a follower.

Q    When you say he was a leader, I believe you gave me an example of like haircuts, things like that.

A    Yes.  Cory was perhaps a little bit more street savvy in terms of street culture than some of the boys that lived in the residence.  So that they, I mean, you know teenage boys, they love to  --  it is good to be bad and that kind of philosophy.  So he could, you know, he could lead the way in that sort of thing.  But those were not substantial things.

Those were insubstantial.

Q    So are you saying that in terms of insubstantial things he was a leader; in terms of substantial things he was  --

A    He was, you know, it is hard for me to imagine -- I mean, it is hard for me to imagine Cory doing the kinds of things that he has been convicted of. It is just not the Cory that I knew, certainly.

Q    Now, you made reference to a robbery, a robbery charge.  Will you tell the ladies and gentlemen of the jury when that happened and what that was about --

A    It was August of 1986.  One of the boys in the residence who was probably  --  Mitch was kind of maybe a bit more fast talking and a bit more, oh, I don't, know how you describe Mitch?  But anyway, Mitch was having trouble with one of the youngsters that he worked with in the neighborhood youth corps.

3658

And he had gotten into a confrontation because Mitch was somewhat grandiose and wanted to boss people around.  So he told the kid at work that "If you don't watch out," because the kid was bossing Mitch around, and nobody should boss Mitch around, so he told the kid at work that "I am going to get my guys after you."  So he got two boys in the residence, Cory and Dwight, to rob this kid on the way to work.

Well, of course the kid immediately went to work and said, "Mitch and two friends robbed me." Immediately they came after Mitch, and then Mitch immediately told on Cory and Dwight, the other kid, and so they were arrested.  It was kind of ridiculous, but it happened.

Q    With respect to that, you were telling me earlier about Mitch.  Do you recall what the story was that Mitch had told Cory?

A    Well, I mean, I think what Mitch said is that this guy at work was giving him a hard time, he didn't like it, and he must have embellished it enough that Cory and Dwight thought that Mitch had a just problem with this kid.  So they went to help Mitch out.

Q    And what happened as a result of that?

A    Well, Mitch was arrested first, and then the

3659

police came to the residence and arrested Cory and Dwight.

Q    How old was Cory at the time?

A    I think he must have been 18 at the time.

Q    18?

A    Yes.

Q    Where was he taken?

A    He was taken to Riker's Island, which is the prison that's used kind of as a  --

Q    For how long a period of time, do you recall?
A    He was taken to Riker's and then they went to court. Or maybe they held him in court. And then it was put off until November. The arrest was August 19th, and then he went back to Court in November 26th, and then he went to Riker's for eight days after that.
Q    Did you have occasion to visit him at Riker's?
A    Yes.
Q    Will you tell the ladies and gentlemen of the jury, what was that like? What was Riker's Island like?
A    It was awful. You had to go through the guards three times, you know. I had identification. And then you had to take the bus and then you had to go show your identification again. And they took their time bringing Cory out to see us, and then Cory, of course, had to take off his shoes, you know, go through the whole thing. It was very uncomfortable. I didn't even think the guards were very nice. But it was not a pleasant place.
Q    Did Cory have occasion to tell you any stories about what he saw at Riker's Island?
A    Yes. We talked about it afterwards because he came out and he was only there eight days. He said -- he admitted it was pretty awful, and that he saw guys having sex in the beds, and of course there was the searching, and you could never use the telephones. It was a pretty awful experience for him.
Q    During this period of time, when I was asking you earlier about his mother, you had difficulty in even remembering his mother. Was that unusual?
A    Oh, yes. It was highly unusual. In most of the boys, even though they couldn't live with their families, most of the boys that lived in the residence had families that I had sessions with or I would go in a home visit with the boy, or I would have contact with the family. In fact, the two boys that were with Cory, they had families that were very involved and very concerned. But Cory's mom was very elusive. I think I met her once or twice. I mean, I knew Cory cared about her, but I didn't get any --she didn't work with us. She didn't really try to help us help Cory. And she was almost nonexistent in Cory's life, as far as I was concerned.
Q    How many times would you say during that two-year period did you actually see her?
A    I think twice.
Q    Twice?
A    Yes.
Q    Did you have occasion to contact her on the

telephone, or attempt to contact her on the telephone?

A    Absolutely.  Part of our program is to make sure that we do try to maintain relationships with the families, because long after we are out of the guys' life, we want them to have relationships with their family.  We did a lot of reaching out to Cory's mom, but she just didn't respond.

Q    You made reference to one of your quotes in here, that Cory talked about his mother as if she was a goddess.  Can you explain that to the ladies and gentlemen of the jury?

A    Well, it was hard for Cory, I think, to admit to himself, and furthermore to us, that his mom just wasn't there for him.  He wished that she would have been, but to admit it to himself and to us would have been hard.  So he acted as if his mother was terrific.  You know, and he and I would try to talk about it, but it was hard for him to admit much.  But you sensed by his behavior that he was really very hurt and that his mother wasn't all he said she was.  But she is attractive, and I think kind of interesting to be with when he was with her face-to-face, right?  So then you know, he would have those moments of being with her, and then when he wasn't with her, she was gone from him.  But it was not an area that was easy for Cory to discuss with me.  We tried, but I didn't want to push too hard.

Q    You have indicated that you were aware of a very severe learning disability with respect to Cory.  In terms of the other boys, how would you rate that or relate that?

A    Well, Cory was in a house where all the other kids went to regular classes.  So that Cory certainly was their peer when it came to the playground, playing basketball, doing things socially, but when it came to going to school they all went to Newtowne High School, but he went to special classes.  He wasn't their peer in terms of his educational level.  That was a source of distress for him.  All the other kids were mainstream, had mainstream classes.  I don't know if it is true here in Virginia, but there is also issues of kids in special ed, you know, in regular high school, and Cory was in special ed classes.

Q    At that point, would you characterize him as very susceptible to peer pressure?

A    Sure.

Q    In terms of his motivation, though, while he was at school or at the boys' residence, were you aware of a very severe learning disability?  Did he remain motivated to learn?

A    You know, it is hard.  He always tried.  But then I think when he got into  --  as you look back on the situation, maybe he was getting more and more discouraged, I think, as he was getting older.  And then the experience of Riker's in August, and then going to  --

Q    Let me stop you there.  Did you notice a change in Cory after he went to Riker's Island?

A    Well, yes.  Because then he left our residence two months after he got out of Riker's.

Q    Can you characterize that?  I mean in terms of the change, I understand he left, but did you notice

3664

a change in his attitude?

A    Well, I think he started being more difficult with the house parents and not wanting to abide by the expectations, because we had fairly clear expectations.  And so, I mean, he didn't verbalize it at the time, but looking back on it, I wonder if he didn't just say "I can't live up to these expectations, I can't do it," and so that ultimately when he left in February, it was, you know, that he didn't want to be in our residence anymore, didn't want to keep trying.

Q    Do you feel like he gave up after that?

A    Right.

Q    Threw up his hands and gave up?

A    Right.

Q    When he left, did you folks ask him to leave or did he leave on his own, or how did that happen?

A    Well, our residence was a program to help young people grow up.  We were not a rescue operation.  So if youngsters wanted our help, we would give as much as we could to help them.  And sometimes if one of the boys went home for awhile, they would come back with a renewed sense that "Hey, this is the lifestyle I want to live, this is the way I want to be."  So Cory was showing by his behavior that maybe it wasn't

3665

working out.  So he went home to his mother and we were hoping he would come back.  We wanted him to come back.

Q    Why did you feel he would come back if he went back to his mother?

A    Because then maybe he would begin to think about, well, our expectations weren't so hard, and that maybe he could build a life for himself, and that we were people who cared about him and this was a place where he could get his life together.  And so we wanted him to come back.  We were hoping he would come back.

Q    Personally, you wanted him to come back as well as the rest of the staff?

A    Absolutely.

Q    After he left, you haven't heard from him since; is that correct?

A    No.

Q    His mom, though, in fact registered a complaint against your school for sending him back home, didn't she?

A    Right.

MR. McGARVEY:  Thank you, Ms. Noble. Please answer the questions of the government.

THE COURT:  Any questions?

3666

MR. VICK:  Yes, sir.

CROSS-EXAMINATION

BY MR. VICK:

Q    It is fair to say that the environment you attempted to provide for Cory Johnson was a loving, care environment, supportive?  Correct?

A    Yes.

Q    That was your purpose.

A    Right.

Q    And Cory ultimately rejected that environment, didn't he?

A    Well, in a way, yes.

Q    Isn't it clear that that's what he did?  And I refer you to your letter of February 18th, 1987, to the Principal at Newtowne High School.  In your last two lines you say, "We felt Cory needed some time away from our residence to reconsider his behavior and attitude.  We have not heard from Cory, so it would appear he is not interested in changing his behavior and attitude and returning to the residence."  It is pretty clear when you wrote that that he had rejected that caring atmosphere that you were providing, correct?

A    I think maybe he was despairing that he couldn't do it, giving up.

3667

Q    But he walked away willingly?

A    Right.  Well, I don't know how willingly, but yes, he walked away.

Q    Did you force him out?

A    No.  Well, we said, "Your behavior has to change."

Q    But you told him he could come back, and he stayed away?

A    Yes.

Q    He didn't want what you had to offer, did he?

A    I have to say that.

Q    While he was there, he exhibited a great amount of street savvy?

A    Yes.

Q    He was socially very able with the other students, the other residents?

A    Yes.

Q    A leader of sorts?
A    Yes.  He was liked and cared about, and respected.
Q    And very interactive with them?
A    Yes.
Q    Very much able to express himself and his position?
A    Yes.

3668

Q    And very much aware of what was right and what was wrong?
A    Yes.
Q    You no indication whatsoever that he didn't know what was right as opposed to what was wrong?
A    No.  Cory knew right from wrong.
Q    In fact, he had a very good sense of what good values were, didn't he?
A    I think so, yes.
Q    Yet he was able on at least a couple of occasions there to commit robberies?
A    Well, just one occasion.
Q    Didn't he rob tennis shoes from another boy there?
A    Oh, no.  I don't think he  --
Q    I'll read you your report from September 28th, 1985.  "Cory is one of the first to speak up and was recently involved in an event in the community where his tendency to speak up caused a bit of a problem.  One of the other boys ended up getting his sneakers stolen.  When we discussed this in an emergency meeting, Cory was able to acknowledge his responsibility and help contribute money to replace the man's sneakers."
A    That didn't mean he stole the sneakers.  He

3669

spoke up.  I can't remember the details of that.  I read that in preparing for this.  But I don't think that meant that Cory stole the sneakers.
Q    He indicated his responsibility?
A    Yes.  I think it was one of the kids.  I don't remember the details.
Q    But he did go on to rob another young man with Mitch, didn't he?
A    Robbery wasn't the motive.  It was to get even, to help Mitch.  They took a watch.  The kid didn't even have a lot of money.  It wasn't like he was wealthy.
Q    Ended up taking his paycheck, too?
A    Yes.  But it was a blank paycheck.  They couldn't cash it.
Q    But they tried to take it from him, didn't they?
A    Yes.
Q    They robbed him of it, didn't they?

A    Yes.

Q    But he knew the difference between right and wrong.

A    Yes.

MR. VICK:  No further questions.

BY MR. McGARVEY:

Q    I hesitated to bring this up on direct, but Mr. Vick asked you about a loving, caring environment. You made reference in one of your reports to  --  you used the term "sadistic" in terms of the house parents or some of the house parents.  Can you explain what that meant?

A    Well, you know, child care  --  I mean, raising children is not easy.  And getting house parents who are really caring and loving and nurturing all the time is rough.  And Cory, I mean, the house parents that he had were not  --  I have worked with a lot of house parents through the years.  They were not the greatest.  They were okay, but they were not as good as many of the other cycles of house parents that I have.  So that a couple of his house parents I really didn't feel were real enlightened in terms of handling not only Cory, but some of the other boys, and could be a little bit mean and subtly sadistic in their approach to discipline and how they tried to teach the guys what was the proper way to handle a problem.

Q    Was that part of the  --  what was your responsibility with respect to the house parents vis-a-vis the kids?

A    Well, you have to be real careful not to split, you know, so if one of the boys would come and say, "Ms. Noble, John is," so on, complain, my role is to try to help them go back to the house parent and resolve it with the house parents.  Because even if I couldn't have a great relationship with the house parents, sometimes the youngsters themselves could find a way to work things out.  I would always send them back to the house parent and then maybe indirectly we would talk about it in a staff meeting, to try to get the house parent to see a different approach might work or something else might work. But as tempting as it was, I never could really take the side of the youngsters.  I would always have to send them back to the house parent to try to resolve whatever problem they might have, unless it was, you know, unless the house parent did something immoral or illegal.  Then it would be a different answer.

Q    So in terms of what Mr. Vick asked you about, the loving and caring environment, in fact Cory had voiced some displeasure, in fact a lot of displeasure with some of these house parents; and in fact, you

were constrained to side with the house parents.  Is that correct?

A    Yes.  For the sake of the guys.

Q    I understand that.

3672

MR. McGARVEY:  Thank you.

THE COURT:  You may stand down, ma'am.

(Witness stood aside.)

Call your next witness.

MR. COOLEY:  We recall Dr. Cornell.

DR. DEWEY CORNELL,

recalled as a witness by and on behalf of defendant Johnson, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COOLEY:

Q    Dr. Cornell, you obviously were previously sworn, and I would ask you to continue, if you would.  I want to ask you about your reliance on Cory as a source of information for the report and the exhibits that you have prepared.

A    Okay.

Q    How much did you rely on what Cory told you?

A    Well, I never completely rely on what a defendant tells me.  Defendants may well be motivated to present themselves in the most favorable light, so as much as is practically possible, I try to confirm or disconfirm whatever I am told through collateral sources of information.

Q    Did you have any doubts about the things when

3673

Cory talked with you?  Did you have doubts about what he was telling you?  And if so, can you be somewhat specific about them?

A    There were several points which I doubted what he was telling me.  He told me he was very well adjusted while he was at the Pleasantville Cottage School, for example.  And initially, I was skeptical of that.  And I went to great lengths to try to confirm that and find out if in fact that was not the case.  I found out that he was in fact telling me the truth.  I also didn't think he was being completely forthcoming about his mother.  He initially described her in very glowing terms, which also didn't seem plausible to me given the problems that he had.

Q    Did he tell you that she was very devoted and very loving?

A    Yes.

Q    That sort of thing?

A    Yes.  Devoted, loving, responsible, always taking him places, doing things for him.  He described her as a kind of an ideal mother.  I mean, it didn't seem plausible to me.

Q    And when you began to check it, of course that

did not pan out.

A    That's right.  And I went back and talked with

3674

him subsequently when I had records and further information, and he was willing to acknowledge a little bit, that there were areas in which his mother was a disappointment to him.  When I interviewed the mother, also, I also was able to confirm my impression of her.

Q    If we can, I'm going to turn your attention to the area of learning disability.  I'm going to ask you, if you would, to somewhat briefly describe to the ladies and gentlemen what is involved when we talk about a learning disability.  Make reference to this.

MR. COOLEY:  This will be, ladies and gentlemen and Your Honor, this will be the second green tab in the book.

BY MR. COOLEY:

A    In a nutshell, learning disability is a form of impairment in the brain that affects the person's ability to learn.  A person might have adequate intelligence, they might have adequate motivation, but because of some defect in their ability to use language or understand language, or process language, they are impaired in some academic area.  It may be one area or it may be multiple areas.  In Cory's case, reading and spelling were the main areas.  This

3675

term "learning disability" is a fairly broad term. It is used sometimes to describe pretty mild conditions.

In Cory's case, it is a severe learning disability.  Sometimes the term dyslexia is used for individuals who have a specific reading disability. Sometimes the term minimal brain dysfunction or developmental aphasia, those are all terms that are used somewhat interchangeably.  The federal definition of learning disability of 1977, which I included in here, is one that sort of pulls all those terms together and gives a more general definition of learning disability.  It also points out that this is not because the person is mentally retarded or has emotional disturbance or who has economic disadvantage.  It is a defect in the basic psychological process of using or interpreting or understanding language.  There is a second definition that's also used in the field on the next page.  The National Joint Committee for Learning Disabilities. It echoes very much the federal definition.  It also adds to it; that these individuals may have problems in their social behavior, not just in reading and writing, but they may not be able to perceive and interact socially in a normal fashion as well, even

3676

though that's not a learning disability by itself.
But that seems to be a secondary problem.
It also points out that you can be learning disabled and mentally retarded and/or emotionally disturbed in addition. You can have more than one problem. Those two definitions are the definitions I use and that are the generally-accepted definitions in the field of learning disability.

Q    What causes a learning disability like Cory's?

A    Well, there are probably multiple causes of learning disability, anything that can damage the brain or impair the brain. This may be genetic. Certainly there is research which finds that learning disabilities run in families. Anything toxic to the brain, particularly drug use by a mother during pregnancy, can be a factor, or a head injury sustained at some point in life. But we don't know all of the different causes or the different ways in which the brain can be injured to produce a learning disability. And we don't know what was the cause in Cory's case.

Q    Certainly it is not a voluntary thing, not something one says "I want this," or "I don't want this." It is not something that can be discarded?

A    Right. Correct.

3677

Q    Now, when was Cory first diagnosed as learning disabled?

A    To my knowledge, when he was 13 when he went to the Pleasantville Diagnostic Center.

Q    I refer you to the yellow tab, the fifth page of your mitigation report, and I'm somewhat rapidly going to move you through that. But on page five of that report in the yellow tab, the last  --  the first yellow tab, pardon me. The last three paragraphs contain comments made by various psychiatrists or psychologists in his case. The first of those was from John Stadler. He stated Cory was a remarkably peaceful kid trying very hard to do better. And this is a quote:  "He had a terrible neurological impairment to learning and though he wanted to learn, he couldn't."  And Dr. Stadler felt that Cory did very well in a structured setting, "but like many boys like him, I imagine he is very susceptible to his environment."
That is a quote from the reports; is that correct?

A    Yes. That's a quote that he said to me. He stated to me.

Q    Stated to you.

A    Yes.

3678

Q    All right. And he did express some regret that

Pleasantville didn't have some of the resources to address Cory's problems; is that correct?

A    Yes.  He expressed regret about that.

Q    You spoke with Dr. Elizabeth Clemmens; is that correct?

A    Yes.

Q    She described that Cory is a severely learning-disabled boy who became very frustrated when he did not receive the remedial help in speech therapy that he was promised?

A    Yes.

Q    She felt he was right to feel frustrated.

A    Yes.

Q    Because of the limitations and those things that were not being addressed.

A    Yes.

Q    You also spoke with Dr. Ken Barish, and he described to you and recalled Cory and described Cory to you as one of the most severe cases of learning disability he has ever encountered.

A    That's right.

Q    And that his impairment was so severe and so pervasive in his cognitive processes that Cory was unable to learn how to compensate for his problems

3679

like other learning-disabled children.

A    That's correct.

Q    In other words, that even other disabled children, learning disabled, could learn to do things Cory simply could not do and he was not able to compensate for that.

A    That's correct.

Q    Indeed, when he gives lectures, he cites Cory's case in his lectures as an example of that type of severe disability.

A    He, for example, recalled that when he asked Cory to spell the word arm, A-R-M, that Cory replied H-M-E as his spelling for arm.  And I have, too, in my evaluation found those kinds of spelling problems.

Q    And he also felt that there was absolutely no question in his mind that Cory's disability was a result of neurological impairment.

A    He had no question about that.

Q    You have testified now that Cory has this learning disability.  That's obvious from the reports that are before the ladies and gentlemen of the jury.

    Is there further documentation of that coming from a more recent test?

3680

A    As you might imagine, I'm trying to be thorough about this.  And in fact, I gave him my own set of tests to confirm that this learning disability was

still present and that I would arrive at the same diagnosis based on my own sources of information. So I went back and conducted my own psychological testing of Cory.

Q    Now, these would be found behind the white tab in the book; is that correct?

A    Yes.

Q    And there are some blown-up  -- Marshal, could you help me?

(Documents displayed on easel before jury.)

BY MR. COOLEY:

Q    Doctor, can you tell the ladies and gentlemen of the jury the results of your tests?  And they have before them in an expanded version, blown-up version, the graph.

A    Yes.  I'll try to be brief about this.  First, I wanted to document his level of intelligence.  I gave him the standard individual intelligence test called the Wechsler Adult Intelligence Scale-Revised Version.  It is a standard test for adults to assess their intelligence.  He had been previously given the children's version of that test when he was younger.

This test is composed of a number of sub-tests that are listed here: information, digit span, vocabulary, and so on.  And those scores are combined to give you the person's IQ.  You expect that on each of these tests, the average score is a 10.  That is, the person right at the fiftieth percentile, right in the middle of the population in his age group, would attain a 10 sub-test score.  The average person gets a 10, sometimes you get a 9, 11, 12.  You vary a little bit around 10 as a big point.

Obviously, a very bright person gets scores over 10, and a less intelligent person gets scores much lower than 10.  In Cory's case, you will see he started off getting 5's and 6's in all of these first set of tests.  Those are consistent with someone who is mildly retarded.  That is, if he had continued to get that pattern of 5's and 6's on all his tests he would have scored in the retarded range.  Those initial tests, the first ones that are listed there where he got the 5's and 6's, are all of the verbal tests, the language tests, vocabulary, arithmetic, comprehension, all things that involve use of language.

The latter tests where he started to score higher are the nonverbal tests, sometimes called the performance tests.  These are tests that involve puzzles, blocks, things that he does with his hands.  You will recall he had some carpentry training that probably enhanced his skills in that area.  And in those areas, he did better.  And actually, on one of

them he got a 10, which would be the average expected score for a normal individual.

Because these latter scores were higher, his overall IQ fell above the range of mental retardation, just above that range.

(Another document displayed on easel.)

BY MR. COOLEY:

Q    The next to the last page in that section is a bar graph that is entitled "Reading and Math Scores."  Would you tell the ladies and gentlemen of the jury very briefly what that entails and what that shows us?

A    I gave him an intelligence test, but also gave him an achievement test.  Again, I gave him the standard individually-administered achievement test, the Woodcock-Johnson Test of Achievement.  This is a test.  Actually, I didn't give him the entire test.  There are 20-some parts to this test.  But I gave him specifically the tests in reading, two tests in reading and two tests in math, identification, and

3683

comprehension.  Identification is his ability to identify a word -- identify words.  He is presented a word, has to be able to pronounce what that word is to show he can identify it.  In Comprehension, he has to be able to comprehend the meaning of a sentence and choose the correct word to complete a sentence.  Those turn out to be too easily objectively scored tests of reading ability.  On both of those he scored at the second-grade level, a 2.4 means at the second-grade level, a 2.6 also is at the second-grade level.

In the area of mathematics.  The first is calculation, which is ability to do arithmetic problems: addition, subtraction, division, multiplication.  And there he scored at the sixth-grade level, 6.7.  He also had applied problems, which are kind of common sense word problems, such as how much change should you get back if you are buying something that costs a certain amount of money, so forth.  That's sort of a practical arithmetic skill.  There he was at the fourth-grade level.  So certainly, the second-grade scores in reading were very consistent with what he had obtained when he was a teenager.  The somewhat higher scores reflect the fact that he was able to do

3684

somewhat better in arithmetic, although obviously still a very low level.

Q    Finally, the last bar graph, the last page of that section, is labeled "Intelligence and Achievement."  Can you tell the ladies and gentlemen of the jury what that represents?

A    This bar puts together those two tests.  That

is, we look at someone's intelligence and look at their achievement and see if they correspond.  We expect that a person's achievement should be commensurate with their intelligence.  That is, even if you have got low intelligence, you ought to achieve up to the level of your intelligence.  Now, if you look here on just the right-hand side, you will see where it says "Math."  The black bar graph where it says 100, that's the expected level that the average person at the 50th percentile would get in both intelligence and achievement.  So that's sort of our standard.  In intelligence he gets a 77.  That was his IQ result.  That's clearly well below average.  It is close to the level of mental retardation.  In math he gets a 77.  If I take those grade-level scores and I can look them up in a table and transform them into a standard score, he gets a 77.  So his math level is equivalent, exactly

3685

equivalent, to what his intellectual level is.  That to me is an indication that he is not learning disabled in math.  He is low in math, but he is at the level you would expect, given his intelligence.

If we look on the left, those three bars are not even.  We have the 100 standard bar that's black on the left, and he has a 77, which is the same intelligence score.  But then his reading is 53. That is, if you transform that second-grade reading level into a standard score, it is a standard score of 53.  And that is clearly in the mentally retarded range, in the moderately retarded range, actually. So that we cannot only see in this graph that his general intelligence is low, but his ability to learn in the area of reading is lower still.  So a person can be both mentally retarded and learning disabled. In his case, he is very low in general intelligence, although not retarded, and learning disabled.

Q    Doctor, also, I believe you did a test in the course of this relating to Cory's writing.

(Document displayed on easel.)

A    I gave him a standard test of his ability to write, a test of written language, TOWL, the part of the test that is most commonly used.  The person is given a picture.  You see this outer-space scene.

3686

And the young person is asked to make up a story to go with the picture.  They are given 15 minutes to write up a story.  Then you evaluate the story for its vocabulary, spelling, grammar, for its complexity of the themes that are presented, and this is the story that Cory gave me to this picture.  This was very striking to me because this story is very immature.  The writing is very immature.  The spelling is very immature, leaving aside the

penmanship.

Q    This is reprinted in the book before the ladies and gentlemen.  It is the fourth page back in behind the white tab.  And the third page back is your findings related to that; is that right?  And it also includes your typed-out interpretation of what Cory wrote.

A    Yes, I typed out what I thought he wrote.  There were a couple words I couldn't decipher, but I typed out the story which you can read and see is a very immature story.  And then below that, I have listed the scores that he received for this story, and the typical age level of someone who writes a story of that type.

Q    He begins his story with "Me and my mom."

A    You want me to read that?

Q    Well --

MR. VICK:  It is all in front of the jury.

MR. COOLEY:  I'm not going to use it.

THE COURT:  All right.  Go on.

BY MR. COOLEY:

Q    But the story was about Cory and his mother going to the moon?

A    That's right.  He chose to tell a story about he and his mother going on a trip together to see the rockets.

Q    And obviously there was more space, but he ended where he did.

A    Yes.  His story was a little short for someone of his age.

Q    Now, Doctor, you also had an opportunity to refer Cory for evaluation by Dr. Peck; you made some reference to that.  Dr. Peck is a neuropsychologist.  His report is found behind the pink tab in the book.  And I will ask you to somewhat rapidly summarize what the findings from Dr. Peck showed.

A    I gave intelligence and achievement.  I asked Dr. Peck to give him neuropsychological tests, which are sensitive to brain damage, to see if we could identify specific areas of brain impairment or dysfunction.  These tests are commonly given when someone has had a head injury or has  --  there is reason to believe that they have had some kind of brain impairment.  They are very technical tests.  There is a large number of them.  Nobody is expected to do poorly on all of them; that is, they tap as many areas of brain functioning as we have tests for, everything from abstract reasoning to fine motor coordination, visual motor coordination, auditory processing, lots of different areas.

And what Dr. Peck found is that Cory's performance indicated abnormal neuropsychological

functioning.  That is, it did indicate impairment, brain impairment, in a number of areas.  First of all, he found that he had impairment in visual memory, memory for things he sees, and visual sequencing.  That is, the ability to keep things in proper order sequentially, visually.  Now, if you think about reading, those are two critical skills.  You have to keep the letters in the proper order and the words in the proper order, and you have to be able to remember what words are, how they are spelled and so forth, in order to read.  He has deficits in both those areas.

In addition, Dr. Peck found that he had deficits in auditory processing.  That is, often, if somebody

3689

can't read and they have visual problems, you try to teach them auditorily through the spoken word.  But he has deficits in auditory discrimination; that is, the ability to listen and understand what is said to him.  At the end of this complicated report that Dr. Peck has written, he points out that this kind of person could have difficulty understanding what people are saying, and that that could create social and interpersonal difficulties for him.  He doesn't quite understand when people are arguing with him or talking with him, what they are saying and what their intention is, and he doesn't have good skills in that area.  Abstract reasoning and judgment were poor.  For example, on the category test, which is a highly sensitive test to brain impairment, he shows inflexible thinking; that is, kind of approach to problems where he cannot shift from one approach to another approach.  He cannot, when he is making an error or making a mistake in solving a problem, he does not show the ability to recognize a mistake and to shift from that mistake to another strategy.  He tends to persist in a poor strategy of solving problems.

So in a number of different areas, he shows neuropsychological impairment.  Not all areas.

3690

Rarely does anyone show impairment in all areas.  But he shows impairment in quite a number of them.

Q    If I could, I would move your attention to the concept of mental retardation.  I would ask you to look at this last chart that's being displayed to the jury.  Can you tell the ladies and gentlemen of the jury what they are being shown at this point?  And this would be the last page behind the second green tab, the definition of mental retardation.

A    Yes.

Q    What does the term mean?

A    Mental retardation means that the person has significantly sub-average intelligence which can be

measured by a general intelligence test, as well as impairment in adaptive behavior. Adaptive behavior means their ability to sort of function in every day life; to have practical intelligence, if you will, and good survival skills. And you can measure the first part by giving them an intelligence test. Individuals that fall in the range of 70 to 75 can be considered in the range of mental retardation. And then of course, anything lower than that indicates mental retardation. In addition to having low intelligence, you need to show that the person has impaired adaptive behavior in any two of about ten areas that are listed there. Certainly functional academics, the ability to do academic work is one in which he has impairment. Also, communication deficits with his speech impairment and communication problems, he has some deficits there. Self care, social skills, work, the ability to maintain a job, to have good work habits, to use the kind of common sense you need to hold a job, all of those are possible areas in which his functioning is not at a normal level. As I said before, my conclusion was that he is just above the level of mental retardation.

Q    And Doctor, when you made that, reached that conclusion, you were aware that if he could be categorized as mentally retarded, that Cory would not be death-eligible under the statute; is that right?

A    Yes. I realized this was a very serious issue. The law states very specifically that if he were mentally retarded, we would not have this sentencing hearing for the death penalty. So I checked my scores, went back, and saw him a second time. I consulted with colleagues. I wanted to make very sure that this was an accurate score. Because the definition of mental retardation is not a hard and fast absolute. It is a gray area. And people have stereotypes of mental retardation as someone who looks very impaired and looks unusual and so forth. But in fact, many mentally-retarded people look very normal and can function fairly well in daily life. So I did not very easily reach this conclusion that he is just above the level of mental retardation.

Q    And exactly where is he? How close is he to being mentally retarded?

A    The IQ score I got was 77. If he had gotten a 75, he would be within the range that counts as mental retardation. 70 to 75 is kind of the gray area. If you are in that area, you can be mildly retarded. He was two points above that, which is a matter of one or two questions on an intelligence test that would make the difference there.

Q     Doctor, would it be fair to say that most mentally-retarded folks are only mildly retarded?
A     Yes.  There is a social stereotype we have of the retarded person that really is of the more seriously retarded person.  We used to think that everybody who was mentally retarded would have to be put in an institution and they could never live on their own or function or hold a job.  In fact, if you put people in institutions they will become institutionalized and sort of look and function that way.
      We now know that a mildly retarded person can be educated up to about the sixth-grade level.  We know that a mildly retarded person can hold a job if they have good training, if it is a structured job, if they have good supervision.  We know that many mildly retarded people get married, live on their own, pay their bills, have families.  So we know that mild mental retardation doesn't mean that the person is completely dysfunctional, the way that you might characterize it on television, but has some capabilities.  And so I had to compare that to Cory.
Q     On some tests Cory was given by you and on some of the tests he was given by the folks at Pleasantville Cottage School back in his adolescent years, Cory in fact scored in the mentally retarded range, did he not?
A     Yes.
Q     And would it be fair to say that in some areas, Cory functions on the same level as someone who is mentally retarded?
A     That's correct.
Q     And is it fair to say that because of his intellectual limitations, that Cory Johnson has impaired ability to reason?
A     Yes.
Q     Would it be fair to say that Cory Johnson has an impaired ability to use good judgment to control his behavior?
A     Absolutely.
Q     Would it be fair to say that Cory Johnson has impaired ability to understand and foresee the consequences of his actions?
A     He has impairment in that area, yes.
Q     Is there anything in the scientific literature on mental retardation about individuals with these limitations committing illegal acts?
A     Yes.  It is not uncommon for individuals who are mildly retarded to commit illegal acts.  We find, in part of assessing their adaptive behavior, that very commonly they do break the law.  They use poor judgment.  They don't have good self control.  And

they do break the law.

Q    Is it the case that mentally retarded individuals are often very dependent on others and tend to rely on others in the decisions they make?

A    Yes.  That's one of the factors you have to consider, because part of the limitation is that the person then is more vulnerable to what other people tell them to do or suggest that they do, or look for

3695

cues in what other people are doing and try to fake it, emulate them.  And individuals with severe intellectual deficits are very susceptible to that kind of pressure.

Q    And while Cory Johnson is technically not mentally retarded, because he does have these similar intellectual limitations, would it be fair to say that he may be overly dependent on others and tend to rely on others for decisions?

A    Yes.

Q    Is it not the case that mentally retarded individuals are often overly susceptible to influence by others, doing what others direct them to do?

A    That's a standard part of when you evaluate anyone who is mentally retarded; you expect that that problem is going to be present to some degree, and it usually is.

Q    Part of their brain impairment is impairment in the ability to use independent judgment when somebody wants them to do something.

A    Yes.  And to foresee future consequences of actions.  That is, you can put a mildly retarded person and give them a very structured question, a very specific situation, and they can sort of give you the right answer.  But then you put them in a

3696

different situation when they are in a different emotional state and they don't give you the right answer anymore.  They don't use the same level of judgment.  They are variable in their level of functioning.

Q    Would it be fair to say with the limitations that Cory Johnson has, as you and the other professionals and the reports have indicated, would it be fair to say that he, too, could be lacking in independent judgment and susceptible to being influenced by others?

A    To some degree, yes.  He would have to be.

Q    Does learning ability only affect ability to read and write or to do other kinds of schoolwork?

A    No.  That term is used because that's where it is first identified, but there is more to it.

Q    Is that just your opinion?

A    No, it is not.  If you take any standard textbook on learning disability, Handbook of Learning

Disabilities, the Kaufmann textbook on learning disabilities, any standard textbook will have a chapter or chapters on the non-academic problems that learning-disabled children and young adults have. That is, they have social problems. They don't judge and reason well in social situations. They have very

3697

poor self-esteem. They are much more prone to get involved in delinquent activity. In fact, that's a whole research area. Delinquency and learning disability are linked.

Q    Why would learning disability have anything to do with someone getting involved with criminal behavior?

A    What you find is that the deficit that they have that affects their ability to learn also affects their judgment, their ability to control their behavior, and to foresee the consequences of their action. In my own research with violent delinquent youth, they consistently have verbal deficits. That is, their IQ is consistently lower in those verbal areas. They don't reason well. And we rely on language to a large extent to guide our behavior and to tell us right from wrong and to tell us "Wait a minute, think about this, consider some other course of action." If you have deficits in language, those whole steps in the reasoning process get aborted, get skipped.

Q    And your findings that folks with these learning disabilities may well gravitate to that or be more susceptible to that, is that also consistent with the other studies in the field?

3698

A    Yes. There are a number of studies in the field which find that having a learning disability makes one at risk to become involved as a delinquent in anti-social and criminal behavior. And if you were to assess -- I'm doing a study right now in which we are assessing individuals at Staunton State Prison. There is a high incidence of learning disabilities in this general population.

Q    Now, Doctor, you have spent several hours here talking with these ladies and gentlemen describing Cory's learning disability and his background. I am going to ask you again, do the things that you have brought forward in your mind, was there an effort to excuse the acts for which Cory has been convicted?

A    No. And this is very important to me to make this distinction. I don't want any of my testimony to be construed that I am condoning what he is doing or minimizing what the crimes are that he has been convicted of. I am only here to inform the jury and address the very specific issue of whether he has complete blameworthiness that would indicate that he

would receive a death sentence as opposed to life in prison without parole.  And I would be very uncomfortable presenting my testimony under any other basis than that, that narrow basis.

3699

Q    Doctor, the factors that you have described, do they make -- do they, in fact, make Cory Johnson less responsible for his actions --
        MR. VICK:  That's the jury's ultimate province.
        THE COURT:  He can answer the question.
BY MR. COOLEY:
Q    -- than a person who has full cognitive skills?
A    I would have to say they make him less than normal.  They make him substantially less than normal.  They impair his judgment, his ability to control his actions, foresee the consequences of his actions.  I don't think they excuse his behavior.  I don't think that means he does not know that things are wrong, that killing is wrong, and that drug dealing is wrong.  I have to leave it to the jury to make the value judgment of how much to weigh that and what to do with that.  I believe it does make him not a normal individual, not as responsible as the ordinary citizen.
        MR. COOLEY: Thank you.  Answer any questions of the government.
                CROSS-EXAMINATION
BY MR. VICK:
Q    Good afternoon.  As I understand your testimony,

3700

you have spent a total of some 15 hours, approximately, with Cory Johnson interviewing him concerning the subject of your testimony here this afternoon.
A    Yes.
Q    Indeed, you went into great detail with him concerning his involvement in crime.
A    Yes, I did.
Q    He detailed that to you in an open, candid manner?
A    Surprisingly open, yes.
Q    He detailed extensive criminal involvement on his part?
A    He detailed extensive drug dealing.
Q    Throughout this, it is clear, is it not, that he knew exactly what he was doing when he was dealing drugs?
A    He knew that it was wrong to deal drugs, yes.
Q    The ladies and gentlemen of the jury have heard several weeks of testimony which outlined a structure to this drug dealing; that is, Cory Johnson, other people involved here, maintained a level of supervision and organization and had people working

for them.  That indeed is inconsistent with someone who is mentally retarded, isn't it?

3701

A    I don't think Cory was pulling strings and giving orders and directing people around.

Q    That's based upon your testing of him?

A    And the review of records.  My complete evaluation.

Q    You weren't out there on the street with him, so you really don't have any idea?

A    That's correct.  I wasn't out on the street with him.

Q    If the testimony was that indeed Cory was one of the people who organized and supervised people to distribute drugs, that's inconsistent with mild mental retardation, or close to it?

A    I would be very skeptical of that, yes.

Q    Indeed, when you gave these tests to Cory Johnson and you came up with a mental -- with an IQ, he knew he was being tested for this very testimony in Court, if indeed he happened to be found guilty and was facing the death penalty.

A    I don't think his understanding was as specific as that.

Q    He didn't know you were testing him in an effort -- so that you could testify for him in the death penalty phase of this case?

A    He did know that, yes.

3702

Q    Very simply, he did know that.

A    Yes.

Q    All right.  The testing that had been done previously shows a different IQ than that for Mr. Cory Johnson, doesn't it?

A    As is always the case in testing, there are some scores higher and some lower.  Mine is in the middle.

Q    Indeed, Dr. Gallaudet, I believe, gave him a full scale IQ of 88, a performance IQ of 93, in 1982.

A    When he was 13 years old, yes.

Q    That's in the very normal range of IQ, isn't it?

A    No, that's in the low average.

Q    Average.

A    For some areas that were deficient, yes.

Q    Indeed, you have quoted here extensively the test given by Dr. Barish which resulted in his appearing to be mildly retarded in some categories, correct?

A    Yes.

Q    In that same report he goes on to say that Cory's very deficient score on the block design subtest is the result of several rotations of design

3703

that he easily corrected when his error was pointed
out to him.  These scores should therefore not be
taken as an indication of Cory's intellectual
potential.

A    Of his potential, that's correct.  It is common
for brain-damaged individuals to rotate the designs,
and then after somebody else points out the rotation
they say, "Oh, yes, it is rotated," and then fix it.

Q    But his  --

MR. COOLEY:  I would ask he be allowed to
finish.

THE COURT:  Sustained.

BY MR. VICK:

Q    Were you finished?

A    What I wanted to say about that, I think you are
misinterpreting that particular sentence.  The fact
that he was able to recognize that he had rotated the
design is very commonly found in brain-damaged
individuals.  It doesn't mean that he wasn't trying
hard, and it doesn't mean that he actually is smarter
than that.  What it means is that that was another
indication that he had the kind of deficit of a
brain-damaged person.

Q    Intellectual potential is another way of saying
IQ, isn't it?

3704

A    Not really.

Q    What did the doctor mean when he said, "These
scores should not therefore be taken as an indication
of his intellectual potential"?

A    He is trying to be as optimistic as he can about
a very difficult situation.

Q    IQ is only one of a number of factors that are
to be considered when determining whether someone is
mentally retarded or not?

A    That's probably the main one and first one, but
it is not the only factor.

Q    In fact, before the jury, I believe, there are a
number of other factors that go into that.

A    Adaptive behavior is the other.

Q    Socialization?  Is that another way of putting
that?  His ability to get along with others?

A    No.  Not the ability to get along with other
people, no.

Q    Did you happen to be in the courtroom during the
testimony of Ms. Odette Noble?

A    I came in in the middle of her testimony.

Q    Did you hear the portion of her testimony that
indeed Cory Johnson was a leader of sorts in the
residence that she ran?

A    Well, not only did I hear that, but I asked her

3705

about it when I interviewed her over the phone, and

then talked with her about it again today to understand what she meant by that.

Q    Very able to express himself verbally to the others, very able to take care of himself?

A    They said he was a big talker, that he was the first one to adopt new styles on the street, such as hair styles and clothing styles.  I think trend-setter is probably a better term in terms of what she described.  I asked her specifically whether he was a leader in terms of ability to initiate and carry out criminal activity, because that's really the issue I'm concerned about.  And what she said, which I put in my report, I quoted her in my report because I thought that was important.  She said Cory wouldn't be the leader because he wouldn't have the brains, but he would be the point man.  He would be the one to stand up and do the speaking, he wanted to belong so much.  That was my impression.  That if somebody says, "Cory, go do something," he might be the first one to go do it, because he is trying so hard to do what the other person wants him to do.  That's a different sense of the term "leader" than I thought you had in mind.

Q    But he was able to socialize and express himself

3706

and tell the other people in the residence exactly what was going on in his mind, correct?

A    He would express himself, apparently, a lot in the group therapy meetings.

Q    In fact, throughout his Mt. Pleasant Cottage stay, that was a consistent theme.  He is able to handle himself very well verbally, isn't he?

A    He has speech articulation problems.  But he has no reluctance to express himself, to try to say what is on his mind.

Q    In fact, Dr. Peck found that he was in the superior range, structure, as to word fluency.  He scored at the 85th percentile.

A    He could come up with words and say a lot of words one after another, and was not reluctant at all to give a series of words.

Q    That's inconsistent with mental retardation, too, isn't it?

A    Not inconsistent with mental retardation.

Q    It would be a factor that would tend to make you think he was not mentally retarded, isn't it?

A    No.  It is not in the mentally retarded range.  But even someone who is mildly retarded is not retarded in every single area of their functioning.  And there are mentally retarded kids who are very

3707

verbal, who talk a lot, who talk and chatter all the time.  There are others who say very little.  It varies.

Q    There is no doubt Cory is able to express himself and tell you where he stands.
A    I would agree with that.
Q    And socialize to the point of being a peer in a group of people?
A    He is very talkative socially.
Q    If the testimony that this jury has heard over the last several weeks is that he has indeed been one of these people who organized others to work below him selling drugs, it is consistent with that, isn't it?
A    What do you mean by "organized others"?
Q    Just that.  Organized other people to sell drugs.
        MR. COOLEY:  I am not sure he is correct. The government gave a very specific definition of "organized."  So to say it is in its normal sense --
        THE COURT:  Mr. Vick, I don't know how helpful it is to tell this witness about all that we have heard and get his estimation of it.  Go ahead and ask your questions, but hurry up.

3708

BY MR. VICK:
Q    His ability to verbalize himself is very consistent with an ability to organize people to work for him, wouldn't it be?
A    No.  I think he has the ability to abstractly decide what people should do and to give them commands and to foresee what the consequences are of their actions.  When you talk about organize and to be in a leadership position, I think you have got to be able to say, "I want you to do X, Y, and Z because I think this will happen or that will happen."  Now, just being able to talk to somebody and express your views to somebody, I think, is very short of that.
Q    You are saying he would be incapable of saying to someone, for example, "I want you to take me to a certain residence because there is something I want to do there"?
A    To that limited degree, I don't think that would be a problem.
Q    He could make those decisions?
A    He could say, "Take me somewhere, I want to go somewhere," sure.
Q    "I want to kill somebody because they bothered me"?
A    I think he could say that.

3709

Q    He also could hold a job, couldn't he?
A    Well, I have doubts about that.
Q    Your own report indicates that he held a job and walked away from it.
A    He held jobs during the Summer Youth Corps.  He

also held a job apparently, for a brief time, at a grocery store, and apparently on a loading dock.  But the fact that he could not maintain those jobs is why I'm not sure he can hold a job.

Q    People who have low intelligence don't necessarily all resort to criminal behavior, do they?

A    You are quite right about that.

Q    And people, you are certainly not excusing his  --  you are not saying his low intelligence is an excuse for his resorting to criminal behavior?

A    That's correct.

Q    People who have low intelligence certainly don't resort, all of them, to violent activity, do they?

A    Well, more so than a normal person.

Q    My question is  --

A    But not the overwhelming majority.

Q    As I understand your testimony, he is very suggestible?

A    I would qualify that a little bit.  But he is suggestible.

Q    And susceptible to pressure?

A    To his environment.

Q    If that has resulted in the past in his committing very violent acts, does that mean that that sort of pressure  --

        MR. McGARVEY:  I object.

        THE COURT:  The objection is sustained.

        MR. McGARVEY:  Thank you.

BY MR. VICK:

Q    In jail, do you think he will be susceptible to peer pressure?

        MR. McGARVEY:  Same objection.

        THE COURT:  Sustained.

        MR. VICK:  Beg the Court's indulgence.

    (Counsel conferring with co-counsel.)

    I have no further questions.

        THE COURT:  All right.  May the witness stand down?

        MR. COOLEY:  He may, Your Honor.

    (Witness stood aside.)

    Mr. Cooley, call your next witness.

        MR. COOLEY:  We don't have any more witnesses.  There is one matter we may want to seek regarding a potential stipulation.

    (At Bench.)

        MR. COOLEY:  The only other thing we have is we would want to put in as part of our case the stipulation that I believe Mr. Baugh has filed regarding Jerry Gaiters, the fact that he was not death-eligible under that conviction.

        MR. VICK:  We never sought the death

penalty against him, never intended to seek the death penalty against him prior to his pleading guilty.

MR. COOLEY:  I'm not disputing that.

MR. VICK:  I don't think this is the stipulation.  Jerry Gaiters was charged in the indictment, and we have ample evidence to argue that he was not death-eligible.

MR. BAUGH:  As we obviously tell the United States in the position that it did not qualify him to be, we would submit that the Court, as a matter of law, must acknowledge that it was not an issue in controversy that can be argued to the jury to decide one way or the other.  As a matter of law, Mr. Gaiters pled guilty to 848 death penalty charges, and they didn't move for the death penalty.  Therefore, he would not get the death penalty.  That's a matter of law.

THE COURT:  No.  It is just not something that I want to get involved in.  You all can argue that to the jury or Mr. Vick can state it.

MR. BAUGH:  We object.

THE COURT:  I understand.

MR. COOLEY:  Judge, respectfully, I would move into evidence the book, the mitigation book.  And we will obviously have no objection if the Court wants to allow a sufficient number of copies to go to the jury.

THE COURT:  All right.

MR. COOLEY:  With the possible exception of wanting to join in and adopt the testimony of a witness relating to the discussion we just had at the bar conference, defendant Johnson rests at this time.

MR. VICK:  We obviously have no objection to that going in.

(In Open Court.)

THE COURT:  All right.

Ladies and gentlemen, that completes Mr. Johnson's mitigation presentation.  I need to give you all some direction about how things are going to proceed.  I need to tell you today so that you all can make some planning.  Some of you may not like this very much, but I have decided, in consultation with the lawyers, that this is the better course to proceed on and this is what we are going to do.

We now know that tomorrow we will hear from Mr. Roane, his mitigation case.  That should take up the better part of tomorrow.  Then we would have our instructions conference to go through, then we would have the arguments to you on the penalty phase, which would probably start on Friday morning.  And then, of course, I will give the instructions.

If that time line follows as we expect it to, you would then, therefore, get the case to start your deliberations in this phase Friday afternoon.  Early, late, somewhere in the afternoon on Friday.

Now, once you start to deliberate on this phase, we are going to keep you until you have finished deliberating.  What that means for you practically is when you come here on Friday, I want you to pack a little bag as though you may be staying for two or three days.  Because we will keep you Friday night at a hotel, and we will bring you back in and start your deliberations again on Saturday.  You would deliberate during the course of Saturday.  And if your deliberations are not complete, we will keep you until it is over.  So Friday when you come here, come prepared to stay for a couple of days.  We will explain in more particularity through the Marshals how this all will be handled.  But I wanted you to know that now so you can start to make your preparations.  I've held off on this as long as I can.

All right, we will see you tomorrow morning at 10 o'clock.

(The jury left the courtroom.)

Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

All right.  We will be in adjournment until 10:00 a.m.

(Proceedings adjourned at 3:35 p.m.)